Kristin A. Linsley (#154148)
  klinsley@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center #2600
San Francisco, CA  94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

Jay P. Srinivasan (#181471)
  jsrinivasan@gibsondunn.com
Bradley J. Hamburger (#266916)
  bhamburger@gibsondunn.com
Samuel Eckman (#308923)
  seckman@gibsondunn.com
Alexander N. Harris (#278482)
  aharris@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grande Ave.
Los Angeles, CA  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

*Attorneys for Plaintiff RealPage, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALPAGE, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>THE CITY OF BERKELEY, CALIFORNIA, and PAUL BUDDENHAGEN, CITY MANAGER OF BERKELEY, CALIFORNIA, in his official capacity,<br><br>                    Defendants. | **CASE NO.**    25-cv-3004<br><br>**COMPLAINT** |

**INTRODUCTION**

1.      This case is about a sweeping and unconstitutional ban on lawful speech specifically intended to outlaw software products developed and sold by companies like Plaintiff RealPage, Inc. that provide information and advice to owners and managers of rental properties.  On March 25, 2025, the City of Berkeley, California enacted an ordinance that would expressly prohibit certain types of lawful speech about the residential rental market.  *See* Berkeley Municipal Code Chapter 13.63 (Ex. 1), https://tinyurl.com/3uuefv52 (the "Ordinance").  Specifically, the Ordinance makes it unlawful to "sell, license, or otherwise provide to city of Berkeley landlords" advice or recommendations regarding "rents or occupancy levels that may be achieved for residential dwelling units in the city of Berkeley"—but only if that advice or those recommendations are provided through what the Ordinance calls a "coordinated pricing algorithm."  § 13.63.030(A).  And the Ordinance makes it unlawful for "a landlord to use a coordinated pricing algorithm . . . when setting rents or occupancy levels for residential dwelling units in the city of Berkeley."  § 13.63.030(B).  Because the Ordinance violates the First Amendment's prohibition on content-based speech restrictions, the Court should enter a judgment declaring that the Ordinance violates the federal constitution and enter an injunction barring its enforcement.

2.      Commentators have observed that, through most of the 2010s, rental prices in Berkeley rose by more than 10 percent per year, but that trendline began to flatten in recent years, with new rents for one-bedroom units increasing by less than 3 percent per year since 2018.  *See* Nico Savidge, *Has Berkeley's building boom made housing more affordable?  We dug into the data*, Berkeleyside (Oct. 23, 2023), https://tinyurl.com/2s4n3jv5.  This decline in rent increases has coincided with an increase in new construction: according to one study, while the City permitted fewer than 200 new housing units per year on average between 2001 and 2014, *id.*, it permitted 343 new units in 2018, 634 units in 2019, 733 units in 2020, 659 units in 2021, and 887 units in 2022, *see*

Nico Savidge, *Berkeley is adding new housing at the fastest rate in decades*, Berkeleyside (July 25, 2023), https://tinyurl.com/5t35rk5d.

3.      Plaintiff RealPage, Inc. is a technology company that provides a broad portfolio of software products to help its customers—owners and managers of rental properties—better operate their communities, including for the benefit of their residents.  Some of RealPage's software products, known as revenue management software, evaluate internal supply and demand data from the subject property along with publicly available rent data from other properties to generate personalized price recommendations that align with the customer's unique asset strategy for each property.  The software issues recommendations that customers are free to accept or reject, and customers in fact reject the software's recommendations a large percentage of the time.

4.      RealPage does not engage, and has never engaged, in any kind of price fixing; nor has it ever facilitated or contributed to price fixing.   Nonetheless, an organization known as the American Economic Liberties Project ("AELP"), launched in 2020, began to peddle the groundless claim, based in large measure on demonstrably false factual assertions, that rising rents across the country were caused not by insufficient housing supply, but instead by software tools offered by services like RealPage.  AELP's false narrative has taken root in certain municipalities that are particularly eager to find a scapegoat for their own hand in impeding the housing supply.  And some have amplified AELP's falsities with even greater untruths for which there can be no good faith basis.  For example, the Office of Vice Mayor and City Councilmember Ben Bartlett stated that RealPage "is currently under parole and facing sentencing for price-fixing practices."  Press Release, *Berkeley Bans AI Rent Pricing Algorithms; Bartlett Calls for Technology to Empower, Not Exploit Communities* (March 17, 2025) (Ex. 2).  This is categorically false.  RealPage is not (and never has been) under parole and is not facing (and never has faced) sentencing for price-fixing practices, a crime for which it has never been charged.

5.      Working with another advocacy group called Local Progress, AELP distributed a memorandum in March 2024 that pressed for cities across the country to enact laws banning the provision of rental advice through algorithms.  The nine-page memorandum mentions RealPage by name 44 times, repeatedly pressing the false claim that RealPage allows landlords to "create[e] a cartel to keep rent prices high."

6.      As enacted, the Berkeley Ordinance purports to ban rental advice based on computer analysis of *any* kind of information.  Its operative provisions make it "unlawful to sell, license, or otherwise provide to city of Berkeley landlords any coordinated pricing algorithm that sets, recommends, or advises on rents or occupancy levels that may be achieved for residential dwelling units in the city of Berkeley," § 13.63.030(A), and also makes it unlawful "for a landlord to use" such an algorithm, § 13.63.030(B).  "Coordinated pricing algorithm" is defined broadly and vaguely to include "any analytical or computation processes that use data to recommend or predict the price of consumer goods or services in direct or indirect coordination with one or more competitors, including through a third-party vendor such as a software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants."  § 13.63.020(A).  "[C]ompetitor data," in turn, is defined in sweeping terms to cover all "information, including information about actual rent prices, occupancy rates, lease start and end dates, and similar data, regardless whether the information is attributable to a specific competitor or anonymized, and regardless whether it is derived from or otherwise provided by another person that competes in the same market or a related market."  § 13.63.020(B). Remarkably, this expansive definition of "competitor data" includes no references whatsoever to data from or about competitors, and instead on its face defines that term to include all "information."  This is no accident, as multiple members of the Berkeley City Council expressly stated that the Ordinance

was intended to ban the use of both public *and* non-public data.  *See* Mar. 11, 2025 Transcript of Berkeley City Council Meeting (Ex. 3) at 25:21–23, 26:1–4 (Councilmember Lunaparra stating that she "introduced a supplemental item to clarify some definitions and close potential loopholes" in order to "mak[e] sure that companies like RealPage can't use any data, public or private, to fix prices or leave units vacant").

7.      Notably, although the Ordinance purports to address "the sharing of data in order to artificially inflate rents and vacancy rates for rental housing," § 13.63.010(B), it does not prohibit all data-sharing.  The Ordinance specifically exempts "any report published by a trade association that receives renter data and publishes it in an aggregated and anonymous manner" and any "product used for the purpose of establishing rent or income limits in accordance with the affordable housing guidelines of a local government, the state, the federal government, or other political subdivision." § 13.63.020(A).

8.      In effect, then, and accounting for the various definitions, the Ordinance bans the use of algorithms to evaluate any information, even information that is readily accessible to and known by the general public, concerning local or statewide rents or occupancy levels for the purposes of advising landlords—including presumably putting publicly available information into an Excel spreadsheet to calculate a rent.  As Councilmember Mark Humbert noted, the Ordinance would seem to "prevent a landlord from using their own nonpublic records to inform their decisions about real levels of vacancy" and to prohibit the operation of Zillow's rental features, which use both public and non-public data. Ex. 3 at 22:1–7, 23:4–7.  But it does *not* prohibit a trade association from publishing a weekly analysis of ideal rental rates on a block-by-block basis throughout the City.

9.      The Ordinance violates the First Amendment because it prohibits speech based on its content—namely, whether the speech provides recommendations or advice on rents or occupancy levels.  This is not commercial speech because the regulated speech neither proposes a transaction

between the speaker (RealPage) and another party (the owner or manager of a property) nor constitutes an advertisement.  Instead, the Ordinance is a content-based and viewpoint-based regulation of speech.  As such, it is subject to strict scrutiny.  And the City cannot satisfy its burden under such scrutiny because it cannot demonstrate that the law is narrowly tailored to serve a compelling state interest.  Even accepting that preventing collusion among competitors and constraining the rate of rent increases are sufficiently compelling government interests, there is no evidence that the speech sought to be prohibited by the Ordinance (as opposed to other factors) causes either of these perceived harms.  And in any event, the City could have engaged numerous less burdensome alternatives to achieve those aims—for example, encouraging the increase in housing supply, enforcing existing antitrust laws, or taking other regulatory steps that are not targeted at speaker-based and content-based speech activity.  Even under intermediate scrutiny, the Ordinance violates the First Amendment.  The Ordinance is not narrowly drawn.  It covers *any* "information"— with no defined statutory limit and with no regard to whether the information is used for legitimate and lawful conduct.  Moreover, as noted above, the City Council had no evidence the Ordinance would prevent collusion or improve the rental market—let alone that the full sweep of the Ordinance is necessary to further those goals, when many other options besides the restriction of speech are available.

10. Compounding the issues stemming from its substantial overbreadth, the Ordinance fails to define its operative terms adequately and is therefore void for vagueness.  It does not explain how the "coordinated" algorithms it purports to regulate differ from other algorithms; it defines "competitor data" as "information" without apparent reference to any limitations on the source or nature of that information; and it does not clarify whether it pertains to use of *all* types of data.  *See* §§ 13.63.020(A)–(B).  Its ill-defined scope creates a potential for arbitrary enforcement—a distinctly

non-hypothetical threat given that the Ordinance expressly targets companies like RealPage. *See* §§ 13.63.010(F)–(G).

## PARTIES

11.     Plaintiff RealPage, Inc. is a Delaware corporation with its principal place of business in Richardson, Texas.  RealPage does business in Berkeley, California.  It sells its property management and data analytics software to landlords in Berkeley.

12.     Defendant City of Berkeley is a municipal corporation located in the State of California.  It exercises local governmental powers under color of California law.

13.     Defendant City Manager Paul Buddenhagen is a municipal official of the City of Berkeley.  He exercises local governmental powers, including the power and duty to enforce all local ordinances, under color of California law.  *See* Berkeley City Charter § 28; Berkeley Municipal Code § 2.36.020.

## JURISDICTION AND VENUE

14.     This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343. Because RealPage seeks an "injunction[] to protect rights safeguarded by the Constitution," it has presented a federal question that this Court has jurisdiction to resolve under 28 U.S.C. § 1331.  *See Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489, 491 n.2 (2010) (quoting *Bell v. Hood*, 327 U.S. 678, 684 (1946)).

15.     RealPage has standing to bring this action.  *First*, RealPage has suffered an "injury in fact" that is "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 180, (2000).  The "threat of future enforcement" here, which could result in injunctive relief, restitution, or civil penalties up to $1,000 per violation, is "substantial" and credib[le]," giving rise to an injury in fact. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014) (observing that "[n]othing in

this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law" and finding the threat of future enforcement of a speech regulation sufficient for Article III standing). *Second*, "the injury is fairly traceable to the challenged action of the defendant"—enacting the Ordinance. *See Laidlaw*, 528 U.S. at 180. And *third*, "it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision" nullifying the Ordinance. *Id*. at 181.

16.     The City of Berkeley is subject to the personal jurisdiction of this Court under Federal Rule of Civil Procedure 4(k)(1)(A) because it is located in the State of California and it has caused or threatened to cause harm by acts occurring in the State of California.

17.     City Manager Paul Buddenhagen is subject to the personal jurisdiction of this Court under Federal Rule of Civil Procedure 4(k)(1)(A) because he resides in the State of California, exercises local governmental powers under color of California law, and has caused or threatened to cause harm by acts occurring in the State of California.

18.     Venue is proper in the United States District Court for the Northern District of California under 28 U.S.C. § 1391(b)(1), (b)(2), and (b)(3) because Defendants are located in and can be found in this District and because a substantial part of the events giving rise to RealPage's claims for relief occurred in this District.

19.     Under Civil Local Rule 3-2(c) and (d), this action should be assigned to the San Francisco or Oakland Division of this Court because this action arises in Alameda County. A substantial part of the events or omissions that give rise to RealPage's claims for relief occurred in Alameda County and a substantial part of the property that is the subject of this action is situated in Alameda County.

# BACKGROUND

**I.    The Berkeley City Council Adopts an Ordinance That Expressly Targets RealPage's Software Products**

20.    At the Berkeley City Council meeting on March 11, 2025, the Council considered a proposed ordinance submitted by the Housing Advisory Commission, then titled "Ordinance to Prohibit the Sale or Use of Algorithmic Devices to Set Rents or Manage Occupancy Levels for Residential Dwelling Units."  Annotated Agenda Pkt. at 11 (March 11, 2025), https://tinyurl.com/yj3uzk7e.

21.    The earliest version of the proposed ordinance would have banned the sale or use of "algorithmic devices," which were then defined as "device[s] . . . that use[] one or more algorithms to perform calculations of non-public competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising a landlord" on rent or occupancy.  Agenda Pkt. at 444 (March 11, 2025), https://tinyurl.com/558y3kb6.  The draft ordinance defined "non-public competitor data" as "information that is not available to the general public, including information about actual rent prices, occupancy rates, lease start and end dates, and similar data."  *Id*. at 445.  Although that version of the proposed ordinance would have violated the First Amendment, the version that the City ultimately adopted prohibits an even greater amount of protected speech.

22.    An attachment to the proposed ordinance prepared by the City's Housing Advisory Commission specifically identified RealPage as the target of the Ordinance.  *See* Agenda Pkt. at 449 (March 11, 2025) (slide titled "What's RealPage?").  There, the Commission noted that "RealPage and its rent-setting software YieldStar ha[ve] been the subject of controversy" and highlighted a 2022 ProPublica article that contains false and misleading claims.  *Id*.  The document also suggests that any use of "Automated Rent Setting" or "AI Revenue Management" would "amount[] to illegal price-fixing," *see id*. at 448, and falsely asserts that RealPage "creat[es] a cartel," *see id*. at 450; *see*

*also* Ex. 3 at 4:2–25 (a member of the Housing Advisory Commission presenting these materials at the March 11, 2025 City Council meeting).

23.    The proposed ordinance was amended on March 11, 2025 purportedly "to clarify definitions and applicability." Annotated Agenda Pkt. at 11 (March 11, 2025). The term "algorithmic device" was changed to "pricing algorithm," and the definition of that term was amended to "any analytical or computation processes that use data to recommend or predict the price of consumer goods or services in direct or indirect coordination with one or more competitors, including through a third-party vendor such as a software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants." Agenda Pkt. at 28 (March 25, 2025) (reflecting the amended version), https://tinyurl.com/2a72877d. In addition, the term "non-public competitor data" was amended to "competitor data," and the definition of that term was changed to encompass all "information," not just "information that is not available to the general public." *id.*; *cf.* Agenda Pkt. at 445 (March 11, 2025). This change was deliberate: as noted above, multiple members of the Berkeley City Council explained that the Ordinance was meant to ban the use of *any* data, regardless of its nature or origin. *See* Ex. 3 at 25:21–23, 26:1–4.

24.    When the Ordinance was first proposed at the March 11, 2025 City Council meeting, members of the public expressed concern and confusion. A renter from the Elmwood district in Berkeley, for example, pointed out the potential overbreadth of the Ordinance, observing that he believed the Council was "creating issues for a lot of landlords who may use any sort of software to be able to control rents." Ex. 3 at 16:9–11. Another member of the public noted she was "having a hard time understanding" if the Ordinance would apply to Zillow, which "uses algorithms to set its suggested rents." *Id.* at 20:20–25, 21:3–4. That individual also indicated that she was "having a very

difficult time understanding" how RealPage could be responsible for causing the increase in prices for "all rents in Berkeley," as the City claimed, when an antitrust lawsuit had identified only 1,300 units in Berkeley that used RealPage's software. *Id*. at 21:4–8.

25.    Councilmember Mark Humbert likewise voiced opposition to the proposed Ordinance. His "primary reason" for opposing the Ordinance was that its definitions "are overly broad and likely unenforceable." Ex. 3 at 21:22–25. The Ordinance, he explained, would seem to "prevent a landlord from using their own nonpublic records to inform their decisions about real levels of vacancy." *Id*. at 22:3–5. Similarly, he noted, under the Ordinance's definition of "pricing algorithm," it would be illegal for "a couple trying to rent out their ADU [Accessory Dwelling Unit] [to] plug[] in a bunch of real information from Craigslist into an Excel spreadsheet to find an average rent in their area," or for Berkeley residents to use "Zillow's rental service[], which relies on both public and private data." *Id*. at 22:23–25, 23:1–7. "Although the ordinance provides additional examples of the more specific pricing algorithms in mind," he stated, "it does not adopt a more limited definition that could withstand scrutiny." *Id*. at 22:20–23. Finally, he observed that more effective methods of lowering the price of housing existed. *See id*. at 24:22–25 ("I think we see from the data that the single most important thing we could do to lower the price of housing is to build more of it.").

26.    The proposed ordinance was adopted at the March 11, 2025 City Council meeting, and a second reading was scheduled for March 25, 2025. *See* Annotated Agenda Pkt. at 11 (March 11, 2025).

27.    On March 17, 2025, Vice Mayor and City Councilmember Ben Bartlett issued a press release touting the purportedly "historic step" taken by the Berkeley City Council in "banning AI-driven rent-pricing algorithms." Ex. 2. The Office of Vice Mayor and City Councilmember Ben Bartlett specifically mentioned RealPage and falsely stated that RealPage "is currently under parole

and facing sentencing for price-fixing practices." *Id.* RealPage is not under parole and is not facing

sentencing for price-fixing practices.

28.     The Ordinance appeared on the consent calendar for a second reading at the March 25,

2025 City Council meeting. *See* Agenda Pkt. at 28 (March 25, 2025). The Ordinance was adopted

with what the City describes as a "minor clarifying addition"—substituting the term "coordinated

pricing algorithm" for "pricing algorithm" throughout the Ordinance. *See* Annotated Agenda Pkt. at

3 (March 25, 2025), https://tinyurl.com/yc8jazmy.

29.     In the final version of the Ordinance, as in the version adopted March 11, 2025, the

City "finds and determines that the adoption of this chapter is necessary to the promotion of the

public health, safety, and welfare" by prohibiting software programs that "enable landlords to

indirectly coordinate with one another through the sharing of data in order to artificially inflate rents

and vacancy rates for rental housing." § 13.63.010; *see also* Supp. Comm. Pkt. #2 at 1 (March 25,

2025), https://tinyurl.com/3uuefv52.

30.     RealPage is specifically named three separate times in the Ordinance. § 13.63.010(F)–

(G).

31.     The Ordinance makes it "unlawful to sell, license or otherwise provide to City of

Berkeley landlords any coordinated pricing algorithm that sets, recommends, or advises on rents or

occupancy levels that may be achieved for residential dwelling units in the city of Berkeley."

§ 13.63.030(A). It also makes it "unlawful for a landlord to use a coordinated pricing algorithm

described in subsection A when setting rents or occupancy levels for residential dwelling units in the

city of Berkeley." § 13.63.030(B).

32.     The Ordinance defines "coordinated pricing algorithm" as "any analytical or

computation processes that use data to recommend or predict the price of consumer goods or services

in direct or indirect coordination with one or more competitors, including through a third-party

vendor such as a software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants." § 13.63.020(A).

33.    The Ordinance, like the version adopted on March 11, 2025, defines "competitor data" as "information, including information about actual rent prices, occupancy rates, lease start and end dates, and similar data, regardless whether the information is attributable to a specific competitor or anonymized, and regardless whether it is derived from or otherwise provided by another person that competes in the same market or a related market." § 13.63.020(B).

34.    The Ordinance, like the version adopted March 11, 2025, provides for enforcement (1) by the Berkeley City Attorney in an action for damages, injunctive relief, restitution/return of illegal profits, and/or civil penalties of up to $1,000 per violation, or (2) by a tenant in an action for injunctive relief, money damages, and/the same civil penalties. §§ 13.63.040(A)–(B).

## II.    The Ordinance Violates the First Amendment.

35.    The Ordinance regulates speech—namely, speech that "sets, recommends, or advises" on rental "information." §§ 13.63.020(A)–(B). The First Amendment protects the "creation and dissemination of information" as "speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 564, 570 (2011) (collecting cases—and explaining that "information" is "speech" and is the "beginning point for . . . speech"). It protects the "creation" of information, *id.*, the "dissemination" of information, *id.*, the "use" of information, and information-generating devices, *id.* at 564, 568.

36.    There is no "information" exception—and certainly no "landlord" or "algorithm" exception—rooted in the precedent or history of the First Amendment. *Sorrell*, 564 U.S. at 570; *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018) ("*NIFLA*") (speech exceptions narrowly defined); *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024) (speech covers

new technology, including algorithms).  Information is speech—and its generation and dissemination are protected First Amendment activities.

37.    The Ordinance suppresses speech by imposing "restrictions on the sale, disclosure, and use of . . . information."  *Sorrell*, 564 U.S. at 564.  The Ordinance burdens the "creation" and "dissemination" of information—prohibiting the use of technology to generate rental information, to gather, sort, and analyze that rental information, and to share that rental information with covered audiences.  §§ 13.63.030(A)–(B).  The Ordinance also prohibits the "use" of information by landlords, § 13.63.020(B)—imposing "'restraints on the way in which the information might be used.'"  *Sorrell*, 564 U.S. at 568 (quoting *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32 (1984)).

38.    The City cannot ban "purchasing or using" a method of speech as a means of prohibiting protected speech.  *Sorrell*, 564 U.S. at 571.  The First Amendment protects mediums of speech—whether ink in pens, printing presses for books, or computers for typists—where they are used to convey information or other speech.  The First Amendment also protects means of speech—whether a radio to hear the news, a computer to perform computations, or a search engine to pull and sort results.  The City also cannot ban a speech device ("algorithms" and "technology"), *Moody*, 603 U.S. at 733 (cleaned up), to prohibit the "creation and dissemination of information," *Sorrell*, 564 U.S. at 570.  The "'basic principles'" of the "First Amendment do not vary" when applied to speech in "'ever-advancing technology'"—and when the State seeks to restrict such speech, it necessarily "confronts the First Amendment."  *Moody*, 603 at 732–33 (quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 790 (2011)).

39.    The Ordinance's direct prohibition of speech, and its content-based and speaker-based restrictions, are subject to strict scrutiny.  The Ordinance prohibits the "use" and "creation and dissemination of information"—core "speech" activity.  *Sorrell*, 564 U.S. at 564, 570.

Gibson, Dunn &
Crutcher LLP

13

40.     The unconstitutional nature of that speech restriction is exacerbated by other features of the Ordinance.  The speech restrictions of the Ordinance are content-based—they prohibit particular "information" used to "set[], recommend[], or advise[]" on rental activities. §§ 13.63.020(A)–(B); *see Sorrell*, 564 U.S. at 564; *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115 (1991).  The speech restrictions are also user-based—they prohibit particular speech activities for particular actors (i.e., "landlords").  *See, e.g.*, 13.63.020(A)–(B); *Sorrell*, 564 U.S. at 564; *Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575 (1983).  The Ordinance also selectively permits two types of speech that would otherwise fall within its scope: "report[s] published by a trade association that receives renter data and publishes it in an aggregated and anonymous manner" and "product[s] used for the purpose of establishing rent or income limits in accordance with the affordable housing guidelines of a local government, the state, the federal government, or other political subdivision."  § 13.63.020(A).  The Ordinance's speech restrictions are thus "presumptively unconstitutional"—and subject to "strict scrutiny."  *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (collecting cases).

41.     No strict-scrutiny exception—including the "commercial speech" exception—applies here.  Commercial speech is generally "speech that does no more than propose a commercial transaction."  *United States v. United Foods, Inc.,* 533 U.S. 405, 409 (2001) (relying on *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980)).  That exception is inapplicable here, and provides no basis for reduced constitutional scrutiny of the Ordinance's sweeping speech restrictions.

42.     The Ordinance is far removed from the domain of proposed commercial transactions.  "'[T]he test for identifying commercial speech'" is "the proposal of a commercial transaction."  *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 423 (1993) (quoting *Bd. of Trustees of State Univ. of New York v. Fox*, 492 U.S. 469, 474 (1989)) (emphasis omitted); *see also Central Hudson*,

447 U.S. at 564–66.  But the speech targeted here—the generation and dissemination of information related to recommendations and advice on rental practices—does not propose *any* transaction between the speaker (RealPage) and another party (the owner or manager of a property) and certainly does not "merely" propose such a transaction.  Nor does the speech constitute an advertisement.  On the contrary the banned speech is the provision of advice and information to a business—a subject that is distinct from commercial advertising.

43.    The Ordinance fails strict scrutiny because the City cannot "prov[e] that the [laws] are narrowly tailored to serve compelling state interests."  *NIFLA*, 585 U.S. at 766.  Even if the Ordinance were meant to serve a compelling state interest—either preventing collusion among competitors on rental prices, or more generally just reducing rental prices in the City—the Ordinance, in a substantial number of applications and as applied to RealPage, "fail[s] under strict scrutiny because [the Ordinance] is not narrowly tailored."  *X Corp. v. Bonta*, 116 F.4th 888, 903 (9th Cir. 2024).

44.    First, the Ordinance fails narrow tailoring because the City could have pursued these objectives through less burdensome alternatives that would not involve restricting speech—encouraging the increase in housing supply, enforcing existing antitrust laws, or other regulatory steps that are not targeted at speaker-based and content-based speech activity.  *See, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024).  Rather than restrict speech, the "[City] could have" assessed the viability of "less restrictive means" to address landlord misconduct, such as by "relying on existing . . . laws that prohibited related . . . conduct."  *Id*.  That is particularly true because illegal collusion can be—and is—already regulated through existing antitrust and other consumer protection laws.

45.    Second, the Ordinance fails narrow tailoring because it is overbroad.  The Ordinance could have imposed narrow restrictions focused on improper or unlawful conduct. But its broad

speech restrictions—including its application to all "algorithms" and potentially to all "information"—goes far beyond what is necessary to serve any compelling municipal interest in lowering rents and fighting collusion.

46.     Third, the vagueness and breadth of the Ordinance only compound these problems. The definitions in the Ordinance—including the sweeping definition of "competitor data" that purports to cover any "information" from anywhere, not just from "competitors"—is so broad and vague that companies lack fair notice of what conduct the Ordinance prohibits and would allow the City to target specific actors (like RealPage) whose speech the City disfavors.  The breadth and vagueness of the law also undermine any contention that it is "narrowly tailored."  Although narrower, targeted alternative exists, the City has not "tried" any of these narrower and less-speech-restrictive alternatives, *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2010), much less carried its burden to show why they would not satisfy the City's purported interests, *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024).

47.     Even if the Ordinance were treated as a regulation of commercial speech, it would fail. A statute that regulates commercial speech will generally be reviewed under intermediate scrutiny—which requires an important government interest, and means that are substantially related to directly advancing that interest.  *Central Hudson*, 447 U.S. at 564–66.  Under intermediate scrutiny, the City must establish that the Ordinance will directly advance a substantial government interest and that it is narrowly drawn to achieve that interest.  *See, e.g.*, *id*. at 564.

48.     The Ordinance—with its broad and vague speech restrictions and lack of a clear connection to any of the City's state interests—abjectly fails that standard.  Perhaps most critically, the Ordinance is not "narrowly drawn."  *In re R.M.J.*, 455 U.S. 191, 203 (1982); *Central Hudson*, 447 U.S. at 565.  On the contrary, it is astonishingly broad—combining sweeping breadth and confusing vagueness to sweep in wide swaths of legitimate speech activity.  The Ordinance sweeps in any and

all "information"—with no defined statutory limit and no regard to whether the information is used for legitimate and lawful conduct.  But the City "cannot regulate speech that poses no danger to the asserted state interest," nor can it "suppress information when narrower restrictions on expression would serves its interest as well."  *Central Hudson*, 447 U.S.at 565.

49.     Nor can the City show that the Ordinance will materially benefit rental prices, prevent collusion among competitors, or improve the rental market—let alone that the full sweep of the Ordinance is necessary to further those goals, when other options besides the restriction of speech are available.  The City must provide a "nonhypothetical justification," *NIFLA*, 585 U.S. at 778, and show that the "harm" it seeks to remedy is more than just "purely hypothetical" and that the speech "restrictions will in fact alleviate [the harm] to a material degree," *Ibanez v. Fla. Dep't for Bus. & Pro. Regulation, Bd. of Accountancy*, 512 U.S. 136, 146 (1994).  But the City cannot make such a showing—and certainly not to the degree necessary to justify the full sweep of the statute, or its specific application to RealPage.  The Ordinance thus fails any level of First Amendment scrutiny.

### III.     The Ordinance is Unconstitutionally Vague.

50.     RealPage was targeted by the Ordinance and the City Council for its speech activity. That constitutional injury to RealPage's freedom of speech and legitimate business interests is only compounded by the unconstitutional vagueness of the Ordinance's speech restrictions.

51.     "In our constitutional order, a vague law is no law at all."  *United States v. Davis*, 588 U.S. 445, 447 (2019).  A law is unconstitutionally vague if it fails to provide fair notice of "what conduct it prohibits," or "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000).

52.     The "void-for-vagueness doctrine has special purchase" for "laws implicating First Amendment freedom."  *Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022).  "[V]agueness

concerns are more acute when a law implicates First Amendment rights, and therefore, vagueness

scrutiny is more stringent." *Id*. (collecting cases).

53.     The Ordinance fails adequately to define its key terms—"competitor data" and

"coordinated pricing algorithms"—with sufficient specificity to allow companies to determine what

speech is allowed and what speech is prohibited.  These sweeping and amorphous provisions

individually and collectively fail constitutional due processes standards because they fail to provide

fair notice and fail to constrain future arbitrary enforcement by the City.

54.     ***"Competitor Data."***  The Ordinance prohibits covered uses of "competitor data."

§ 13.63.020(A)-(B).  The term "competitor data" is broadly defined as "*information*, including

information about actual rent prices, occupancy rates, lease start and end dates, and similar data,

regardless whether the information is attributable to a specific competitor or anonymized, and

regardless whether it is derived from or otherwise provided by another person that competes in the

same market or a related market."  § 13.63.020(A)–(B) (emphasis added).

55.     Although the Ordinance claims that it "is not intended to prevent the development or

sale of software to help landlords manage their units generally or through the use of public data,"

§ 13.63.010(I), its definition of "competitor data" lacks any apparent limitations based on the source

or nature of that information.  Among other issues, it appears to encompass all publicly available

"information," rather than being limited to data from competitors (as the term "competitor data"

would suggest).

56.     ***"Coordinated Pricing Algorithm."***  The Ordinance prohibits particular uses of

"coordinated pricing algorithms."  § 13.63.020(A)–(B).  Specifically, it prohibits any "analytical or

computation processes that use data" of certain specifications to set, recommend, or advise on rents

or occupancy levels.  Although it defines a "coordinated pricing algorithm" as a "process[] that use[s]

data to recommend or predict the price of consumer goods or services in direct or indirect

coordination with one or more competitors, including through a third-party vendor such as a software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants," that definition does not provide sufficient notice of how a company may comply. §§ 13.63.020(A)–(B).

57.    As an initial matter, "algorithm" is a broad and undefined term. *See, e.g.*, Black's Law Dictionary (12th ed.) (defining "algorithm" as "[a] mathematical or logical process consisting of a series of steps, designed to solve a specific type of problem"); Merriam-Webster (defining "algorithm" as "a procedure for solving a mathematical problem (as of finding the greatest common divisor) in a finite series of steps that frequently involves repetition of an operation"). For example, would an Excel spreadsheet that computes a proposed rent based on, say, square footage of the property in question, neighborhood, and some "competitor data" violate the Ordinance? What about a simple website that uses a basic algorithm to display text?

58.    The term "direct or indirect" coordination is also broad and undefined. It is possible that a pricing algorithm could violate the statute only when it accomplishes its function through "direct or indirect coordination" among competitors, but it is unclear whether (a) this is a fundamental requirement of the "coordinated pricing algorithm" definition and (b) what constitutes prohibited "coordination." The Ordinance, again, provides no guidance on these critical questions.

59.    The terms of the Ordinance are so ambiguous that RealPage and others will be forced to make high-stakes guesses about whether to cease otherwise legitimate business operations or risk significant penalties. The lack of adequate specificity renders the Ordinance void and unenforceable. *Davis*, 588 U.S. at 447 ("In our constitutional order, a vague law is no law at all."). And the Ordinance "authorizes . . . arbitrary and discriminatory enforcement" by singling out RealPage as the target of its prohibitions, despite terms that, on their faces, apply to a much broader range of

companies. *See Hill*, 530 U.S. at 732. A law permitting such arbitrary enforcement is also constitutionally impermissible. *See Davis*, 588 U.S. at 447.

## FIRST CLAIM FOR RELIEF

### (Violation of the First Amendment Under 42 U.S.C. § 1983)

60.    RealPage realleges and incorporates by reference paragraphs 1 through 59 above.

61.    The Ordinance broadly prohibits the dissemination of information, in violation of the First Amendment to the United States Constitution. It suppresses speech by imposing "restrictions on the sale, disclosure, and use of . . . information." *Sorrell*, 564 U.S. at 564. It burdens the "creation" and "dissemination" of information—prohibiting the use of technology to generate rental information, to gather, sort, and analyze that rental information, and to share that rental information with covered audiences. It also prohibits the "use" of information by landlords, § 13.63.020(B)—imposing "'restraints on the way in which the information might be used.'" *Id*. at 568 (quoting *Seattle Times*, 467 U.S. at 32).

62.    The Ordinance is subject to strict scrutiny. It prohibits the "use" and "creation and dissemination of information"—core "speech" activity. *Sorrell*, 564 U.S. at 564, 570. These prohibitions are content-based and viewpoint-based speech restrictions that are "presumptively unconstitutional" and subject to "strict scrutiny." *Reed*, 576 U.S. at 163 (collecting cases). And it does not regulate commercial speech because it neither proposes a commercial transaction nor constitutes an advertisement. *Central Hudson*, 447 U.S. at 564.

63.    The Ordinance fails strict scrutiny. It fails narrow tailoring because the City could have pursued its stated objectives of lowering rental prices and addressing collusion among competitors through "less burdensome alternatives" that do not involve restricting speech—for example, encouraging the increase in housing supply, enforcing existing antitrust laws, or other regulatory measures that are not targeted at speaker-based and content-based speech activity. *See,*

*e.g.*, *NetChoice*, 113 F.4th at 1121.  It also fails narrow tailoring because it is overbroad.  Its sweeping speech restrictions—including its application to all "algorithms" and potentially to all "information"—go far beyond what is necessary to serve any compelling municipal interest in fighting collusion and constraining rent increases.

64.     Even under the *Central Hudson* test for regulations of commercial speech, the Ordinance still is unconstitutional.  To survive intermediate scrutiny, the City must establish that the Ordinance will directly advance a substantial government interest and is narrowly drawn to achieve that interest.  *See, e.g.*, *Central Hudson*, 447 U.S. at 564.  Most critically, the Ordinance is not "narrowly drawn," *In re R. M. J.*, 455 U.S. 191, 203 (1982); *Central Hudson*, 447 U.S. at 565—on the contrary, it is astonishingly broad.  Nor does the City Council have evidence to support a "nonhypothetical justification" that the Ordinance will materially improve rental prices or occupancy levels or prevent competitor collusion—much less that the full sweep of the Ordinance is necessary to directly further those goals, when other options besides the restriction of speech are available.  *See NIFLA*, 585 U.S. at 777.

65.     For these reasons, the Ordinance violates the First Amendment to the United States Constitution, which protects the freedom to engage in speech and disseminate information—even information that the government views unfavorably.

66.     42 U.S.C. § 1983 provides a civil cause of action to any person who is deprived of rights guaranteed by the United States Constitution or federal law, by another person, under color of State law.

67.     The City, acting under color of state and local law, and through its enactment and threatened enforcement of the Ordinance as alleged, has deprived and will deprive RealPage of its rights under the First Amendment to the Constitution of the United States.

1

**SECOND CLAIM FOR RELIEF**

2

**(Violation of the Due Process Clause Under 42 U.S.C. § 1983)**

3

68.     RealPage realleges and incorporates by reference paragraphs 1 through 67 above.

4

69.     The Ordinance violates the constitutional requirement that a law must be set forth in

5

sufficient specificity to provide fair notice of "what conduct it prohibits." *Hill*, 530 U.S. at 732.  The

6

Ordinance fails to define key terms—"coordinated" pricing algorithms, "competitor data," and

7

"information"—with sufficient specificity to enable regulated actors to comply.  This is particularly

8

so because the Ordinance implicates "First Amendment freedom." *Butcher*, 38 F.4th at 1169.

9

70.     The Ordinance also singles out RealPage as the target of enforcement, despite

10

provisions that sweep broadly and would appear to proscribe the activities of other actors.  *See Hill*,

11

530 U.S. at 732 (identifying the potential for arbitrary enforcement as a ground for finding a law void

12

for vagueness).

13

71.     Because the Ordinance is impermissibly vague and appears to permit or encourage

14

arbitrary enforcement, it violates the Due Process Clause of the Fourteenth Amendment.

15

72.     42 U.S.C. § 1983 provides a civil cause of action to any person who is deprived of

16

rights guaranteed by the United States Constitution or federal law, by another person, under color of

17

State law.

18

73.     The City, acting under color of state and local law, and through its enactment and

19

threatened enforcement of the Ordinance has deprived and will deprive RealPage of its rights under

20

the Fourteenth Amendment to the Constitution of the United States.

21

**THIRD CLAIM FOR RELIEF**

22

**(Attorneys' Fees and Costs Under 42 U.S.C. § 1988 and All Other Applicable Statutes)**

23

74.     RealPage realleges and incorporates by reference Paragraphs 1 through 73 above.

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

75.     Under 42 U.S.C. § 1988(b), "[i]n any proceeding to enforce" 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of its costs."  Additionally, the court "may include expert fees as part of the attorney's fee."  42 U.S.C. § 1988(c).

76.     RealPage is entitled to reasonable attorneys' fees, including expert fees and other costs, in this action and requests that the Court award such fees under 42 U.S.C. § 1988 and all other applicable statutes.

## PRAYER FOR RELIEF

An actual controversy has arisen between the parties entitling RealPage to legal, declaratory, and injunctive relief.

WHEREFORE, RealPage prays that this Court:

(A)     Enter a judgment declaring that the City of Berkeley's ban on coordinated pricing algorithms, codified at Berkeley Municipal Code Chapter 13.63, impermissibly abridges RealPage's First Amendment rights and is invalid facially and as applied to RealPage, *see* 28 U.S.C. § 2201;

(B)     Enter a judgment declaring that the City of Berkeley's ban on coordinated pricing algorithms, codified at Berkeley Municipal Code Chapter 13.63, violates the Due Process Clause both facially and as applied to RealPage, *see* 28 U.S.C. § 2201;

(C)     Enter an injunction barring Defendants the City of Berkeley, California and Paul Buddenhagen, the City Manager of Berkeley, California, from enforcing or causing to be enforced Berkeley Municipal Code Chapter 13.63, in order to prevent imminent and irreparable injury to RealPage and harm to the public;

(D)     Grant RealPage such relief as it deems just and proper, including an award of reasonable attorneys' fees and the costs of this action.

Gibson, Dunn &
Crutcher LLP

23

1     April 2, 2025                                    By: /s/ Kristin A. Linsley
                                                            Kristin A. Linsley
2
                                                       Kristin A. Linsley (#154148)
3                                                        klinsley@gibsondunn.com
                                                       GIBSON, DUNN & CRUTCHER LLP
4                                                      One Embarcadero Center #2600
                                                       San Francisco, CA  94111-3715
5                                                      Telephone:    415.393.8200
                                                       Facsimile:    415.393.8306
6
7                                                      Jay P. Srinivasan (#181471)
                                                         jsrinivasan@gibsondunn.com
8                                                      Bradley J. Hamburger (#266916)
                                                         bhamburger@gibsondunn.com
9                                                      Samuel Eckman (#308923)
                                                         seckman@gibsondunn.com
10                                                     Alexander N. Harris (#278482)
                                                         aharris@gibsondunn.com
11                                                     GIBSON, DUNN & CRUTCHER LLP
                                                       333 South Grande Ave.
12                                                     Los Angeles, CA  90071-3197
                                                       Telephone:    213.229.7000
13                                                     Facsimile:    213.229.7520
14
15                                                     *Attorneys for Plaintiff RealPage, Inc.*

16

17

18

19

20

21

22

23

24

25

26

27

28

Gibson, Dunn &
Crutcher LLP

                                        24

# EXHIBIT 1



# REVISED AGENDA MATERIAL
# for Supplemental Packet 2

**Meeting Date:**      March 25, 2025

**Item Number:**       2

**Item Description:**  Adopt an Ordinance to Prohibit the Sale or Use of Coordinated Pricing Algorithms to Set Rents or Manage Occupancy Levels for Residential Dwelling Units

**Submitted by:**      Councilmember Lunaparra (author), Councilmember Tregub (cosponsor), Councilmember Blackaby (cosponsor)

This supplemental material proposes one minor, non-substantive edit to the ordinance, changing "Pricing Algorithms" to "Coordinated Pricing Algorithms" throughout the ordinance. This technical change was made in consultation with the City Attorney's Office, members of the Housing Advisory Commission, and council colleagues.

ORDINANCE NO. 7,956-N.S.

ADDING CHAPTER 13.63 TO THE BERKELEY MUNICIPAL CODE PROHIBITING ON THE SALE OR USE OF <span style="color:red">COORDINATED</span> PRICING ALGORITHMS TO SET RENTS OR MANAGE OCCUPANCY LEVELS FOR RESIDENTIAL DWELLING UNITS

BE IT ORDAINED by the Council of the City of Berkeley as follows:

<u>Section 1.</u>  That Berkeley Municipal Code 13.63 is added to read as follows:

### Chapter 13.63

### PROHIBITION ON THE SALE OR USE OF <span style="color:red">COORDINATED</span> PRICING ALGORITHMS TO SET RENTS OR MANAGE OCCUPANCY LEVELS FOR RESIDENTIAL DWELLING UNITS

**Sections:**

**13.63.010  Findings and Purpose**
**13.63.020  Definitions**
**13.63.030  Use and Sale of <span style="color:red">Coordinated</span> Pricing Algorithms Prohibited**
**13.63.040  Remedies**
**13.63.050  Undertaking for the General Welfare**
**13.63.060  Severability**

### 13.63.010    Findings and purpose.

The Council hereby finds and determines that the adoption of this chapter is necessary to the promotion of the public health, safety, and welfare.

A.     In recent years, a number of new software programs, often referred to as "<span style="color:red">coordinated</span> pricing algorithms", have threatened to destabilize rental housing markets in cities nationwide, including the City of Berkeley.

B.     These programs enable landlords to indirectly coordinate with one another through the sharing of data in order to artificially inflate rents and vacancy rates for rental housing. Participating landlords provide vast amounts of proprietary data to the programs, which in turn set or provide recommendations for rent and occupancy levels.

C.     More and more landlords in U.S. cities now pool their data and pricing decisions using such software.

D.     The software has contributed to double-digit rent increases (over the last nine years, median rents have increased 19% in the East Bay), higher vacancy rates, and higher rates of eviction, and has generally distorted markets so that rents and vacancy rates have increased in tandem.

E.     Often used by large corporate landlords, the software fuels the consolidation of corporate and private equity ownership of rental housing, at the expense of landlords large and small who are willing to play by the normal rules. Landlords using these tools are not engaging in appropriate market behavior.  And the companies developing and

selling these tools to Berkeley landlords are not doing so either, and are contributing to these problems.

F.      A 2022 class action lawsuit filed in the U.S. District Court in the Western District of Washington at Seattle (one of over 20 private class action lawsuits that have been consolidated into one case) accuses nearly 50 trade associations of serving as "conduits of the cartel" by providing a venue for RealPage and their property owners to conspire. The lawsuit further alleges that landlords use the software to agree on prices to set for rent, and to stagger their lease renewal dates so as to avoid any oversupplies in rental properties.

G.      Numerous antitrust lawsuits have been filed against certain of these companies, including RealPage, Inc. and Yardi Systems, Inc.  The lawsuits allege that these companies are enabling and participating in a scheme of unlawful rent-fixing.  These include a lawsuit filed by the District of Columbia Attorney General in November 2023, a lawsuit filed by the Arizona Attorney General in February 2024, and more than 20 federal private class action lawsuits filed nationwide that have been consolidated in the federal court in the Middle District of Tennessee.  In August 2024, The United States Department of Justice, alongside the attorneys general of California and seven other states, filed an antitrust lawsuit against RealPage, accusing the company of reducing competition among landlords and taking over the market for such algorithm-based rental software.

H.      Instead of waiting for court processes which may take years to resolve, this ordinance prohibits the sale or use of coordinated pricing algorithms for the purpose of setting rents on residential dwelling units in the city of Berkeley, to bring immediate relief to Berkeley tenants, as well as to put landlords who have been using these algorithms on equal footing with those who are willing to adhere to fair standards for setting rental rates.

I.      This Chapter is not intended to prevent the development or sale of software to help landlords manage their units generally or through the use of public data.  Nor does this Chapter regulate the amount of rent that a landlord may charge.  This Chapter solely regulates the use and sale of the coordinated pricing algorithms that analyze and share data, to prevent the harms described above.

## 13.63.020    Definitions.

A.      "Coordinated pPricing algorithm" means any analytical or computation processes that use data to recommend or predict the price of consumer goods or services in direct or indirect coordination with one or more competitors, including through a third-party vendor such as a software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants. "Coordinated pPricing algorithm" includes a product that incorporates a coordinated pricing algorithm, but does not include (a) any report published by a trade association that receives renter data and publishes it in an aggregated and anonymous manner or (b) a product used for the purpose of establishing rent or income limits in accordance with the affordable housing guidelines of a local government, the state, the federal government, or other political subdivision.

B.      "Competitor data" means information, including information about actual rent prices, occupancy rates, lease start and end dates, and similar data, regardless whether

the information is attributable to a specific competitor or anonymized, and regardless whether it is derived from or otherwise provided by another person that competes in the same market or a related market.

**13.63.030    Use and sale of coordinated pricing algorithms prohibited**.

A.    It shall be unlawful to sell, license, or otherwise provide to city of Berkeley landlords any coordinated pricing algorithm that sets, recommends, or advises on rents or occupancy levels that may be achieved for residential dwelling units in the city of Berkeley.

B.    It shall be unlawful for a landlord to use a coordinated pricing algorithm described in subsection A when setting rents or occupancy levels for residential dwelling units in the city of Berkeley.  Each separate month that a violation exists or continues, and each separate residential dwelling unit for which the landlord used the coordinated pricing algorithm, shall constitute a separate and distinct violation.

**13.63.040    Remedies.**

A.    The City Attorney may file a civil action for violations of section 13.63.030, subsections A and/or B, for damages, injunctive relief, restitution/return of illegal profits, and/or civil penalties of up to $1,000 per violation.  The court shall award reasonable attorney's fees and costs to the city Attorney if the City Attorney is the prevailing party in such a civil action.

B.    A tenant may file a civil action for violations of section 13.63.030, subsection B, for injunctive relief, money damages, and/or civil penalties of up to $1,000 per violation.  The court shall award reasonable attorney's fees and costs to the tenant if the tenant is the prevailing party in such a civil action.  A lease provision that limits a prevailing tenant from obtaining attorneys' fees shall not be enforceable against a tenant's claim for attorneys' fees that arises under this subsection 13.63.040 B.

**13.63.050    Undertaking for the general welfare.**

In enacting and implementing this Chapter 13.63, the City is assuming an undertaking only to promote the general welfare.  It is not assuming, nor is it imposing on its officers and employees, an obligation for breach of which it is liable in money damages to any person who claims that such breach proximately caused injury.

**13.63.060    Severability.**

If any part or provision of this Chapter, or the application of this Chapter to any person or circumstance, is held invalid, the remainder of this Chapter, including the application of such part or provision to other persons or circumstances, shall not be affected by such a holding and shall continue in full force and effect.  To this end, the provisions of this Chapter are severable.

Section 2. Copies of this Ordinance shall be posted for two days prior to adoption in the display case located near the walkway in front of the Maudelle Shirek Building, 2134

Martin Luther King Jr. Way. Within 15 days of adoption, copies of this Ordinance shall be filed at each branch of the Berkeley Public Library and the title shall be published in a newspaper of general circulation.

At a regular meeting of the Council of the City of Berkeley held on March 11, 2025, this Ordinance was passed to print and ordered published by posting by the following vote:

Ayes:        Bartlett, Blackaby, Kesarwani, Lunaparra, O'Keefe, Taplin, Tregub, and Ishii.

Noes:        Humbert.

Absent:      None.

# EXHIBIT 2

# BEN BARTLETT
## VICE MAYOR

For Immediate Release:

# Berkeley Bans AI Rent Pricing Algorithms; Bartlett Calls for Technology to Empower, Not Exploit Communities

Berkeley, CA – March 17, 2025 – On Tuesday (March 12, 2025), the Berkeley City Council took a historic step by banning AI-driven rent-pricing algorithms, marking a critical move to protect renters and address soaring housing costs. Vice Mayor  Ben Bartlett praised the decision while emphasizing the broader responsibility to ensure AI is developed and used ethically to protect vulnerable communities.

"Technology itself is neutral—people are not," said Bartlett. "Algorithms can uplift or oppress, depending entirely on whose hands they're in and whose interests they're designed to serve. Our role is clear: We must ensure AI empowers communities, and not exploits them."

The ordinance prohibits landlords from using or selling rent-pricing algorithms, such as those developed by RealPage, within Berkeley. Violators face fines of up to $1,000 per violation. These tools rely on proprietary data to manipulate housing markets, driving up rents, restricting housing availability, and deepening inequality. RealPage, the company behind such pricing models in Berkeley, is currently under parole and facing sentencing for price-fixing practices. Bartlett stressed that these algorithms, operating largely without public knowledge, trap consumers in exploitative schemes, targeting them through dynamic pricing systems that prioritize profits over people.

"We know that the price fixing that this software facilitated has significantly contributed to the housing affordability crisis.  I am hopeful that Berkeley will start seeing a reduction in rents when management companies can no longer conspire so easily."  Leah Simon Weisberg, Executive Director California Center for Movement Legal Services and Berkeley resident.

Dynamic targeted pricing, a core tool used by large-scale entities, extends beyond the housing market and affects ridesharing, airfares, and other consumer services. By using algorithmic analysis, corporations exploit user data to maximize revenue, often at the expense of fairness and transparency. These systems allow companies to victimize consumers and entire communities, further widening economic disparities. This ordinance affirms Berkeley's commitment to fighting back against such exploitative practices and protecting impacted people.

Housing Advisory Commissioner Sean Vaughn Scott voiced strong support: "This ordinance makes it clear that Berkeley won't allow predatory technologies to destabilize our housing market," said Scott. "It's a vital step toward ethical technology use and tackling housing inequality."

"This ordinance addresses an immediate threat, but its also the beginning of a framework for responsible innovation," said Bartlett. "The future is not written. It is built. We have a responsibility to craft a future where AI works for humanity—not at its expense."

With this bold measure, Berkeley joins cities like San Francisco and Philadelphia in addressing the misuse of AI to protect consumers and uphold equity. The legislation represents a critical step toward ensuring that technological innovation prioritizes justice, accountability, and the well-being of all communities.

For more information or to schedule an interview with Vice Mayor  Ben Bartlett, contact:
Press Contact:
James Chang, Chief of Staff
Office of Vice Mayor Ben Bartlett
Berkeley City Council, District 3
jchang@cityofberkeley.info
415-527-7765

# EXHIBIT 3

1

2

3

4

5

6

7    ORDINANCE TO PROHIBIT ALGORITHMIC DEVICES TO SET RENTS

8                   OR MANAGE OCCUPANCY LEVELS

9

10              Transcription of Video Recording:

11        berkeley_63f9bf64-d3bc-4536-a29a-2fe83d4ea84b

12                      March 11, 2025

13          Video Segment:  2:29:23 to 3:19:06

14

15

16

17

18

19

20

21

22

23

24

25



1             (Beginning at 2:29:23)

2             MAYOR ISHII:  We got it.  Great.  Thank you

3    so much.  I appreciate your help, Rose.

4             All right.  Oh, can you just press the --

5    yeah.  There you go.

6             MS. POTTER:  I won't pass on the irony of a

7    tech item and trying to get our PowerPoint set up.

8    But good evening.  I am Debbie Potter.  I am the

9    immediate past president or past chair of the Housing

10   Advisory Commission.  I'm here this evening with Leah

11   Simon-Weisberg, the current chair.  And we are here

12   before you this evening, Honorable Mayor, members of

13   the City Council, to recommend that you approve an

14   ordinance that prohibits the use of algorithmic

15   devices to set rents or manage occupancy levels.

16             What is automated rent setting or AI revenue

17   management?  This occurs when landlords delegate their

18   rental pricing and supply decisions to a common

19   decision maker.  That decision maker is a third party.

20   It could be a trade association.  It could be a

21   company that offers management software.

22             Landlords who should be competing with each

23   other as to price share data with this common, third-

24   party decision maker, and that then decision maker

25   provides daily pricing and ongoing revenue oversight.



1   You all might be familiar with the concept of dynamic

2   pricing.  That's what this is, essentially, with the

3   daily pricing.

4           So rather than functioning as separate

5   economic entities, these participating landlords make

6   key competitive decisions regarding their rent and

7   their inventory of units collectively.  So rather than

8   competing -- and I will say that it's important to

9   know that the sharing of sensitive data and pricing

10   information is not in a competitor's self-interest

11   unless they know that their fellow competitors are

12   also sharing their proprietary and sensitive data, and

13   that together, they are making collective decisions.

14           And the result of this action is you drive

15   up rents, and it amounts to a legal -- illegal price

16   fixing.

17           So I've talked about what automatic rent

18   setting is, and now I want to touch a little bit on

19   what it is not.  Automatic rent setting does not mean

20   that individual landlords who are independently

21   researching websites such as Zillow or Craig's List to

22   set rents are engaged in automated rent setting.

23           It also is not landlords who don't

24   coordinate with one another to set rents, and it is

25   not landlords who rent units as vacancies arise and



1   who don't hold vacant units off the market.

2            So now that I've talked about what automated

3   rent setting is and what it isn't, what is RealPage?

4   RealPage, according to its own website, provides

5   property management software, data analytics, and

6   services to efficiently manage rent properties and

7   real estate.

8            For several years, RealPage and its rent-

9   setting software, YieldStar, which is the algorithmic

10  device, has been the subject of controversy, and

11  they've pretty much been the subject of controversy

12  since they entered the rental housing market with

13  their algorithmic software devices.

14           And this past fall, the DOJ filed a lawsuit

15  against RealPage, accusing them of being a monopoly.

16  They're thought to control up to 80 percent of the

17  property management software market across the

18  country.

19           And if you want to know what the folks who

20  work with RealPage, the property management companies

21  and the landlords, how they define what RealPage is,

22  quote -- this is a quote -- "We are all technically

23  competitors, but RealPage helps us to work together to

24  make us all more successful in our pricing.  RealPage

25  is designed to work with the community in pricing



1    strategies, not work separately.  We rarely make any

2    overrides to the pricing recommendations."

3            So that's how clients define what RealPage

4    is.

5            So what the accusation is, is that this kind

6    of sharing of information collectively and not

7    competitively is illegal price fixing, and the kind of

8    illegal price fixing that is being done is called hub-

9    and-spoke price fixing.

10           And the way it works is that you have a

11   centralized company, a trade association, a data

12   broker, a software algorithm, that facilitates illegal

13   agreements amongst competitors, landlords in the

14   market.

15           RealPage is the hub, and the landlords who

16   depend on its recommendations regarding rent levels

17   are the spokes.  And by agreeing to follow the rent

18   recommendations using competitively sensitive and/or

19   proprietary data, landlords tacitly agree to fix rents

20   without the need to directly compete with each other.

21           This system allows landlords to conspire, to

22   limit rental supply, and drive up rents, creating a

23   cartel in the legal parlance.

24           So this slide is a visual that just

25   illustrates what a hub-and-spoke price fixing scheme



COUNCIL MEETING                                    March 11, 2025
Berkeley City Council                                            6

1   looks like, and you can see that in this depiction,
2   RealPage is a hub, and then these are some of the
3   major property management firms across the country,
4   many of them who are defendants in class action
5   lawsuits who are the spokes in this hub-and-spoke
6   system.
7              There has been, because there is an
8   accusation of illegal price fixing, there's been a
9   fair amount of legal action to date.  There have been
10  over 30 class action lawsuits that have been filed
11  against RealPage and the landlords who use the
12  software.
13             As I mentioned, the DOJ sued RealPage in the
14  fall of 2024, both for its monopoly control of the
15  software market for rental housing and because it
16  facilitates this illegal price fixing scheme.
17             And once DOJ filed its lawsuit, eight
18  Attorneys General, including the Attorney General of
19  California, joined this DOJ lawsuit.
20             There have also been legislative actions
21  that have occurred.  San Francisco and Philadelphia
22  have banned the sale and use of these pricing
23  algorithms, and a number of local jurisdictions and a
24  few states are considering similar bans.
25             And right now, there are four bills to ban



 1  the sale and use of pricing algorithms that have been

 2  introduced in the California legislature.

 3          So as I mentioned at the outset, we're here

 4  to recommend that the City Council adopt an ordinance

 5  that would ban the sale and use of these algorithmic

 6  devices in the City of Berkeley and what's our

 7  rationale for this recommendation.

 8          Fifty-seven percent of Berkeley's population

 9  are renters.  People of color are three times more

10  likely to be renters than homeowners.  Sixth percent

11  of Berkeley tenants are lower income, and half of all

12  renters in the City of Berkeley are rent-burdened.

13          In addition, we've seen an increasing

14  corporate concentration in the housing market over the

15  last several years, and the city's rent stabilization

16  staff did a preliminary, high-level look to see if

17  Berkeley was being impacted by this corporate

18  ownership and consolidation.  And just at the high

19  level, they identified six property management firms

20  who have been named as defendants in other class

21  action lawsuits, controlling about 1300 units in the

22  City of Berkeley.

23          So this is an issue that is important for

24  the renters in the City of Berkeley and an opportunity

25  to alleviate rapidly increasing rents for Berkeley



1   residents.

2          And just by way of a little more rationale

3   and some background datapoints, over the last nine

4   years, rents have increased 19 percent throughout the

5   East Bay.  The city's housing element notes that rents

6   for rent-controlled and market rate units have

7   increased dramatically over the past decade.  The

8   city's Black population has declined rapidly over the

9   last 20 years due to rising housing costs in the city.

10          The use of these devices is illegal price

11  fixing, and it negatively impacts the rental market by

12  artificially inflating rents and creating housing

13  scarcity.

14          So why take local action?  There have been

15  numerous lawsuits, as I've mentioned, that have been

16  filed throughout the country, but those lawsuits could

17  take years to litigate.  And while these lawsuits are

18  going through the legal process, tenants are not

19  realizing the benefits of an ordinance that would make

20  the use of these algorithmic devices illegal in their

21  jurisdiction.

22          Acting locally will ban these practices to

23  protect tenants now without waiting.  Therefore, we,

24  the HAC, is recommending that the City Council adopt

25  an ordinance banning the sale and use of algorithmic



1   devices to set rents and manage occupancy rates.  I
2   believe that you all have received a letter of support
3   from Tech Equity, and that letter of support has a
4   couple amendments that they believe and say will
5   strengthen the proposed ordinance by updating the
6   definition of algorithmic devices, and including
7   algorithms that use all data, not just nonpublic data.
8           So Council may want to consider those
9   recommendations that were included in Tech Equity's
10  letter.  And with that, we're concluding our
11  presentation.  And both Commissioner Simon-Weisberg
12  and myself are available to answer any questions.
13  Thank you.
14          MAYOR ISHII:  Thank you both very much for
15  your presentation and for the data.  I think that's
16  very helpful.  Are there any clarifying questions
17  before we move on to public comment?  Okay.  Let's
18  move on to public comment.
19          Just want to check with our city clerk.
20  Just make sure our time is okay on the clock and
21  everything.  Okay.  Great.  Thank you.
22          AVERY ARBAUGH:  Good evening, Mayor and
23  Councilmembers, and I'd also like to thank the
24  presenters for their wonderful presentation.  Uh, my
25  name is Avery Arbaugh (phonetic).  I'm a board member



COUNCIL MEETING                                                              March 11, 2025
Berkeley City Council                                                                      10

 1    for the East Bay Stonewall Democratic Club, the

 2    Wellstone Democratic Renewal Club, and the Berkeley

 3    Tenants Union, as well as the head of the Berkeley

 4    Tenant Organizing Task Force.  I'm also a student and

 5    a tenant in Berkeley, and I've had friends who have

 6    been pushed out of the city because of rent burden.

 7            I'm here to stand in support of item 18

 8    because we must stop the cartelization of our rent

 9    prices.  We must be clear that just because this new

10    era of price fixing is done using apps and algorithms,

11    rather than explicit conversation between landlords,

12    it -- the effects of price fixing remain the same.  It

13    harms tenants, and it lines the profits of large

14    corporate landlords at the expense of everyday

15    Berkeleyans.  Thank you very much for your time.

16            MAYOR ISHII:  Thank you.

17            FEMALE VOICE:  I'm in support of this item,

18    but I hope at some point that someone develops this

19    item by reviewing how algorithmic devices are used to

20    have a discriminatory impact on screening of tenants.

21    There have been studies that this is done, that

22    marginalized persons are often excluded from housing

23    based on these use of these types of devices.  So I am

24    hoping that someone brings forward that type of item.

25            The city is doing really good things with



 1  homeless housing and also with the expanding of the in

 2  lieu units, the inclusionary units for additional

 3  Section 8 and Shelter Plus.  But the reality is that

 4  people still have difficulty in Berkeley with vouchers

 5  and with subsidies, despite that in 2017 it was --

 6  okay.  Thank you.

 7          MAYOR ISHII:  Thank you.

 8          NADINE:  Thank you very much for your

 9  presentation, and I just -- my name is Nadine.  I've

10  spoken a few times tonight, and I'm chair of the

11  Berkeley Tenant Union, and in my capacity as such, I

12  and personally I want to support item 18.  Housing is

13  the biggest financialized global commodity in the

14  history of mankind.  And this type of AI price fixing

15  only makes it worse.

16          Did you -- I'm just question -- clarifying

17  question.  Did you say that six landlords in Berkeley

18  owned 36,000 units? How many?  Okay.  1600.  You said

19  something about six landlords, anyway.  It's

20  unbelievable how one person can have control over so

21  many people's lives and their -- the possibility of

22  them staying in Berkeley or not, and then colluding

23  with other people and creating this type of monopoly

24  only makes it much harder.

25          I'm glad that you guys are taking this up



COUNCIL MEETING                                      March 11, 2025
Berkeley City Council                                             12

```
 1   and I hope it passes.  Thank you.
 2             MAYOR ISHII:  Thank you.
 3             FEMALE VOICE:  Hello.  Thank you very much
 4   for members and Madam Mayor, City Council members.  I
 5   also am speaking in favor, and I hope that you would
 6   adopt an ordinance that would look at preventing AI
 7   from setting prices.  This is another example of
 8   housing being looked at as a product.
 9             Two weeks ago we were here.  We were talking
10   about the in lieu fees and they presented it as
11   products.  Here, landlords, business owners are
12   looking at their products, but the product that
13   they're selling is a service.  They're providing a
14   service.  And so consumers should be protected.  And
15   this is a perfect opportunity to protect the consumers
16   in this rental housing industry.
17             So I ask that you please consider protecting
18   the consumers and pass an ordinance that would benefit
19   the consumers here.  Thank you.
20             MAYOR ISHII:  Thank you.
21             SHANE:  Hi, I'm Shane.  I'm speaking in my
22   personal capacity in support of item 18.  As an RA,
23   I'm working with a myriad of students as they navigate
24   the housing system for the first time, and price is a
25   huge concern.
```



1          Particular group of tenants navigates the

2    process with fear and uncertainty with less metrics to

3    determine what is a fair price or lease.  It's evident

4    from the prior presentation that this program is

5    predatory.  I'm unsure how exactly it uses AI in its

6    operations, but AI in and of itself is not a reliable

7    source for social issues.

8          First, generative AI is consistently false,

9    which anyone who sees AI Google results will be

10   familiar with.  Secondly, AI is trained on the

11   internet and is thereby a cumulative amalgamation of

12   every inhumane bias that it trains its algorithm on.

13         Any rental pricing that relies on a system

14   shown time and time again to be not only biased, but

15   outright false, is both ridiculous and predatory.  I

16   urge you to vote yes on item 18 and approve

17   Councilmember Lunaparra's supplemental.  Thank you.

18         MAYOR ISHII:  Thank you.

19         SULLY ALPERT:  Good evening, mayor and

20   members of the City Council.  I've got one minute

21   ceded to me by the gentleman in the back.  My name is

22   Sully Alpert.  I'm the chair of the Berkeley Rent

23   Stabilization Board and speaking in strong support of

24   the item and as it's been modified by the supplemental

25   submitted by Councilmember Lunaparra.



1          Obviously, as someone concerned with tenant

2    protections and the affordability of housing in our

3    community, it's vitally important.  But also, just as

4    another commenter mentioned, as a basic consumer

5    standpoint, you know, it's really sad that we even

6    have to be here putting this forward.

7          If our anti-competitor -- you know, if the

8    laws are federal laws around anti-competitive behavior

9    or better enforced, this would have been totally

10   illegal and would have been shut down long before.

11   But we know, unfortunately, that big business has

12   controlled a lot of our federal regulatory

13   apparatuses.

14          And so luckily we have resources that we can

15   put to use at the city level to combat this kind of

16   behavior.  And this is one really common sense way to

17   do that, right?  You know, unfortunately, we live in a

18   world where the market sets the price of housing.  I

19   wish that weren't the case, but if we are going to

20   live in that world, then the market should be

21   regulated appropriately and the competitors in that

22   market should actually be in competition.

23          And if they are engaging in this kind of

24   anti-competitive behavior, in this kind of collusion,

25   this kind of cartel, then that's not happening.  Rents



 1  aren't being set based on the market.  They're being

 2  set based on a skewed market that hurts Berkeley's

 3  community.  So I'd urge you to pass the strongest

 4  possible version of this legislation as submitted in

 5  your supplemental this evening.  Thank you so much.

 6          MAYOR ISHII:  Thank you.

 7          MALE VOICE:  I also strongly support this

 8  measure to item 18, that is to prevent the housing in

 9  Berkeley from being further cartelized televised and

10  price fixed.  I say further because this already goes

11  on.  While this would rapidly and exponentially

12  accelerate the cartelization of housing, their cartels

13  already exist.

14          One such is the Berkeley Property Owners

15  Association, which masquerades as a trade group, but

16  they have their meetings, you know, what do you

17  suppose all these property owners who call themselves

18  rental housing providers talk about in their meetings

19  with each other?  It doesn't take a whole lot of

20  imagination to figure out that they're not really in

21  competition.

22          MAYOR ISHII:  Thank you.  Thanks for your

23  comment.

24          Alan:  Hello.  My name is Alan.  I'm a

25  renter in Elmwood, and I support the general kind of



 1  idea of this, but I just want to separate the two

 2  issues and not confound them.  One issue is the use of

 3  nonpublic data.  The other issue is the use of other

 4  devices.

 5         So I want to make sure that the Council

 6  understands that.  I think the core issue is the

 7  nonpublic data segment, and that's kind of the price

 8  fixing issue that is being sued under RealPage.  If we

 9  ban use of algorithmic devices, I think you're

10  creating issues for a lot of landlords who may use any

11  sort of software to be able to control rent.

12         A lot of times rent is inefficiently set.

13  It might be too high, and the algorithm may actually

14  recommend that landlords lower their rent to be able

15  to reduce their vacancy, reduce their time spent

16  idling their property.  And that incentivizes both

17  landlords and tenants.

18         So the issue in a housing scarce market

19  obviously is going to look like the pricing is too

20  high.  But if we get more housing, then that will also

21  push pricing down and the algorithm can detect that.

22  Thank you so much.

23         MAYOR ISHII:  Thank you.  Are any other

24  public comments online?

25         THE CLERK:  Yes.  There's four public



1    commenters.  First is David Shearer.

2            DAVID SHEARER:  Hi.  David Shearer, housing

3    advisory commission, speaking only for myself, I am

4    speaking in favor of this item tonight, in particular

5    the text as recommended by HAC and not in the

6    supplemental.

7            I want to make sure that we are clear about

8    what this is about and what it's not about.  This is

9    about anti-competitive collusion and market

10   manipulation.  It's about landlords making more money

11   by declining to compete against each other for

12   tenants.

13           Folks are talking about algorithms and AI.

14   This is not about algorithmic price setting.  The

15   problem is not that the price came from a computer.

16   The problem is collusion.  What the technology is

17   doing is making that collusion more scalable and more

18   efficient.  But the main story here is not algorithms.

19   It's a cartel of landlords colluding rather than

20   competing.

21           We should not overstate the impact.  Banning

22   RealPage will not fix our housing crisis.  We need to

23   build a lot of new housing at all income levels.  But

24   cartels like RealPage can have a meaningful impact on

25   the housing market and housing prices.  It is totally



1    unnecessary, and I hope you will approve this item as

2    recommended by HAC.  Thank you.

3              MAYOR ISHII:  Thank you.

4              THE CLERK:  Next is a caller with a phone

5    number ending in 538.  Should be able to mute press

6    star six.  And caller ending.  Caller with a phone

7    number ending in 538.  Please unmute.  All right.

8    We'll go to somebody else.  Kelly Hammergren.

9              KELLY HAMMERGREN:  Thank you.  I'm pleased

10   to see this on the agenda.  And it was several months

11   ago when I started reading about RealPage, which was

12   maximizing rents over filling units.  And so

13   maximizing rent and to leave vacant units seems to --

14   seems to me to be very concerning.  So that's all I'll

15   say about it.  I hope you pass it.  Thank you very

16   much.

17             MAYOR ISHII:  Thank you.

18             THE CLERK:  All right.  We'll go back to the

19   caller with the number ending in 538.

20             MALE VOICE:  I just like to mention two

21   things very quickly.  The first house I bought in

22   Berkeley was in Cragmont in 1968 was 28,000.  Second

23   one in Euclid was 101,000.  What happened?  Housing

24   prices is unreal.  It's totally unreal.  The fact is,

25   lot of money coming out from foreign money that is



COUNCIL MEETING                                          March 11, 2025
Berkeley City Council                                                19

1  done by what's called private equity firms and

2  destroying the whole housing in the whole country.

3          The other point I'd like to make, we live in

4  earthquake country and what Trump did anything that

5  NOAA were in big, big, big trouble.  NOAA is very

6  important to earthquakes, to ships, to weather, to

7  everything.  This man really should be impeached as

8  soon as possible.  Otherwise, I'm not going to have a

9  country.  Thank you.  And I'm sorry.  My apology to

10  Mayor and to the City Council people.  I just got

11  excited to look back at the last four years and not

12  very happy about that.  But thank you again.  Always

13  great city.  Always love this city.  Have a good

14  night.

15          THE CLERK:  Okay.  Next is Maria Sole.

16          MARIA SOLE:  Yes.  Thank you again.  I'm so

17  glad we're still all here.  I support this as I did

18  the other one, because this is basically a callback to

19  the Berkeley values that we've been speaking about all

20  night.  Whether it's the othering and the hate or the

21  division and the violence and the lack of safety.

22          You know, it's all the same thing.  It's

23  either all of us or none of us.  We've got a few

24  globally that are exploiting and pillaging and

25  plundering at the expense of the rest of us.  And it's



 1   not going to work.

 2          So here's to Berkeley coming together and

 3   not letting a few property owners or realtors, hedge

 4   funds, etc. take possession of our hearts and souls

 5   because housing is necessary for everybody.  Thank

 6   you.

 7          MAYOR ISHII:  Thank you.  Is there one more

 8   person or is that --

 9          THE CLERK:  Two more.

10          MAYOR ISHII:  Two more people.

11          THE CLERK:  Next is Krista.

12          KRISTA GULBRANSON:  Thank you.  Thank you.

13   Mayor and Council.  Krista Gulbranson, executive

14   director of the Berkeley Property Owners Association.

15   I honestly, really just trying to suss out and

16   understand the difference in this proposal, which is

17   different than San Francisco's in that it wants to

18   prohibit algorithmic devices that use both private and

19   public data.

20          So Zillow uses algorithms to set its

21   suggested rents to anybody who is viewing anybody in

22   the public who is viewing, and so as far as I read

23   this proposal and ordinance, it would actually

24   prohibit the use of anybody looking at any public data

25   that could be inclusive of the rent registry, even if



 1  someone takes that public data and inputs it into an

 2  algorithmic device.

 3          So I'm having a hard time understanding

 4  that.  I'm also having a very difficult time

 5  understanding how the 1300 identified units that are

 6  part of the RealPage lawsuit in Berkeley, how those

 7  1300 units are using an algorithmic device to set all

 8  rents in Berkeley.  So --

 9          MAYOR ISHII:  Time is up.

10          KRISTA GULBRANSON:  Oh, sorry.  I did not

11  see that.  Thank you so much.

12          MAYOR ISHII:  That's okay.  I know it can be

13  hard to see online.  One more.  Did you say?

14          THE CLERK:  That's it.  Actually, the person

15  dropped off.

16          MAYOR ISHII:  Okay, Councilmember Humbert, I

17  know you.  I think you had your hand up first.

18          COUNCILMEMBER HUMBERT:  Thank you, Madam

19  Mayor.  It's easy for me to do that online.  We've

20  read through these two items.  The original one and

21  the supplemental carefully.  And I can't support

22  either version of this item tonight.  My primary

23  reason is that the definitions in both versions, but

24  especially the definition in the supplemental, are

25  overbroad and likely unenforceable.



1           The way the original version defines

2    algorithmic device and competitor data could, as we've

3    been discussing, prevent a landlord from using their

4    own nonpublic records to inform their decisions about

5    rent levels and vacancies.

6           If a majority -- additionally, I would like

7    to see algorithmic device change to algorithmic

8    software if it were to pass or something similar with

9    attendant changes.  But I think this is not ready

10   for -- you know, this is not ready to pass.  It would

11   need a substantial amount of work before it made a

12   whole lot of sense and was precise and targeted enough

13   for us to adopt.

14          Even so, the pricing algorithm definition in

15   the supplemental is any analytical or computation

16   processes that use data to recommend or predict the

17   price of consumer goods or services.  This definition

18   is really, really overbroad, unenforceable.  And, you

19   know, possibly and likely, I think, unconstitutional.

20          Although the ordinance provides additional

21   examples of the more specific pricing algorithms in

22   mind, it does not adopt a more limited definition that

23   could withstand scrutiny.  So, you know, I think under

24   this broad definition, a couple trying to rent out

25   their ADU and plugging a bunch of rental information



1  from Craigslist into an Excel spreadsheet to find an

2  average rent in their area would fall under the

3  prohibition.

4          Under either ordinance, it's at best

5  ambiguous whether something like Zillow's rental

6  services, which rely on public and private data, would

7  be illegal for people to use in Berkeley.

8          I also think the ordinances, both of them,

9  both versions as written, are imprecise in a number of

10  ways.  For example, they currently allow tenants a

11  private right of action, but theoretically the people

12  most affected would be prospective tenants.  So as

13  written, these ordinances don't provide a legal avenue

14  for their intended primary beneficiaries.  And if

15  we're going to open the door to prospective tenants

16  using a private right of action, this needs to be

17  carefully prescribed to prevent abuse.

18          I think another issue with these proposals

19  overall is the difficulty, really, and this probably

20  is the crux of the biscuit, is the difficulty of

21  proving such tools have been used.  As a city, we

22  don't have the resources to conduct the level of

23  investigation necessary to establish whether a

24  landlord used illegal algorithms, especially if they

25  tried to do so covertly.



COUNCIL MEETING                                          March 11, 2025
Berkeley City Council                                                24

 1            There's nothing about a particular asking
 2   rent level or vacancy that would, in and of itself,
 3   qualify as evidence that such an algorithm was used.
 4   You know, establishing that such an algorithm was used
 5   would essentially require seizing computers and
 6   subpoenaing records from the landlords or the service
 7   providers.  And this differs from so many of the other
 8   ways in which we regulate rentals, where the evidence
 9   of wrongdoing would be much plainer in physical form,
10   in communications with tenants, or in landlords'
11   discriminatory actions toward prospective tenants.
12            You know, and saying all this, I want to
13   emphasize that I think any anti-competitive behavior
14   and price fixing by large market actors is bad, and
15   something we should try to crack down on at a higher
16   level.  But I don't think this makes sense for us to
17   do here.
18            This is because we don't have the resources
19   of something like an Attorney General's office or the
20   Department of Justice, and because I think the nuance
21   and enforcement are difficult to get right.
22            Finally, looking at the big picture, I think
23   that we see from the data that the single most
24   important thing we can do to lower the price of
25   housing is to build more of it.  The sort of price



COUNCIL MEETING                                      March 11, 2025
Berkeley City Council                                         25

```
 1   fixing schemes this ordinance aims to prevent only
 2   work when there is scarcity and oligopoly in the
 3   market.  And to pretend that these devices somehow are
 4   leading to high rents really is a gross
 5   oversimplification.
 6              I want the city to stay focused on the areas
 7   where we can make the biggest difference with the
 8   resources at our disposal, and those resources are
 9   becoming more and more strained as we move forward
10   into this new era.  So I would like to make a motion
11   to reject both proposals.
12              FEMALE VOICE:  I'll second, for the purposes
13   of discussion.
14              MAYOR ISHII:  Okay.  There -- the next
15   person to speak is Councilmember Lunaparra.  And I'm
16   going to reserve myself a spot after Councilmember
17   Blackaby and Bartlett as well.
18              COUNCILMEMBER LUNAPARRA:  Thank you.  I want
19   to, based on feedback from advocacy organizations,
20   Tech Equity, members of the Housing Advisory
21   Commission, and the City Attorney's office, I
22   introduced a supplemental item to clarify some
23   definitions and close potential loopholes.  And
24   Councilmember Traeger has co-sponsored the item.  So I
25   appreciate that.
```



1          These changes include changing the term

2    algorithmic devices to pricing algorithms as a

3    clarification, and making sure that companies like

4    RealPage can't use any data, public or private, to fix

5    prices or leave units vacant with the goal of price

6    gouging Berkeleyans.

7          I'm concerned that the positive effects of

8    our city's strong action towards building more housing

9    may be curbed by this kind of collusion.  Also,

10   frankly, this is the kind of legislation that's best

11   taken up at the regional level.  So I hope that this

12   is one step towards broader legislation to stop the

13   cooperation between competitors to manipulate the

14   housing market.

15         I have also incorporated further feedback

16   from the City Council's resident tech expert,

17   Councilmember Blackaby, and I'm grateful for his

18   collaboration as well.

19         The City Attorney's office reviewed these

20   technical changes this afternoon, and I'd like to

21   thank them for their quick responses and

22   collaboration.

23         I'm going to share my screen in a second to

24   show these technical changes to my supplemental.  I

25   need to -- give me one second.  I need to be able to



 1    join the meeting.  I'm so sorry.  I'll just say the
 2    changes, okay?  And then.  Yeah.  Let's go.  Yeah.
 3             MAYOR ISHII:  We'll come back.
 4             COUNCILMEMBER LUNAPARRA:  So there's two
 5    main changes.  One large one and one small one.  One
 6    clarifying the definition of pricing algorithms to
 7    make sure that the direct or indirect coordination
 8    with competitors, including through third party
 9    vendors, is illegal under this ordinance.  And one
10    smaller change to remove the explicit naming of the
11    East Bay Rental Housing Association and the Berkeley
12    Properties Property Owners Association in finding
13    Section F.
14             So give me a second while I pull that up.
15    I'm so sorry.
16             MAYOR ISHII:  Sure.  Thank you.  We will now
17    go on to Councilmember Blackaby.
18             COUNCILMEMBER BLACKABY:  Thank you, Mayor.
19    And thank you to our presenters, including D6's
20    nominee to the -- or commissioner to the Housing
21    Advisory Commission.  And thank you to Councilmember
22    Lunaparra, who's been so willing to take feedback and
23    think through these issues.
24             I share a lot of the feedback from folks at
25    this meeting that, you know, algorithms in and of



1  themselves aren't good or bad.  And by the way, I'm

2  not the only resident expert.  I actually will point

3  to Councilmember O'Keefe, who's actually a computer

4  science teacher.  I'm just a marketer.

5          COUNCILMEMBER O'KEEFE:  I have no practical

6  knowledge whatsoever.

7          COUNCILMEMBER BLACKABY:  Well, good.

8          (Overlapping voices)

9          COUNCILMEMBER BLACKABY:  So anyway, so

10  algorithms in and of themselves aren't good or bad.

11  You could certainly envision an algorithm to help

12  renters, for example, gather wide swaths of data

13  across an entire market to help them make an informed

14  decision about what they should be willing to pay.

15  That'd be a great algorithm, right?  That'd be a great

16  LM.  That'd be a great use of technology to give them

17  access to data to make informed decisions.

18          Similarly, you could envision an algorithm,

19  neutral algorithm to help landlords survey the market

20  and determine a fair price to market -- to rent out a

21  unit.  That also could be a great use and a fair use

22  of an algorithm.

23          So to me, the problem isn't the tech per se.

24  It's not the tech, strictly speaking, it's the

25  collusion of some of the -- some of the commenters



1    have said it's the collusion.  It's the coordination

2    among competitors in an anti-competitive way, kind of

3    behind the scenes outside of the free and fair market

4    that we're concerned about.

5              And so any technology that facilitates that

6    kind of coordination and joint price setting, no

7    matter what the source of the data is, it's the

8    coordination and the collusion amongst the market

9    players, I think, is the problem.

10             So, when Councilmember Lunaparra, shows you,

11   we worked a lot on the definition of pricing algorithm

12   to try and introduce that.  It's -- thank you.

13   It's -- we added the highlighted parts in yellow that

14   it's not just the analytical or computation process

15   that uses data to recommend or predict the price.

16   It's in direct or indirect coordination with one or

17   more competitors, including potentially through a

18   third party vendor.

19             The other thing we did is, we made the other

20   section plural because I'm less -- again, less

21   concerned about one landlord using one piece of

22   technology and setting a price in isolation.

23             But jointly, if landlords together are

24   making decisions together about vacancy or about

25   pricing, again, that, to me, is more problematic.



1          So one other broader point.  And then and

2     then I'll cede my time.  Our point is, as a city, you

3     know, we should support innovation.  We should support

4     technology.  We have a world class campus right down

5     the street.  And so I want to make it clear that as a

6     city, we support smart thinkers.  We support

7     development of AI.  We support development of

8     technology that makes things better.  We support

9     technology that makes things more transparent, that

10    makes markets more transparent, and accessing more

11    data to make more informed decisions is a good thing.

12          But we don't support collusion.  We do not

13    allow collusion.  Collusion is illegal in our rental

14    marketplace.  And so that's, I think, the balance we

15    are trying to strike here.

16          Last thing I think I'll mention, and we may

17    not fix this tonight and we've been talking to the

18    city attorney is, what we actually call it.  We're

19    calling it here pricing algorithm.  I think we could

20    probably even be more accurate to say that it's

21    something about -- and this isn't exactly right, but,

22    you know, market setting algorithm or price fixing or

23    price control.

24          There's something about it.  Because again,

25    in and of itself, I don't have a problem with pricing



1   algorithms.  I have a problem with algorithms that

2   facilitate collusion, and that's really what we're

3   trying to regulate here.  So thank you to

4   Councilmember Lunaparra for indulging me.  And

5   hopefully we can get this balance right.

6           MAYOR ISHII:  Thank you.  Yes.  Moving on to

7   Councilmember Bartlett.

8           COUNCILMEMBER BARTLETT:  Thank you.  And

9   thank you for bringing this forward.  And I we had a

10  great talk about this at the committee.  And we

11  discussed the anti-competitive practices and collusion

12  inherent in this.  We talked about the erosion of

13  tenant protections that come as a result.  And there's

14  further GDPR, California privacy protection data

15  concerns, the trending towards housing discrimination

16  and systematizing it, and this overall this tech

17  monopolization, this algorithmic AI capture of the

18  American consumer.

19          And we see it in pricing for airplane

20  tickets.  We see it in everything, anything you shop

21  on, depending on what time of day you get a different

22  price or it knows your -- it knows your banking

23  information, so it knows how much money you make.  You

24  get a different price.  It's turning into a real

25  prison for people.



1        And as my colleague was saying, Mr.

2   Blackaby, you know, this technology.  I think this is

3   really the first time we've -- we're going to -- the

4   first of many times we're going to have to come out

5   with some guidance on how to use this new force that's

6   coming into our world.

7        And it is neutral, but we need to get a hold

8   of it and make it positive.  And that means make it

9   work for people and not against people.  So, you know,

10  I think we really need to pass this.  I like the -- I

11  like the changes made in the supplemental by my

12  colleagues.  It addresses, I think, some of the

13  concerns raised by Councilmember -- he's not here --

14  Humbert.  Yeah.  There you go.  There you are.  Okay.

15       Councilmember Humbert and really describes

16  the hub-and-spoke nature of it and this anti-

17  competitive model.  And in the absence of any real

18  federal enforcement, and less so as we see day by day,

19  I think we have to stick up for our residents here.

20  Thank you.

21       MAYOR ISHII:  Thank you, Vice Mayor.  Moving

22  on to Councilmember Taplin.

23       COUNCILMEMBER TAPLIN:  Thank you.  I just

24  had one question.  You mentioned that there was

25  pending state legislation.  Are you able to share with



1  those bills are?

2         MAYOR ISHII:  There are I think your mic is

3  not on.  Yeah.  Just pull and pull it close to you.

4  There we go.

5         MS. POTTER:  It's so funny after so many

6  years of being up there to be on this side and have to

7  learn how to use these mics again.  There are four --

8  I don't have.  I could pull up in a minute.  I had

9  them up, but I don't have them.  But I will get them.

10  There are four.

11         The Tech Equity has been -- has been working

12  closely with one of the bills.  And this -- the

13  definitions that were recommended that were the base

14  of the Lunaparra and Tregub suggestions are reflected

15  in that.

16         I just -- I think that, you know, it's

17  unclear that we've been doing, you know, there have

18  been state bills across the country.  This one is more

19  modeled off of San Francisco's.  And I think that, you

20  know, that regional impact is going to be very, very

21  important.

22         I mean, I hope the state passes it because

23  that'll make a huge difference.  You know, Greystar

24  not only is one of the bigger players in Berkeley and

25  in the Bay area, but particularly of our student



1   housing.  And I think that one thing I really just

2   want to emphasize is all the empty units.  I teach at

3   the law school previously known as Hastings, and I

4   taught this legislation.  I do antitrust as one of the

5   topics.

6          And I've never had so many students talk

7   because they all live in the student housing overseen

8   by Greystar.  And they talk about how three of the

9   floors are empty and they use -- they're using the

10  algorithm for that student housing, and they are using

11  that student -- that algorithm on our student housing

12  here.

13         And so I think it will make a huge

14  difference if just Greystar would stop using it and

15  our students wouldn't have to spend as much on housing

16  as they are on their tuition.

17         So I think that we really need to do it

18  right away.  I mean, in February is when our rents are

19  highest in Berkeley because all the students are

20  looking for housing because of that algorithm.  And so

21  I hope we -- you know, I hope that this -- at the

22  state level these bills pass.  But we've had one at

23  the federal level, I think, on three years.  That was

24  introduced as soon as the ProPublica article came out.

25         But I can -- I can provide the four bill



 1  numbers.  And I believe that at least two of them have
 2  already come together.
 3          MAYOR ISHII:  Thank you.  Did you have other
 4  questions or comments?  Councilmember?
 5          COUNCILMEMBER TAPLIN:  That's all.  Thank
 6  you.
 7          MAYOR ISHII:  Thank you.  Moving on to --
 8  actually I think it's supposed to be Councilmember
 9  O'Keefe.  For some reason, yours was flashing, and
10  then it --
11          COUNCILMEMBER O'KEEFE:  I'm number 31.
12  Apparently.  It's been it's -- it's confused.  Thank
13  you.  Thank you so much for these changes.  They have
14  scratched an itch that I had.  It was really, really
15  good.  And as Councilmember Blackaby said, I teach
16  computer science.  These words mean something to me,
17  and I don't -- they've been used.  I'm talking about
18  the original language, and I'm sorry for whoever wrote
19  it.
20          I don't mean to, you know, be too mean to
21  you, but I just want to point out, like, algorithm.
22  We think it means like it means software.  It means
23  something computer.  No, an algorithm is actually just
24  a series of instructions that accomplishes something.
25          A device is like a thing, and data is



 1   information.  So I mean, you -- I'm like using an

 2   algorithm on a device when I'm cooking from a recipe.

 3   And I have a digital thermometer, I mean, I'm using an

 4   algorithmic device.

 5            So this to -- it was too loose.  And it was

 6   the objections that this isn't really -- this could

 7   capture normal behavior that any landlord would engage

 8   in, I think was a legitimate concern before.

 9            But I really like these edits, the red ones

10   and then the yellow ones even more because it really,

11   as Councilmember Blackaby said, very well, this really

12   focuses on the thing that we actually don't like,

13   which is the collusion.

14            And so I think, you know, I definitely, you

15   know, agree with the goals.  These scenarios that were

16   described by our wonderful presenters are bad.  We

17   want to stop this from happening.  Absolutely.  And I

18   think that with these edits, this is actually, very

19   well-tailored now to actually do that.  So I'll be

20   supporting it.  And thank you for -- thanks everyone

21   for your work.

22            MAYOR ISHII:  Thank you.  Councilmember.

23   Councilmember Tregub.

24            COUNCILMEMBER TREGUB:  I just wanted to see

25   if the Councilmember Lunaparra, if it was your intent



1   to introduce a substitute motion.

2             COUNCILMEMBER LUNAPARRA:  Yes.  Thank you so

3   much.  Yes, I will -- I will.

4             MAYOR ISHII:  Let her make the motion.  Go

5   ahead.

6             COUNCILMEMBER LUNAPARRA:  I will make a

7   substitute motion to adopt the supplemental two with

8   these changes that are highlighted here and this

9   change that's highlighted here, which is removing the

10  naming of the property owners association and the East

11  Bay Rental Housing Association.  And I will send that

12  to the clerk's office as well.

13            MAYOR ISHII:  And then you'd like to second

14  it?  Councilmember Tregub?  Thank you.

15            I just wanted to make one comment.  Oh, I'm

16  sorry, I didn't see.  I just wanted to make one

17  comment, just to say, you know, about addressing some

18  concerns about this potentially being illegal or

19  unconstitutional, just to comment on the fact that

20  this has happened in other states, counties, etc., and

21  that we've also had our city attorney's office go over

22  it.

23            And so, you know, that gives me a lot of

24  confidence that that's not the case.  And so I just

25  want to make that comment because I think that's



1  important.  Councilmember Kesarwani.

2          COUNCILMEMBER KESARWANI:  Yes.  Thank you

3  very much, Madam Mayor.  And thank you, Councilmember

4  Lunaparra, for this supplemental.  And thank you,

5  Councilmember Blackaby, for the amendment.

6          I think I feel more comfortable supporting

7  this now with this change that we are defining this as

8  indirect or indirect coordination with one or more

9  competitors.  I share the concern that Councilmember

10  Humbert raised about enforcement, but I think that all

11  in all, on balance, passing this and saying that we

12  don't support this type of price collusion, is a

13  reasonable thing to do.

14          So I'll just respectfully withdraw my second

15  of Councilmember Humbert's motion, and I'm prepared to

16  support this with the amendments proposed.  Thank you.

17          MAYOR ISHII:  Okay.  Then I would ask the

18  clerk to take roll unless there are any other

19  comments.  Okay.  Thank you.

20          THE CLERK:  On the motion by Councilmember

21  Lunaparra to adopt the ordinance and supplemental

22  number two with the additional changes made on the

23  dais, Councilmember Kesarwani.

24          COUNCILMEMBER KESARWANI:  Yes.

25          THE CLERK:  Taplin.



1          COUNCILMEMBER TAPLIN:  Yes.

2          THE CLERK:  Bartlett.

3          COUNCILMEMBER BARTLETT:  Yes.

4          THE CLERK:  Tregub?

5          COUNCILMEMBER TREGUB:  Aye.

6          THE CLERK:  O'Keefe.

7          COUNCILMEMBER O'KEEFE:  Yes.

8          THE CLERK:  Blackaby.

9          COUNCILMEMBER BLACKABY:  Yes.

10         THE CLERK:  Lunaparra.

11         COUNCILMEMBER LUNAPARRA:  Yes.

12         THE CLERK:  Humbert.

13         COUNCILMEMBER HUMBERT:  No.

14         THE CLERK:  And Mayor Ishii.

15         MAYOR ISHII:  Yes.

16         THE CLERK:  Okay.  Motion carries.

17         MAYOR ISHII:  Thank you all so much.  I

18  appreciate seeing you all at work here and trying to

19  figure out the boundaries.  So thank you.  I really

20  appreciate it.  Reminds me of game night.

21          Anyway, so, there was adjournment in memory

22  of Polly Armstrong, the former District 8 City Council

23  member.  Again, there was a very touching tribute from

24  Councilmember Humbert that was said earlier.  And so

25  I'm wondering if there's a motion to adjourn.



1          No.  Did I -- missing something?  I'm sorry.
2    Oh, yes.  Thank you.  I'm so sorry.  Is there any
3    additional public comment for items not listed on the
4    agenda.
5          THE CLERK:  From individuals who did not
6    speak at the beginning of the meeting.
7          MAYOR ISHII:  Thank you for clarifying.
8    Yes, for folks who did not speak earlier on the same
9    area.
10          THE CLERK:  Okay.  There's no Zoom hands so
11    we can adjourn the meeting if there's a motion.
12          MAYOR ISHII:  Yes.  Is there a motion?
13    Yeah.  Thank you.
14          THE CLERK:  Councilmember Kaplan.  Second.
15          MAYOR ISHII:  Second.  Is there a second?
16    Yeah.
17          THE CLERK:  Councilmember Lunaparra.  Okay
18    to adjourn the meeting Councilmember Kesarwani?
19          COUNCILMEMBER KESARWANI:  Yes.
20          THE CLERK:  Taplin.
21          COUNCILMEMBER TAPLIN:  Yes.
22          THE CLERK:  Bartlett.
23          COUNCILMEMBER BARTLETT:  Yes.
24          THE CLERK:  Tregub?
25          COUNCILMEMBER TREGUB:  Aye.



```
 1              THE CLERK:  O'Keefe.

 2              COUNCILMEMBER O'KEEFE:  Yes.

 3              THE CLERK:  Blackaby.

 4              COUNCILMEMBER BLACKABY:  Yes.

 5              THE CLERK:  Lunaparra.

 6              COUNCILMEMBER LUNAPARRA:  Yes.

 7              THE CLERK:  Humbert.

 8              COUNCILMEMBER HUMBERT:  Yes.

 9              THE CLERK:  And Mayor Ishii.

10              MAYOR ISHII:  Yes.

11              All right.  Thank you all so much.  Thank

12    you to staff.  And thank you so much to my

13    Councilmembers.

14              (End of Video Recording)

15

16

17

18

19

20

21

22

23

24

25
```



```
 1              CERTIFICATE OF TRANSCRIPTIONIST

 2

 3          I WENDY K. SAWYER, hereby certify that I was

 4     authorized to and did transcribe the provided

 5     recording and that the foregoing transcript is a true

 6     transcript of said electronic recording to the best of

 7     my ability.

 8          I FURTHER CERTIFY that I am not a relative,

 9     employee, attorney, or counsel of any of the parties,

10     nor am I a relative or employee of any of the parties'

11     attorneys or counsel connected with the action, nor am

12     I financially interested in the action.

13

14          DATED this 1st day of April, 2025.

15

16

17     _____

18     WENDY K. SAWYER, CDLT

19

20

21

22

23

24

25
```

