Kristin A. Linsley (#154148)
  klinsley@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center #2600
San Francisco, CA  94111-3715
Telephone:     415.393.8200
Facsimile:     415.393.8306

Jay P. Srinivasan (#181471)
  jsrinivasan@gibsondunn.com
Bradley J. Hamburger (#266916)
  bhamburger@gibsondunn.com
Samuel Eckman (#308923)
  seckman@gibsondunn.com
Alexander N. Harris (#278482)
  aharris@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:     213.229.7000
Facsimile:     213.229.7520

*Attorneys for Plaintiff RealPage, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALPAGE, INC.,<br><br>     Plaintiff,<br><br>  v.<br><br>THE CITY OF BERKELEY, CALIFORNIA, and PAUL BUDDENHAGEN, CITY MANAGER OF BERKELEY, CALIFORNIA, in his official capacity,<br><br>     Defendants. | CASE NO. 3:25-cv-03004-TSH<br><br>**PLAINTIFF REALPAGE, INC.'S NOTICE OF MOTION AND MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>Date: TBD<br>Time: TBD<br>Dept: TBD<br>Judge: Hon. Thomas S. Hixson<br>Trial Date: TBD<br>Date Action Filed: April 2, 2025 |

# **NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that, as soon as the parties may be heard, in the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, Plaintiff RealPage, Inc. will, and hereby does, move this Court for a temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b), and/or for a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), to prohibit Defendants the City of Berkeley, California and Paul Buddenhagen, in his official capacity as City Manager of Berkeley, California, from enforcing or causing to be enforced Berkeley Municipal Code Chapter 13.63 (the "Ordinance"), which goes into effect on April 24, 2025. The Ordinance violates the First Amendment and the Due Process Clause of the United States Constitution, both facially and as applied to RealPage. Through its Complaint and the present motion and supporting papers, RealPage has demonstrated a substantial likelihood that it will prevail on its constitutional challenge, that it will suffer irreparable harm if the Ordinance is enforced against it, that such harm is imminent, given that enforcement can begin as early as April 24, 2025, and that the balance of hardships weighs in its favor.

The Court should issue a temporary restraining order and then preliminary injunction barring Defendants from enforcing or causing to be enforced Berkeley Municipal Code Chapter 13.63, pending final resolution of this action. At a minimum, the Court should issue a temporary restraining order and then preliminary injunction barring Defendants from enforcing or causing to be enforced Berkeley Municipal Code Chapter 13.63 to the extent it would prohibit the sale, license, provision, or use of RealPage's revenue management software, pending final resolution of this action.

A temporary restraining order and preliminary injunction are necessary to preserve the status quo by enjoining enforcement of the Ordinance pending this Court's resolution of the important constitutional issues that this case presents.

RealPage requests this motion be heard on an expedited basis given the effective date of April 24, 2025. The motion is based upon this notice of motion; the memorandum of points and authorities in support thereof; the declarations of Amy Dreyfuss and Kristin Linsley filed concurrently herewith; the pleadings, records, and papers on file in this action; oral argument of counsel; and any other matters of which the Court may take judicial notice.

| | |
|---|---|
| April 3, 2025 | By: /s/ Kristin A. Linsley |
| |         Kristin A. Linsley |
| | |
| | Kristin A. Linsley (#154148) |
| |   klinsley@gibsondunn.com |
| | GIBSON, DUNN & CRUTCHER LLP |
| | One Embarcadero Center #2600 |
| | San Francisco, CA 94111-3715 |
| | Telephone:    415.393.8200 |
| | Facsimile:    415.393.8306 |
| | |
| | Jay P. Srinivasan (#181471) |
| |   jsrinivasan@gibsondunn.com |
| | Bradley J. Hamburger (#266916) |
| |   bhamburger@gibsondunn.com |
| | Samuel Eckman (#308923) |
| |   seckman@gibsondunn.com |
| | Alexander N. Harris (#278482) |
| |   aharris@gibsondunn.com |
| | GIBSON, DUNN & CRUTCHER LLP |
| | 333 South Grand Ave. |
| | Los Angeles, CA 90071-3197 |
| | Telephone:    213.229.7000 |
| | Facsimile:    213.229.7520 |

*Attorneys for Plaintiff RealPage, Inc.*

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND .............................................................................................................. 3

LEGAL STANDARD ...................................................................................................... 7

ARGUMENT ................................................................................................................... 7

    I.      RealPage Is Likely to Prevail on the Merits.................................................. 8

          A.      The Ordinance Violates the First Amendment................................... 8

                1.      The Ordinance Is a Content-Based Restriction of Speech ................... 8

                2.      The Ordinance Fails Strict Scrutiny...................................................... 9

                3.      The Ordinance Does Not Regulate "Commercial Speech" and in Any Event Would Fail Intermediate Scrutiny..................................... 11

          B.      The Ordinance Is Unconstitutionally Vague................................... 12

    II.     The Balance of Equities Strongly Support Enjoining the Ordinance ....................... 15

          A.      The Ordinance Will Cause RealPage Irreparable Harm. ................................ 15

          B.      The Balance of Equities and Public Interest Support a Preliminary Injunction ........................................................................................ 16

CONCLUSION ............................................................................................................... 16

Gibson, Dunn &
Crutcher LLP

**Cases**

*American Beverage Ass'n v. City and Cty. of San Francisco*,
916 F.3d 749 (9th Cir. 2019)..................................................................16

*Ashcroft v. ACLU*,
542 U.S. 656 (2004)..............................................................................16

*Associated Press v. Otter*,
682 F.3d 821 (9th Cir. 2012)..................................................................16

*Baird v. Bonta*,
81 F.4th 1036 (9th Cir. 2023)................................................2, 7, 15, 16

*Brown v. Entertainment Merchants Assn.*,
564 U.S. 786 (2011)................................................................................9

*Bruni v. City of Pittsburgh*,
824 F.3d 353 (3d Cir. 2010)..................................................................11

*Butcher v. Knudsen*,
38 F.4th 1163 (9th Cir. 2022)............................................2, 11, 12, 13

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
29 F.4th 468 (9th Cir. 2022)................................................2, 7, 8, 16

*Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*,
447 U.S. 557 (1980)........................................................................11, 12

*Citizens United v. Fed. Election Comm'n*,
558 U.S. 310 (2010)..........................................................................8, 10

*Community House, Inc. v. City of Boise*,
490 F.3d 1041 (9th Cir. 2007)................................................................16

*Elrod v. Burns*,
427 U.S. 347 (1976)..............................................................................15

*F.C.C. v. Fox Television Stations, Inc.*,
567 U.S. 239 (2012)..........................................................................2, 12

*Hill v. Colorado*,
530 U.S. 703 (2000)..........................................................................2, 13

*Ibanez v. Fla. Dep't for Bus. & Pro. Regulation, Bd. of Accountancy*,
512 U.S. 136 (1994)..............................................................................12

*KH Outdoor, LLC v. City of Trussville*,
458 F.3d 1261 (11th Cir. 2006)..............................................................16

*LGS Architects, Inc. v. Concordia Homes of Nevada*,
434 F.3d 1150 (9th Cir. 2006)................................................................16

Gibson, Dunn &
Crutcher LLP

*Meinecke v. City of Seattle,*
    99 F.4th 514 (9th Cir. 2024)................................................................8, 11, 15

*Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue,*
    460 U.S. 575 (1983) .................................................................................10

*Moody v. NetChoice, LLC,*
    603 U.S. 707 (2024) ...................................................................................9

*National Inst. of Fam. & Life Advocs. v. Becerra,*
    585 U.S. 755 (2018) .............................................................................10, 12

*NetChoice, LLC v. Bonta,*
    113 F.4th 1101 (9th Cir. 2024)................................................2, 7, 10, 16

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................................16

*In re R. M. J.,*
    455 U.S. 191 (1982) .................................................................................12

*Reed v. Town of Gilbert, Ariz.,*
    576 U.S. 155 (2015) ...................................................................................9

*Riley's Am. Heritage Farms v. Elsasser,*
    32 F.4th 707 (9th Cir. 2022)..................................................................7, 16

*Rovio Ent. Ltd. v. Royal Plush Toys, Inc.,*
    907 F. Supp. 2d 1086 (N.D. Cal. 2012) ....................................................7

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,*
    502 U.S. 105 (1991) ...................................................................................9

*Sorrell v. IMS Health Inc.,*
    564 U.S. 552 (2011)..............................................................8, 9, 10, 15, 16

*United States v. Davis,*
    588 U.S. 445 (2019) .................................................................................12

*United States v. United Foods, Inc.,*
    533 U.S. 405 (2001) .................................................................................11

*X Corp. v. Bonta,*
    116 F.4th 888 (9th Cir. 2024)..................................................2, 7, 10, 15, 16

**Statutes**

15 U.S.C. § 1 ................................................................................................10

Cal. Bus. & Prof. Code § 17200 ..................................................................10

Ordinance § 13.63.010(I) .............................................................................13

Ordinance § 13.63.010(A)..............................................................................6

Gibson, Dunn &
Crutcher LLP

Ordinance § 13.63.010(B).......................................................................................................1

Ordinance § 13.63.010(H).......................................................................................................1

Ordinance § 13.63.020(A)..............................................................................5, 6, 9, 10, 13, 14

Ordinance § 13.63.020(B)..............................................................................3, 5, 9, 10, 13, 14

Ordinance § 13.63.030(A)...............................................................................................1, 3, 5, 9

Ordinance § 13.63.030(B)...............................................................................................1, 3, 5, 9

Ordinance § 13.63.030(F).......................................................................................................3

Ordinance § 13.63.030(G).......................................................................................................3

Ordinance § 13.63.040.......................................................................................................6

**Other Authorities**

Black's Law Dictionary (12th ed.)........................................................................................14

Gibson, Dunn &
Crutcher LLP

## MEMORANDUM OF POINTS AND AUTHORITIES

### INTRODUCTION

This case challenges an Ordinance recently enacted by the City of Berkeley that, if enforced, would effect a sweeping and unconstitutional ban on lawful speech, motivated specifically by an intent to outlaw software products developed and sold by companies like RealPage that provide advice and information to owners and managers of rental properties. The Ordinance would make it unlawful for businesses like RealPage to "recommend[] or advise[] on rents or occupancy levels that may be achieved for residential dwelling units in the City of Berkeley" using certain software algorithms and likewise would prohibit landlords from using such information in determining rents or occupancy levels. Ordinance § 13.63.030(A)-(B). Although nominally designed to prevent "landlords [from] indirectly coordinat[ing] with one another through the sharing of data in order to artificially inflate rents and vacancy rates for rental housing," *id.* § 13.63.010(B), the Ordinance is actually an expansive ban on constitutionally protected speech.

The Court should grant a temporary restraining order before the Ordinance's effective date of April 24, 2025, and then a preliminary injunction. RealPage is likely to succeed on the merits: The Ordinance flagrantly violates the freedom of speech enshrined in the First Amendment of the United States Constitution because it imposes sweeping content- and speaker-based speech restrictions, yet it is not narrowly tailored to serve the City's claimed governmental interests in preventing purported collusion among landlords and stemming rising rental prices. There are many ways for the City to achieve its interest in constraining rent increases without impinging on speech—including by facilitating the construction of new rental units. And to the extent the concern is collusion, the City admits that the antitrust laws already address this concern were it valid, but simply takes issue with the speed of redress. As the Ordinance itself explains, "Instead of waiting for court processes which may take years to resolve, this Ordinance prohibits the sale or use of coordinated pricing algorithms for the purpose of setting rents on residential dwelling units in the city of Berkeley, to bring immediate relief to Berkeley tenants" regardless of whether algorithms are found to be violative of the antitrust laws or not. Ordinance § 13.63.010(H). For these reasons, the Ordinance cannot survive strict scrutiny under the First Amendment. And even if the Ordinance could be construed as regulating only commercial

Gibson, Dunn & Crutcher LLP

speech—which it cannot, as it does not meet the Supreme Court's clear test for delineating the commercial/non-commercial distinction—RealPage still is likely to succeed in its challenge because the Ordinance cannot satisfy even intermediate scrutiny.

There is another significant constitutional issue with the Ordinance: its broad and sweeping speech restrictions fail to provide the fair notice of "what conduct it prohibits," and the sufficient safeguards to prevent "arbitrary and discriminatory enforcement," that are demanded by the Due Process Clause. *Hill v. Colorado*, 530 U.S. 703, 732 (2000); *see also Butcher v. Knudsen*, 38 F.4th 1163, 1169 (9th Cir. 2022); *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). For example, it is unclear whether the Ordinance's expansive definition of "competitor data" prohibits the use of any "information" from any source to formulate and provide advice on rents or occupancy rates (as the text of the Ordinance suggests), or instead whether it prohibits only the use of data from competitors. It also is unclear whether the term "coordinated" activity is meant to limit the facially broad scope of the Ordinance—and, if it is, what sorts of coordination are covered and what sorts are not. Given the ambiguities in its key definitions, the Ordinance is void for vagueness.

The remaining equitable factors favor issuance of a temporary restraining order and a preliminary injunction. The City has no interest in enforcing an unconstitutional law, and the equities and public interest always favor the vindication of constitutional rights. *See, e.g.*, *Baird v. Bonta*, 81 F.4th 1036, 1042 (9th Cir. 2023). Absent preliminary injunctive relief from this Court, RealPage will face irreparable harm in having to choose either to cease to offer its revenue management software in Berkeley immediately in the face of this unconstitutional law or risk the imposition of substantial penalties—harms that cannot be redressed at the end of a trial on the merits. And the potential harm to RealPage is imminent, given that the City could start enforcing the Ordinance and imposing penalties as early as April 24, 2025.

Courts in this Circuit routinely enjoin California state and municipal entities, on a temporary and/or preliminary basis, from enforcing laws that burden the freedom of speech while First Amendment and related constitutional questions are litigated. *See, e.g.*, *X Corp. v. Bonta*, 116 F.4th 888 (9th Cir. 2024); *NetChoice, LLC v. Bonta*, 113 F.4th 1101 (9th Cir. 2024); *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022). This Court should follow

that same approach here and temporarily restrain and then preliminarily enjoin the Ordinance while the weighty constitutional issues raised by the Ordinance's new but sweeping mandate are adjudicated.

**BACKGROUND**

On March 25, 2025, the City Council of Berkeley enacted Berkeley Municipal Code Chapter 13.63 (the "Ordinance"), entitled "Prohibition on the Sale or Use of Pricing Algorithms to Set Rents or Manage Occupancy Levels for Residential Dwelling Units." Compl. ¶ 1; *see also* Compl., Ex. 1. The Ordinance—which targets RealPage by name three separate times, Ordinance § 13.63.030(F)-(G)— expressly bans certain types of speech about the residential rental market. Specifically, the Ordinance makes it unlawful to "sell, license, or otherwise provide to city of Berkeley landlords" advice or recommendations regarding "rents or occupancy levels that may be achieved for residential dwelling units in the city of Berkeley"—but only if that advice or those recommendations are provided through what the Ordinance calls a "coordinated pricing algorithm." *Id*. § 13.63.030(A). In addition to prohibiting companies like RealPage from engaging in speech, the Ordinance makes it unlawful for "a landlord to use" this information "when setting rents or occupancy levels for residential dwelling units in the city of Berkeley." *Id*. § 13.63.030(B). And through a series of vague and broadly worded definitions, the Ordinance gives these dual prohibitions an astonishingly expansive sweep, essentially prohibiting the algorithmic use of any "information," regardless of its source, to generate the targeted advice or recommendations. *Id*. § 13.63.020(B).

Plaintiff RealPage, Inc. is a technology company that provides a broad portfolio of software products to help its customers—who consist of owners and managers of rental properties—better operate their communities, including for the benefit of their residents. Dreyfuss Decl. ¶ 2. Some of RealPage's software products, known as revenue management software, evaluate internal supply and demand data from a given property, together with publicly available rent data from other properties, to generate personalized price recommendations that align with the customer's unique asset strategy for the subject property. *Id*. Each customer's unique asset strategy is expressed in the software through more than 100 customizable parameters set by each customer for each of its properties, resulting in thousands of distinct configurations of the software. *Id*. Every day, the software recommends rent prices—including decreases when the subject property's availability (supply) and leasing activity

(demand) dynamics indicate that a decrease is warranted. *Id.* ¶ 3. Customers retain complete discretion over their pricing decisions and are free to accept or reject any rent recommendation made by the software; in fact, customers set prices that are different than the software recommends over half the time. *Id.* ¶ 5.

RealPage does not engage, and has never engaged, in any kind of price fixing; nor has it ever facilitated or contributed to price fixing. Compl. ¶ 4. Nonetheless, an organization known as the American Economic Liberties Project ("AELP"), launched in 2020, began to peddle the groundless claim, based largely on demonstrably false factual assertions, that rising rents across the country were caused not by insufficient housing supply, but instead by software tools offered by services like RealPage. *Id.* AELP's false narrative has found fertile ground in municipalities seeking to find a scapegoat to deflect their own role in impeding housing supplies. *Id.* In March 2024, working with another advocacy group called Local Progress, AELP distributed a memorandum that deployed this narrative to urge cities across the country to enact laws banning the provision of rental advice through algorithms. The nine-page memorandum mentions RealPage by name 44 times, repeatedly pressing the false claim that RealPage somehow allows landlords to "creat[e] a cartel to keep rent prices high." Compl. ¶ 5.

This misinformation campaign culminated in Berkeley's enactment of the Ordinance, which similarly targets RealPage by name. On March 11, 2025, the Council first considered a proposed Ordinance submitted by the City's Housing Advisory Commission. An attachment to the proposed Ordinance prepared by the Advisory Commission specifically identified RealPage as the target of the draft Ordinance. Compl. ¶ 22. The Commission noted that "RealPage and its rent-setting software YieldStar ha[ve] been the subject of controversy" and highlighted a 2022 ProPublica article that in turn contained a series of false and misleading factual assertions. *Id.* The Advisory Committee's attachment also suggested that any use of "AI Revenue Management"—which is the name of a specific RealPage revenue management software product, *see* Dreyfuss Decl. ¶ 8—or "Automated Rent Setting" would "amount[] to illegal price-fixing," and falsely asserted that RealPage "creat[es] a cartel." *Id.*; *see also Id.*, Ex. 3 at 4:2–25 (presentation of these materials by an Advisory Commission member at the March 11, 2025 City Council meeting).

Gibson, Dunn & Crutcher LLP

On March 17, 2025, Vice Mayor and City Councilmember Ben Bartlett issued a press release touting the purportedly "historic step" taken by the Berkeley City Council in "banning AI-driven rent-pricing algorithms." Compl., Ex. 2. Bartlett's Office specifically mentioned RealPage and falsely stated that RealPage "is currently under parole and facing sentencing for price-fixing practices." *Id.* In fact, RealPage is neither "under parole" nor "facing sentencing" for price-fixing practices or anything else. As these statements confirm, the Ordinance is premised largely on a pretext of misinformation and misunderstandings about RealPage—including false statements about its lawful business practices.

Apart from these pretextual issues, the as-enacted Ordinance effects a broad and sweeping ban on protected speech, using expansive definitions to impose a near-total ban on the sale or use of algorithms that generate and share information about the Berkeley rental market. As noted, the Ordinance makes it "unlawful" (1) "to sell, license, or otherwise provide to city of Berkeley landlords any coordinated pricing algorithm that sets, recommends, or advises on rents or occupancy levels that may be achieved for residential dwelling units in the city of Berkeley," Ordinance § 13.63.030(A), and (2) "for a landlord to use" such an algorithm, *id.*, § 13.63.030(B). It defines "coordinated pricing algorithm" as:

> any analytical or computation processes that use data to recommend or predict the price of consumer goods or services in direct or indirect coordination with one or more competitors, including through a third-party vendor such as a software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants.

*Id.* § 13.63.020(A). And "competitor data" is defined in sweeping terms as:

> information, including information about actual rent prices, occupancy rates, lease start and end dates, and similar data, regardless whether the information is attributable to a specific competitor or anonymized, and regardless whether it is derived from or otherwise provided by another person that competes in the same market or a related market."

*Id.* § 13.63.020(B). Remarkably, this expansive definition of "competitor data"—which drives the scope of the entire Ordinance—includes no references whatsoever to data from competitors, and instead on its face defines that term to include all "information." This is no accident, as multiple members of the Berkeley City Council expressly stated that the Ordinance was intended to ban the use

Gibson, Dunn & Crutcher LLP

of all data. Compl., Ex. 3 at 25:21–23, 26:1–4 (Councilmember Lunaparra stating that she "introduced a supplemental item to clarify some definitions and close potential loopholes" in order to "mak[e] sure that companies like RealPage can't use any data, public or private, to fix prices or leave units vacant").

Although the Ordinance describes as its principal purpose the need to address "the sharing of data in order to artificially inflate rents and vacancy rates for rental housing," § 13.63.010(A), it does not prohibit all such data-sharing. On the contrary, it specifically exempts "any report published by a trade association that receives renter data and publishes it in an aggregated and anonymous manner" and any "product used for the purpose of establishing rent or income limits in accordance with the affordable housing guidelines of a local government, the state, the federal government, or other political subdivision." Ordinance § 13.63.020(A). The Ordinance bars the provision of information or advice about rents or occupancy levels based on a software algorithm that analyzes any kind of information, whether publicly available or not—presumably including putting publicly available information into an Excel spreadsheet to calculate a rent. As Councilmember Mark Humbert noted in this regard, the Ordinance would seem to "prevent a landlord from using their own nonpublic records to inform their decisions about real levels of vacancy," and to prohibit the operation of Zillow's rental features. Compl., Ex. 3 at 22:3–5, 22:23–25, 23:1–7. Yet it does *not* prohibit a trade association from publishing a weekly analysis of ideal rental rates on a block-by-block basis throughout the City.

To enforce these substantive prohibitions, the Ordinance imposes severe penalties for noncompliance. It allows civil enforcement actions by the City Attorney, or any "tenant," and authorizes civil penalties of up to $1000 "per violation" (a term that is not defined), as well as damages, injunctive relief, restitution, "return of illegal profits," and attorneys' fees. Ordinance § 13.63.040. The Ordinance thus couples sweeping and ill-defined prohibitions on constitutionally protected speech with broad authorization for potentially crippling fines and other relief for any violation.

Through this action, RealPage asserts three claims for relief. It seeks declaratory and injunctive relief on the ground that the Ordinance violates the First Amendment (Compl. ¶¶ 60–67) and is unconstitutionally vague under the Due Process Clause (*id*., ¶¶ 68–73). It also seeks an award of attorneys' fees and costs (*id*. ¶¶ 74–76).

Absent a temporary restraining order, RealPage will be deprived of its constitutional rights, and suffer irreparable harm, if enforcement of Berkeley Municipal Code Chapter 13.63 is not enjoined before it takes effect on April 24, 2025. Dreyfuss Decl. ¶ 8. Without immediate injunctive relief, RealPage will be prevented from generating, disseminating, or using information and will be put to the choice of withdrawing its revenue management products from the Berkeley market or risking significant financial penalties for the use of these products. *Id.* These harms cannot be remedied after RealPage prevails at the conclusion of the litigation. *Id.*

## LEGAL STANDARD

"The appropriate legal standard to analyze a preliminary injunction motion requires a district court to determine whether a movant has established that (1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest." *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023). The first factor "is especially important when a plaintiff alleges a constitutional violation and injury." *Id.* In fact, "[i]f a plaintiff in such a case shows he is likely to prevail on the merits, that showing usually demonstrates he is suffering irreparable harm no matter how brief the violation." *Id.* And the "likelihood of succeeding on the merits also tips the public interest sharply in his favor because it is 'always in the public interest to prevent the violation of a party's constitutional rights.'" *Id.* (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022). "The standard for a TRO is the same as for a preliminary injunction." *Rovio Ent. Ltd. v. Royal Plush Toys, Inc.*, 907 F. Supp. 2d 1086, 1092 (N.D. Cal. 2012).

## ARGUMENT

Courts routinely grant temporary restraining orders and/or preliminary injunctions prohibiting California government entities from violating the First Amendment. *See*, *e.g.*, *X Corp.*, 116 F.4th 888; *NetChoice*, 113 F.4th 1101; *California Chamber of Com.*, 29 F.4th 468. This Court should do the same here in order to preserve the status quo so RealPage can vindicate its fundamental rights under the United States Constitution. Absent such relief, RealPage and other similarly situated speakers (and listeners) will be put to the Hobson's choice of either self-censoring or facing substantial civil penalties and other relief under the Ordinance.

Gibson, Dunn &
Crutcher LLP

# I. RealPage Is Likely to Prevail on the Merits

RealPage is likely to succeed in showing that the Ordinance is unconstitutional. The Ninth Circuit has "articulated a unique likelihood-of-success standard in First Amendment cases: '[I]n the First Amendment context, the moving party bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech.'" *Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024) (quoting *California Chamber of Com.*, 29 F.4th at 478). RealPage's First Amendment challenge to the Ordinance is more than "colorable," and the City cannot meet its burden to justify the Ordinance—let alone establish that the Ordinance's novel speech restrictions must be imposed and enforceable during this litigation. RealPage's Due Process challenge to the broad and vague prohibitions of the Ordinance only illuminates other constitutional defects in the City's law.

## A. The Ordinance Violates the First Amendment

The Ordinance, by broadly prohibiting speakers from "set[ting], recommend[ing], or advis[ing]" on rental information using "algorithms" to process any and all "information," flagrantly violates the First Amendment's protection for the creation and dissemination of information. And its burden on speech, which imposes speaker-based and content-based restrictions on noncommercial speech, fails any level of heightened scrutiny under the First Amendment.

### 1. The Ordinance Is a Content-Based Restriction of Speech

The First Amendment protects the "right to speak"—and the "creation and dissemination of information are speech within the meaning of the First Amendment." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 568, 570 (2011). "Information" that falls within the First Amendment's protections covers a wide range of subjects from the profound to the mundane—including reports of violent threats during a labor strike, pharmaceutical data, beer labels, and credit reports, *see id*. at 571—but the First Amendment's protection for the free flow of information remains constant. Whether delivered through printing presses or computer algorithms, such information is protected by the First Amendment, which strongly disfavors "[l]aws enacted to control or suppress speech," even when they "operate at different points in the speech process." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010).

"Facts, after all, are the beginning point of much of the speech that is most essential to advance human knowledge and conduct human affairs." *Sorrell*, 564 U.S. at 570.

The Ordinance suppresses speech by imposing "restrictions on the sale, disclosure, and use of . . . information," *Sorrell*, 564 U.S. at 563–64—specifically, information about rents and occupancy levels, Ordinance § 13.63.030(A)-(B). That the Ordinance prohibits this speech only when generated through the "use" of "algorithms" does not convert the regulated speech into mere conduct not covered by the First Amendment. A ban on the means for speech is still a ban on speech. Just as the government cannot evade First Amendment scrutiny by banning the use of printing presses rather than the publishing of books, and just as it cannot ban the delivery of audio tapes as a means of preventing the delivery of the information stored on them, *see Sorrell*, 564 U.S. at 566–67, the City cannot evade First Amendment scrutiny by banning the use of algorithms that provide advice on rents and occupancy rates rather than banning the advice itself. *See Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024) (First Amendment protects speech "technology").

The First Amendment protects "ever-advancing technology" that is used to deliver protected speech—whether Westlaw for lawyers, algorithms for social-media companies, or Google maps to figure out where to find a new restaurant. The "'basic principles'" of the "First Amendment do not vary" when applied to speech in "'ever-advancing technology'"—and when the government seeks to restrict such speech, it necessarily "confronts the First Amendment." *Moody*, 603 U.S. at 732–33 (quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 790 (2011)).

## 2. The Ordinance Fails Strict Scrutiny

Content-based and speaker-based restrictions on speech are "presumptively unconstitutional" and subject to "strict scrutiny." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). The Ordinance's speech restrictions are content-based because they prohibit disseminating "information" used to "set[], recommend[], or advise[]" on rental activities. Ordinance § 13.63.020(A)-(B); *see, e.g.*, *Sorrell*, 564 U.S. at 564 (law was "content-based" when it limited "pharmaceutical" information used for business purposes); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 108, 116 (1991) (law was "content-based" when prohibited sale of "works describing [convict's] crime"). The Ordinance's speech restrictions are also user-based—they prohibit particular speech

activities for particular actors (i.e., "landlords"). *See*, *e.g.*, Ordinance § 13.63.020(A)-(B); *Sorrell*, 564 U.S. at 564 (law "disfavor[ed] specific speakers, namely pharmaceutical manufacturers"); *Minneapolis Star & Trib. Co. v. Minnesota Comm'r of Revenue*, 460 U.S. 575, 576 (1983) (use tax was speaker-based where it "impose[d] a special tax on the press").

The Ordinance fails strict scrutiny because the City cannot "prov[e] that the [laws] are narrowly tailored to serve compelling state interests." *National Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 767 (2018) ("*NIFLA*"). The stated purpose of the Ordinance is to stop collusive pricing and keep rental prices under control. Even assuming these are compelling state interests sufficiently weighty to justify the suppression of speech, the Ordinance—in a substantial number of applications and specifically as applied to RealPage—"fail[s] under strict scrutiny because [it] is not narrowly tailored." *X Corp.*, 116 F.4th at 903.

First, the Ordinance fails narrow tailoring because the City could have pursued its objectives through less burdensome alternatives that do not involve restricting speech, such as encouraging the increase in housing supply, enforcing existing antitrust laws, or adopting other regulatory measures that are not targeted at speaker-based and content-based speech activity. *NetChoice*, 113 F.4th at 1121; *see also*, *e.g.*, *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 361 (2010) ("more speech, not less, is the governing rule" under our "law and tradition"). Rather than restrict speech, the "[City] could have" assessed the viability of "less restrictive means" to address landlord misconduct, including by "relying on existing . . . laws that prohibited related . . . conduct." *NetChoice*, 113 F.4th at 1121. That is particularly true because collusion, when it actually exists, is already addressed by antitrust laws (e.g., the Sherman Act, 15 U.S.C. § 1) and other consumer protection laws (e.g., California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200). There is no suggestion by the City that these laws are not working, only that they are not working quickly enough for the City's liking. The City does not claim that RealPage or any other defendant is responsible for any delay; nor does it suggest that any of these lawsuits are proceeding in any unusual respect.

Second, the Ordinance fails narrow tailoring because it is vastly overbroad. The Ordinance could have potentially imposed narrow restrictions focused on improper or unlawful conduct. But its broad speech restrictions—including its application to all "algorithms" and seemingly all "information"

Gibson, Dunn & Crutcher LLP

(whether it is data from competitors or not)—goes far beyond what is necessary to serve any compelling municipal interest in lowering rents and fighting collusion.

Third, the vagueness of the Ordinance compounds these problems. Its key terms and definitions are so vague that companies will lack fair notice of its reach, enabling the City (or an unidentified "tenant") to target whichever companies might offend the government or a tenant on that day with their speech and seek crippling penalties in the process. *See*, *e.g.*, *Butcher*, 38 F.4th at 1169 (vagueness concerns compounded in free-speech context). The Ordinance nowhere explains, for example, how the "coordinated" algorithms it purports to regulate differ from other algorithms; it defines "competitor data" as "information" without apparent reference to any limitations on the source or nature of that information (for example, whether the information is aggregated and anonymized); and it does not clarify whether it pertains to use of *all* types of data. It is a sword of Damocles—with accompanying threats of penalties—hanging over anyone who dares to say anything to do with providing housing in Berkeley using computer software. Although narrower, targeted alternatives obviously exist, the City has not "tried" any of these narrower and less-speech-restrictive alternatives, *Bruni v. City of Pittsburgh*, 824 F.3d 353, 370 (3d Cir. 2010), and cannot carry its burden to show they would not satisfy the City's purported interests, *Meinecke*, 99 F.4th at 521.

### 3. The Ordinance Does Not Regulate "Commercial Speech" and in Any Event Would Fail Intermediate Scrutiny

Unlike restrictions on core First Amendment speech, restrictions on commercial speech are subject to intermediate scrutiny. But this lower tier of scrutiny does not help the City.

As a threshold matter, the Ordinance does not regulate "commercial speech." Commercial speech is generally "speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.,* 533 U.S. 405, 409 (2001) (citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n*, 447 U.S. 557 (1980)). But the speech targeted here—the generation and dissemination of information on rents and occupancy levels—does not propose a transaction between the speaker (RealPage) and another party (the owner or manager of a property), nor is it an advertisement. At most, it is market advice to third parties about transactions *they* might propose. And the Ordinance's prohibition on selling, licensing, or giving landlords information and advice applies whether or not

Gibson, Dunn & Crutcher LLP

landlords use such information for particular advertisements or particular products. The Ordinance is no neutral commercial-advertisement regulation—it is a broad restriction on the free flow of information that goes well beyond regulating particular transactions or particular advertisements.

Even if the Ordinance were treated as a regulation of commercial speech, it would not survive intermediate scrutiny. Under intermediate scrutiny, the City would have to establish that the Ordinance directly advances a substantial governmental interest and is narrowly drawn to achieve that interest. *See, e.g., Central Hudson*, 447 U.S. at 564. But the Ordinance is not "narrowly drawn." *In re R. M. J.*, 455 U.S. 191, 203 (1982); *Central Hudson*, 447 U.S. at 565. Its coverage of "competitor data" appears to cover the use of *any* "information"—with no defined statutory limit and without regard to whether the information is used for legitimate and lawful conduct. But the City "cannot regulate speech that poses no danger to the asserted state interest," nor can it "suppress information when narrower restrictions on expression would serve its interest as well." *Central Hudson*, 447 U.S. at 565. Moreover, the City Council offered no credible evidence that the Ordinance would reduce rental prices or improve competition in the rental market—let alone that the full sweep of the Ordinance is necessary to further those goals, when other options that do not restrict speech are available. The City must provide a "nonhypothetical justification," *NIFLA*, 585 U.S. at 777, and show that the "harm" it seeks to remedy is more than just "purely hypothetical" and that the speech "restrictions will in fact alleviate [the harm] to a material degree," *Ibanez v. Fla. Dep't for Bus. & Pro. Regulation, Bd. of Accountancy*, 512 U.S. 136, 146 (1994). But the City cannot make such a showing—and certainly not to the degree necessary to justify the full sweep of the Ordinance, or its application to RealPage. The Ordinance thus fails any level of First Amendment scrutiny.

## B. The Ordinance Is Unconstitutionally Vague

The Ordinance expressly targets RealPage by name, but it fails to describe in clear terms the speech that it proscribes. Such a law—one that calls out a particular entity by name and targets it for punishment with substantial penalties but fails to provide that entity (and others) with fair notice of how it can comply with the law's penalty-backed provisions—is unconstitutional.

"In our constitutional order, a vague law is no law at all." *United States v. Davis*, 588 U.S. 445, 447 (2019). Due process "requires the invalidation of laws that are impermissibly vague." *FCC v. Fox*

Gibson, Dunn & Crutcher LLP

*Television Studios*, 567 U.S. 239, 253 (2012). A law is unconstitutionally vague if it fails to provide fair notice of "what conduct it prohibits," or if it "authorizes or even encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000). The "void-for-vagueness doctrine has special purchase" for "laws implicating First Amendment freedom." *Butcher*, 38 F.4th at 1169. "[V]agueness concerns are more acute when a law implicates First Amendment rights, and therefore, vagueness scrutiny is more stringent." *Id.* (collecting cases).

Here, the Ordinance has several sweeping and amorphous provisions that—individually and collectively—fail constitutional vagueness standards because they fail to provide fair notice and to constrain future arbitrary enforcement by the City.

*"Competitor Data."* The Ordinance prohibits covered uses of "competitor data." Ordinance § 13.63.020(A)-(B). The term "competitor data" is broadly defined as "*information*, including information about actual rent prices, occupancy rates, lease start and end dates, and similar data, regardless whether the information is attributable to a specific competitor or anonymized, and regardless whether it is derived from or otherwise provided by another person that competes in the same market or a related market." *Id.* § 13.63.020(A)-(B) (emphasis added).

Remarkably, this expansive definition of "competitor data" includes no references whatsoever to the data of competitors, and instead on its face defines that term to include all "information." Although the Ordinance claims that it "is not intended to prevent the development or sale of software to help landlords manage their units generally or through the use of public data," § 13.63.010(I), its definition of "competitor data" lacks any apparent limitations based on the source or nature of that information. Among other issues, it appears to encompass all publicly available "information," rather than being limited to data from competitors (as the term "competitor data" would suggest). This is no accident, as multiple members of the Berkeley City Council expressly stated that the Ordinance was intended to ban the use of all data. Compl., Ex. 3 at 25:21–23, 26:1–4. More questions than answers emerge from the Ordinance's "competitor data" definition. What about data that comes from public records, rather than from competitors—would that be "competitor data"? And what if public information is not publicly disclosed but is generally available through inquiry—would that be "competitor data"?

As Councilmember Humbert emphasized at the City Council meeting, it is unclear what the Ordinance sweeps in—for example, it is unclear whether its language would forbid a couple from plugging in rental values from Craigslist into an Excel spreadsheet to set the rent price for their Accessory Dwelling Unit. *See* Compl., Ex. 3. at 22:23–25, 23:1–7. The Ordinance provides no answers on what "information" it actually prohibits software products from using, yet it imposes potentially crippling penalties for violating whatever construction the City might ultimately give the vague and sweeping provisions of the Ordinance.

*"Coordinated Pricing Algorithm."* The Ordinance references "coordinated pricing algorithms," Ordinance § 13.63.020(A)-(B), but provides no clear explanation of what constitutes such an algorithm. "Coordinated pricing algorithm" is defined as a "process[] that use[s] data to recommend or predict the price of consumer goods or services in direct or indirect coordination with one or more competitors, including through a third-party vendor such as a software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants," but that definition provides insufficient notice of how a company may comply. Ordinance § 13.63.020(A).

As an initial matter, "algorithm" is a broad and undefined term. *See*, *e.g.*, Black's Law Dictionary (12th ed.) (defining "algorithm" as "[a] mathematical or logical process consisting of a series of steps, designed to solve a specific type of problem"); Merriam-Webster (defining "algorithm" as "a procedure for solving a mathematical problem (as of finding the greatest common divisor) in a finite series of steps that frequently involves repetition of an operation"). For example, would an Excel spreadsheet that computes a proposed rent based on, say, square footage of the property in question, neighborhood, and some "competitor data" violate the Ordinance? What about a simple website that uses a basic algorithm to display text? And the term "direct or indirect" coordination is also broad and undefined. It is possible that a pricing algorithm could violate the Ordinance only when it accomplishes its function through "direct or indirect coordination" among competitors, but it is unclear whether (a) this is a fundamental requirement of the "coordinated pricing algorithm" definition and (b) what

Gibson, Dunn & Crutcher LLP

constitutes prohibited "coordination." The Ordinance, again, provides no guidance on these critical questions.

*       *       *

RealPage is likely to succeed in showing that the Ordinance is unconstitutional. The Ordinance restricts the "use" and "creation and dissemination of information" protected by the First Amendment. *Sorrell*, 564 U.S. at 564. And the broad and vague provisions of the Ordinance—which sweep in all "information" through its expansive "competitor data" definition—only exacerbate its flaws under the First Amendment and render it void for vagueness. The City will be unable to carry its burden of justifying the Ordinance's broad and vague speech restrictions. *See Meinecke*, 99 F.4th at 521. Given it is likely to be held unconstitutional, the Court should enjoin the Ordinance before its April 24, 2025 effective date.

## II. The Balance of Equities Strongly Support Enjoining the Ordinance

Each of the remaining factors—irreparable harm, balance of the equities, and public interest—supports immediate relief. Without immediate injunctive relief, RealPage will be prevented from generating, disseminating, or using information—an irreparable First Amendment injury—and will be put to the choice of leaving the Berkeley market or risking significant financial penalties for its protected speech activity. And the balance of the equities and the public interest similarly push decisively in RealPage's favor—it is "always in the public interest to prevent the violation of a party's constitutional rights." *Baird*, 81 F.4th at 1042. A temporary restraining order and then a preliminary injunction are necessary to preserve the status quo so that this Court can adjudicate the constitutionality of the Ordinance in an orderly fashion.

### A. The Ordinance Will Cause RealPage Irreparable Harm.

The Ordinance will cause irreparable harm to RealPage, which will face the suppression of its constitutionally protected speech as soon as the Ordinance becomes effective on April 24. "The loss of First Amendment freedom, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *X Corp.*, 116 F.4th at 903 (same). Courts have repeatedly granted temporary restraining orders and preliminary injunctions against similar attempts

Gibson, Dunn &
Crutcher LLP

by government entities to violate the freedom of speech.  *See, e.g.*, *X Corp.*, 116 F.4th 888; *NetChoice*,

113 F.4th 1101; *California Chamber of Com.*, 29 F.4th at 468; *Ashcroft v. ACLU*, 542 U.S. 656 (2004).

### B.    The Balance of Equities and Public Interest Support a Preliminary Injunction

The public interest and the balance of the equities also favor a preliminary injunction or temporary restraining order against the unconstitutional Ordinance.  Where the "[g]overnment is the opposing party," the balance of equities and public interest "merge."  *Nken v. Holder*, 556 U.S. 418, 435 (2009).  And "it is 'always in the public interest to prevent the violation of a party's constitutional rights.'"  *Baird*, 81 F.4th at 1042 (quoting *Riley's Am. Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022)).  "[R]ais[ing] 'serious First Amendment questions compels a finding that . . . the balance of hardships tips sharply in [the movant's] favor.'"  *American Beverage Ass'n v. City and Cty. of San Francisco*, 916 F.3d 749, 758 (9th Cir. 2019) (quoting *Community House, Inc. v. City of Boise*, 490 F.3d 1041, 1059 (9th Cir. 2007)); *see Associated Press v. Otter*, 682 F.3d 821, 826 (9th Cir. 2012) (recognizing the "significant public interest in upholding First Amendment principles").

The City cannot claim that delaying implementation of its unconstitutional law threatens any legitimate or urgent public interest.  As an initial matter, the City "has no legitimate interest in enforcing an unconstitutional ordinance."  *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).  Nor is there any pressing need for the City to enforce the Ordinance—and the City has certainly not tried to show any such need.  The speech activity the City seeks to prohibit—including the "creation and dissemination of information," *Sorrell*, 564 U.S. at 570—has never been prohibited in the City before.  And existing law, including antitrust and consumer-protection law, already bars illegal and improper anticompetitive behavior.  A temporary restraining order and preliminary injunction—even if limited to RealPage's revenue management software—would simply "preserve the status quo until [this Court] resolves the merits of this case."  *LGS Architects, Inc. v. Concordia Homes of Nevada*, 434 F.3d 1150, 1157 (9th Cir. 2006).

### CONCLUSION

RealPage respectfully requests that this Court issue a temporary restraining order and then preliminary injunction barring Defendants from enforcing or causing to be enforced Berkeley Municipal Code Chapter 13.63, pending final resolution of this action. At a minimum, the Court should issue a temporary restraining order and then preliminary injunction barring Defendants from enforcing or causing to be enforced Berkeley Municipal Code Chapter 13.63 to the extent it would prohibit the sale, license, provision, or use of RealPage's revenue management software, pending final resolution of this action.

Respectfully submitted,

April 3, 2025

By: /s/ Kristin A. Linsley
        Kristin A. Linsley

Kristin A. Linsley (#154148)
  klinsley@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center #2600
San Francisco, CA 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

Jay P. Srinivasan (#181471)
  jsrinivasan@gibsondunn.com
Bradley J. Hamburger (#266916)
  bhamburger@gibsondunn.com
Samuel Eckman (#308923)
  seckman@gibsondunn.com
Alexander N. Harris (#278482)
  aharris@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

*Attorneys for Plaintiff RealPage, Inc.*

Gibson, Dunn & Crutcher LLP