KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS - # 158708
epeters@keker.com
IAN KANIG - # 295623
ikanig@keker.com
CARA R. MEYER - # 348877
cmeyer@keker.com
KAYLA CROWELL - # 349061
kcrowell@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:    415 391 5400
Facsimile:    415 397 7188

BERKELEY CITY ATTORNEY'S OFFICE
FARIMAH F. BROWN - # 201227
City Attorney
KATRINA L. EILAND - # 275701
Deputy City Attorney
keiland@berkeleyca.gov
STEPHEN A. HYLAS - # 319833
Deputy City Attorney
shylas@berkeleyca.gov
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6998
Facsimile: (510) 981-6960

Attorneys for Defendants THE CITY OF
BERKELEY, CALIFORNIA and PAUL
BUDDENHAGEN

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| REALPAGE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE CITY OF BERKELEY, CALIFORNIA, and PAUL BUDDENHAGEN, CITY MANAGER OF BERKELEY, CALIFORNIA, in his official capacity,<br><br>Defendant. | Case No. 3:25-cv-03004-JSC<br><br>**DEFENDANTS CITY OF BERKELEY, CALIFORNIA AND PAUL BUDDENHAGEN'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Date:        April 16, 2025<br>Time:        11:00a.m.<br>Dept.:       8—19th Floor (via Zoom)<br>Judge:      Hon. Jacqueline Scott Corley<br><br>Date Filed: April 2, 2025<br><br>Trial Date:  Not Set |

2898822

# **TABLE OF CONTENTS**

**Page(s)**

I.   INTRODUCTION ...................................................................................................1

II.  BACKGROUND ...................................................................................................3

    A.   The U.S. Department of Justice and a bipartisan coalition of State Attorneys General are suing RealPage for selling software that facilitates price-fixing.............3

    B.   RealPage's coordinated pricing software is likely harming Berkeley residents by substantially increasing rental prices, vacancy rates, and eviction rates. ..............4

    C.   To redress this harm, on March 25, 2025, the Berkeley City Council voted to prohibit the sale and use of coordinated pricing algorithms to set rental rates...........5

    D.   RealPage filed this action, alleging that the Ordinance will infringe on its First Amendment free speech and Fourteenth Amendment due process rights..........6

III. LEGAL STANDARD ...........................................................................................7

IV.  ARGUMENT ........................................................................................................7

    A.   RealPage has failed to meet its substantial burden of proving that it will likely prevail on the merits of either of its claims challenging the Ordinance. ........7

        1.   The Ordinance will not violate RealPage's First Amendment rights. ...............8

            a.   The Ordinance's prohibition on the sale of algorithms is an economic regulation subject to no First Amendment protection. ............9

            b.   RealPage has no First Amendment right to speech that relates to price-fixing or facilitating price-fixing in the rental market. .................13

            c.   Even if the Ordinance is subject to First Amendment scrutiny, it regulates commercial speech and is precisely tailored to serve Berkeley's interest in promoting a fair housing market.........................14

        2.   The Ordinance's separate prohibition on landlords' use of RealPage's software does not implicate RealPage's First Amendment rights. .................17

        3.   The Ordinance is not unconstitutionally vague. ..............................................18

            a.   RealPage cannot assert any vagueness challenge because the Ordinance expressly targets RealPage, as it repeatedly admits. .............18

            b.   The specific terms that RealPage claims are undefined are expressly defined by the Ordinance or have a plain meaning. ..............19

    B.   RealPage has failed to prove it faces an immediate risk of irreparable harm..........23

        1.   RealPage has failed to assert a colorable constitutional violation and thus it has not shown that it is at risk of immediate irreparable harm. ...........23

        2.   In any case, the Ordinance is not yet effective, and the City Council may determine that a stay of enforcement pending review is needed. ...........24

i

2898822

C.     The balance of the equities and the public interest sharply favor Berkeley. ............24

V.     CONCLUSION.....................................................................................................................25

2898822

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Airbnb, Inc. v. City & Cnty. of San Francisco,*
217 F. Supp. 3d 1066 (N.D. Cal. 2016) ........................................................................ *passim*

*Arcara v. Cloud Books, Inc.,*
478 U.S. 697 (1986).........................................................................................8, 9, 14

*Arce v. Douglas,*
793 F.3d 968 (9th Cir. 2015) .........................................................................19, 20, 21

*Ashcroft v. Am. C.L. Union,*
542 U.S. 656 (2004).........................................................................................23

*Cal. Chamber of Com. v. Council for Educ. & Rsch. on Toxics,*
29 F.4th 468 (9th Cir. 2022).........................................................................................23

*Cal. Motor Transp. Co. v. Trucking Unlimited,*
404 U.S. 508 (1972).........................................................................................2, 8, 13

*Cal. Teachers Ass'n v. State Bd. of Educ.,*
271 F.3d 1141 (9th Cir. 2001) .........................................................................20

*Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commission of New York,*
447 U.S. 557 (1980).........................................................................................2, 14, 15

*Coal. for Econ. Equity v. Wilson,*
122 F.3d 718 (9th Cir. 1997) .........................................................................3, 24

*CTIA - The Wireless Ass'n v. City of Berkeley, California,*
928 F.3d 832 (9th Cir. 2019) .........................................................................25

*Diamond S.J. Enter., Inc. v. City of San Jose,*
100 F.4th 1059 (9th Cir. 2024) .........................................................................17

*Diamond S.J. Enter., Inc. v. City of San Jose,*
395 F. Supp. 3d 1202 (N.D. Cal. 2019) .........................................................................12

*Disney Enters., Inc. v. VidAngel, Inc.,*
869 F.3d 848 (9th Cir. 2017) .........................................................................25

*Drakes Bay Oyster Co. v. Jewell,*
747 F.3d 1073 (9th Cir. 2014) .........................................................................2, 7, 24

*Edge v. City of Everett,*
929 F.3d 657 (9th Cir. 2019) .........................................................................20, 22

2898822

*First Resort, Inc. v. Herrera,*
   860 F.3d 1263 (9th Cir. 2017) ................................................................. *passim*

*Garcia v. Cnty. of Alameda,*
   2024 WL 4476659 (N.D. Cal. Oct. 11, 2024)...............................................12, 24

*Golden Gate Rest. Ass'n v. City & Cnty. Of San Francisco,*
   512 F.3d 1112 (9th Cir. 2008).................................................................25

*Gospel Missions of Am. v. City of Los Angeles,*
   419 F.3d 1042 (9th Cir. 2005) ............................................................20, 22

*Holder v. Humanitarian L. Project,*
   561 U.S. 1 (2010).....................................................................2, 18, 19, 22

*Homeaway.com, Inc. v. City of Santa Monica,*
   2018 WL 1281772 (C.D. Cal. Mar. 9, 2018) ...........................................24

*HomeAway.com, Inc. v. City of Santa Monica,*
   918 F.3d 676 (9th Cir. 2019) ................................................................. *passim*

*Hum. Life of Wash. Inc. v. Brumsickle,*
   624 F.3d 990 (9th Cir. 2010)..............................................................20, 21

*Hunt v. City of Los Angeles,*
   638 F.3d 703 (9th Cir. 2011) ........................................................18, 19, 21

*Int'l Franchise Ass'n, Inc. v. City of Seattle,*
   803 F.3d 389 (9th Cir. 2015) ................................................................. *passim*

*Lopez v. Candaele,*
   630 F.3d 775 (9th Cir. 2010) ...............................................................17

*Lujan v. Defs. of Wildlife,*
   504 U.S. 555 (1992).............................................................................17

*Matsumoto v. Labrador,*
   122 F.4th 787 (9th Cir. 2024) ...........................................................20, 22

*Metro Lights, L.L.C. v. City of Los Angeles,*
   551 F.3d 898 (9th Cir. 2009) .............................................................14, 15

*Moody v. NetChoice, LLC,*
   603 U.S. 707 (2024)............................................................................12, 13

*NetChoice, LLC v. Bonta,*
   113 F.4th 1101 (9th Cir. 2024) .........................................................17, 23

*Pimentel v. Dreyfus,*
   670 F.3d 1096 (9th Cir. 2012) ...............................................................8

2898822

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
    413 U.S. 376 (1973) ................................................................................................14

*In re: RealPage, Inc. Rental Software Antitrust Litig. (No. II)*,
    709 F. Supp. 3d 478 (M.D. Tenn. Dec. 28, 2023) ............................................3, 4

*Reges v. Cauce*,
    733 F. Supp. 3d 1025 (W.D. Wash. 2024)...........................................................21

*Rosa v. Robertson*,
    2025 WL 41937 (N.D. Cal. Jan. 7, 2025)............................................................22

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*,
    502 U.S. 105 (1991)..............................................................................................11

*Smith v. Helzer*,
    95 F.4th 1207 (9th Cir.)(2024)............................................................................23

*Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*,
    240 F.3d 832 (9th Cir. 2001) .................................................................................7

*Su v. L & Y Food, Inc.*,
    728 F. Supp. 3d 1050 (C.D. Cal. 2024) ...............................................................25

*United States v. Kilbride*,
    584 F.3d 1240 (9th Cir. 2009) .......................................................................20, 22

*United States v. Topco Assocs., Inc.*,
    405 U.S. 596 (1972)..............................................................................................15

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
    455 U.S. 489 (1982)..........................................................................................2, 16

*Wash. State Grange v. Wash. State Repub. Party*,
    552 U.S. 442 (2008)..............................................................................................23

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008).........................................................................................1, 7, 8

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) .........................................................................17, 23

*In re Yahoo Mail Litig.*,
    7 F. Supp. 3d 1016 (N.D. Cal. 2014) ...................................................................15

*Young v. Am. Mini Theatres, Inc.*,
    427 U.S. 50 (1976)................................................................................................17

*Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*,
    471 U.S. 626 (1985)..............................................................................................15

v

2898822

**Federal Statutes**

42 U.S.C. § 1983 ......................................................................................................7

42 U.S.C. § 1988 ......................................................................................................7

**Ordinances**

Berkeley Mun. Code § 1.04.040 ............................................................................24

Berkeley Ordinance No. 7,956-N.S. § 13.63.030 ........................................... *passim*

Berkeley Ordinance No. 7,956-N.S. § 13.63.010 ..........................................10, 19

Berkeley Ordinance No. 7,956-N.S. § 13.63.020 ..............................10, 20, 21, 22

Ordinance § 13.63.010 ......................................................................6, 16, 24, 25

Ordinance § 13.63.020 ..............................................................................6, 10, 16

**U.S. Constitution**

Cal. Const., art. XI §§ 5, 7 ......................................................................................1

**Other Authorities**

*Information*, Brittanica Dictionary ......................................................................22

2898822

1

## I.    INTRODUCTION

2         The City of Berkeley has passed an ordinance to protect its residential renters from the

3  collusive and harmful practices of Plaintiff RealPage, Inc. and the landlords using its software to

4  coordinate in setting residential rental prices and vacancy rates.  Berkeley Ordinance No. 7,956-

5  N.S. § 13.63.030 ("Ordinance").  The U.S. Department of Justice, a bipartisan coalition of State

6  Attorneys General, and private plaintiffs proceeding in an MDL have sued RealPage for violating

7  the antitrust and unfair competition laws because its conduct is tantamount to price-fixing.  In

8  fact, there is evidence that RealPage's software has contributed to double-digit residential rent

9  increases, higher vacancy rates, and higher rates of eviction in Berkeley.  To prevent that serious

10 and ongoing harm to renters, the Ordinance prohibits the sale and use of software that sets rents

11 or occupancy levels in coordination with competitors.  This law thus falls well within Berkeley's

12 plenary authority to protect its citizens' health and welfare.  *See* Cal. Const., art. XI §§ 5, 7.

13        In response, RealPage now alleges that the Ordinance threatens to violate RealPage's First

14 Amendment free speech rights and Fourteenth Amendment due process rights.  RealPage seeks a

15 temporary restraining order barring the Ordinance from becoming effective, but it fails to disclose

16 the government enforcement action or the MDL proceeding against it.  Dkt. No. 12 ("Mot.").

17        RealPage is not entitled to this extraordinary relief.  RealPage is neither likely to succeed

18 on the merits, nor will it be irreparably harmed by the Ordinance, and the balance of the equities

19 and the public interest decisively favor Berkeley.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555

20 U.S. 7, 22 (2008) (four-part preliminary-relief test).  ***First,*** Real Page is not likely to succeed on

21 either of its claims.  Its First Amendment claim fails because the Ordinance does not target ***any***

22 speech or speakers; it is a "housing and rental regulation" that targets economic activity not

23 subject to ***any*** First Amendment scrutiny.  *HomeAway.com, Inc. v. City of Santa Monica*, 918

24 F.3d 676, 685 (9th Cir. 2019); *accord Airbnb, Inc. v. City & Cnty. of San Francisco*, 217 F. Supp.

25 3d 1066, 1077 (N.D. Cal. 2016); *see also Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d

26 389, 408 (9th Cir. 2015) ("*IFA*").  RealPage studiously avoids mentioning this binding precedent.

27        To the extent that the Ordinance incidentally burdens any speech, it would be speech that

28 furthers antitrust violations, which is not subject to any First Amendment protection.  It is well-

2898822

established that "First Amendment [free speech] rights may not be used as the means or the pretext for achieving 'substantive evils,'" including "violation of the antitrust laws." *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 515 (1972). Because RealPage has made **no showing** that the sale and use of its price-coordination software is not enabling violations of the antitrust or unfair competition laws, it has not shown that it is likely to prevail on the merits of its First Amendment claim. And even if the Ordinance did burden speech beyond the scope of these existing laws, it would be commercial speech that facilitates and enables price coordination, which Berkeley is constitutionally permitted to regulate in order to alleviate ongoing and concrete harm to its residents. *See Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Commission of New York*, 447 U.S. 557 (1980). RealPage's hypotheticals about the Ordinance barring landlords from using Excel spreadsheets or Zillow to help determine rental rates are strawmen. The Ordinance proscribes **algorithmic price coordination** among **competing landlords**; it does not proscribe the mere sale or use of data or software. In any case, RealPage does not and cannot raise a facial First Amendment overbreadth challenge to a law that burdens only commercial speech. *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 496–97 (1982).

RealPage's due process challenge for vagueness is similarly without basis. No entity that is expressly and admittedly targeted by an ordinance like RealPage can raise a vagueness claim because it has fair notice that the law applies to it. *Holder v. Humanitarian L. Project*, 561 U.S. 1, 18–20 (2010). In any case, RealPage's claim fails because it is "clear what the ordinance as a whole prohibits." *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1274 (9th Cir. 2017). The two terms that RealPage says are undefined **are** defined, and the other is the word "information." There is no real question what the Ordinance prohibits: algorithmic rental-price coordination.

**Second,** because RealPage has failed to prove that it is likely to prevail on the merits of its claims, it has necessarily failed to show any risk that it will suffer immediate irreparable harm.

**Finally,** the balance of the equities and the public interest decisively weigh in Berkeley's favor. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014) (these factors "merge" when the government is a party). Berkeley's undisputedly compelling interest in alleviating the housing affordability crisis defeats RealPage's interest in its unlawful conduct.

Indeed, it is Berkeley that "suffers irreparable injury whenever an enactment of its people or their representatives is enjoined." *Coal. for Econ. Equity v. Wilson*, 122 F.3d 718, 719 (9th Cir. 1997).

## II.    BACKGROUND

### A.    The U.S. Department of Justice and a bipartisan coalition of State Attorneys General are suing RealPage for selling software that facilitates price-fixing.

On August 23, 2024, the U.S. Department of Justice and a bipartisan coalition of nine State Attorneys General—including for the State of California—filed an exhaustive, 110-page complaint against RealPage in the Middle District of North Carolina.  They filed an amended complaint on January 7, 2025, to name several large commercial backed landlords as conspirators.  Declaration of Ian Kanig ("Kanig Decl."), Ex. 1 ("Government Action.").  The Government Action came on the heels of a massive, private class action MDL against RealPage proceeding in the Middle District of Tennessee alleging price-fixing in multifamily residential rental units.  Kanig Decl., Ex. 2.  That MDL is now past the pleadings stage.  *In re: RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478 (M.D. Tenn. Dec. 28, 2023).

In announcing the Government Action, former-Deputy U.S. Attorney General Lisa Monaco had this to say: "By feeding sensitive data into a sophisticated algorithm powered by artificial intelligence, RealPage has found a modern way to violate a century-old law through systematic coordination of rental housing prices — undermining competition and fairness for consumers in the process.  Training a machine to break the law is still breaking the law."[1]

The Government Action's allegations against RealPage are stunning and give rise to great and legitimate concerns that it is violating the antitrust laws.  It details how RealPage has "openly and directly" engaged in the systemic coordination of residential real estate markets across the country through its sale of so-called "revenue management software."  *Id.* ¶¶ 3, 14.  This software solicits and collects data from landlords, such as rental prices from executed leases, lease terms, and future occupancy.  *Id.* ¶ 5.  It then feeds this data into a coordinated pricing algorithm that provides competing landlords "daily, near real-time pricing 'recommendations.'"  *Id.* ¶ 6.

---

[1] Kanig Decl., Ex. 3—U.S. DOJ, "Justice Department Sues RealPage for Algorithmic Pricing Scheme that Harms Millions of American Renters," Aug. 23, 2024, tinyurl.com/5hapwd5p.

RealPage's software then "monitors compliance by landlords to its recommendations," nudging them to increase their prices in coordination with price increases from other landlords. *Id.* ¶ 9. In fact, some landlords "effectively outsource their pricing function to RealPage" through an automatic software setting that allows RealPage itself to fix the price that their renters pay. *Id.*

In the words of one landlord, "I always liked this product because [RealPage's] algorithm uses proprietary data from other subscribers to suggest rents and term. That's classic price-fixing[.]" *Id.* ¶ 10. This is a feature, not a bug. RealPage admits the purpose of its coordinated algorithmic-pricing software is to allow landlords to avoid competition: "[T]here is greater good in everybody succeeding versus essentially trying to compete against one another in a way that actually keeps the entire industry down." *Id.* ¶ 2. In short, a "rising tide raises all ships." *Id.* ¶ 6. A ProPublica investigation found RealPage's own executives touting the double-digit percentage increases in rental prices that its software facilitates: "I think it's driving it, quite honestly. As a property manager, very few of us would be willing to actually raise rents double digits within a single month by doing it manually. . . . We said there's way too much empathy going on here."[2]

The Government Action thus claims that RealPage is violating Section 1 of the Sherman Act by (1) unlawfully sharing information for use in competitors' pricing and (2) through vertical agreements with landlords to align pricing. *Id.* ¶¶ 224–43. It also asserts that RealPage is engaged in monopolistic conduct that violates Section 2 of the Sherman Act. *Id.* ¶¶ 280–89. This "complaint against RealPage illustrates [the United States Department of Justice's] corporate enforcement strategy in action. We identify the most serious wrongdoers, whether individuals or companies, and focus our full energy on holding them accountable." *Id.* The State Attorneys General also assert claims under their laws, including California law. *Id.* ¶¶ 295–97.

### B. RealPage's coordinated pricing software is likely harming Berkeley residents by substantially increasing rental prices, vacancy rates, and eviction rates.

RealPage admits that it is selling its coordinated pricing software in Berkeley, Compl. ¶ 8, and there is clear evidence that it is likely harming vulnerable Berkeley residents. Fifty-seven

---

[2] Kanig Decl., Ex. 4—ProPublica, "Rent Going Up? One Company's Algorithm Could Be Why," Oct. 15, 2022, www.propublica.org/article/yieldstar-rent-increase-realpage-rent.

1   percent of Berkeley residents are renters: nearly 68,000 people.  *See* Kanig Decl., Ex. 5 at 16.

2   Sixty percent of those renters are lower-income individuals.  *Id.*  And half of all renters are

3   considered rent-burdened, meaning that they pay more than 30% of their income in rent.  *Id.*  The

4   Berkeley Housing Advisory Commission believes that RealPage and another similar company

5   have already caused a ***five to twelve percent increase*** in prices across housing markets.  *Id.* at 2.

6   Indeed, six of the named landlords in the Government Action own at least ***1,300 rental units*** in

7   Berkeley and are likely using RealPage's software to engage in unlawful price coordination

8   there.[3]  *Id.* at 3.  Further, nearly fifty trade associations—including the East Bay Rental Housing

9   Association and the Berkeley Property Owners Association—are allegedly operating as "conduits

10  of the [RealPage] cartel" by using its coordinated algorithmic pricing software to fix rental prices

11  and to stagger their lease renewal dates to artificially constrict supply and thereby inflate rental

12  prices.  *Id.* at 7, 13–14; Kanig Decl., Ex. 2 (MDL Complaint) ¶¶ 389–91.  As a result, rental

13  prices, vacancy rates, and eviction rates are up.  Decl. of Margot Ernst ("Ernst Decl.") ¶¶ 6–11.

14      This evidence demonstrated to Berkeley that coordinated pricing algorithms, like those

15  that RealPage admittedly sells to Berkeley landlords, are causing concrete harm to its residents.

16  **C.    To redress this harm, on March 25, 2025, the Berkeley City Council voted to
        prohibit the sale and use of coordinated pricing algorithms to set rental rates.**

17

18      In view of this ongoing harm, the Berkeley City Council convened on March 11, 2025, to

19  consider the recommendation of the Berkeley Housing Advisory Commission to prohibit the sale

20  and use of coordinated pricing algorithms like those identified in the Government Action and the

21  RealPage MDL.  Kanig Decl., Ex. 5 at 2.  The Ordinance was adopted.  *Id*. at 4.  On March 25,

22  2025, the City Council reconvened to hold a second reading of the Ordinance.  *Id.*, Ex. 7 at 3.

23  The City Council made several revisions and adopted it in its current form.  *Id.*, Ex. 8 (full text).

24      The current version of the Ordinance contains two distinct, substantive provisions.  The

25  first provision provides that: "It shall be unlawful to ***sell, license, or otherwise provide*** to city of

26  Berkeley landlords any ***coordinated pricing algorithm*** that ***sets, recommends, or advises*** on ***rents***

27

28  _____

    [3] RealPage itself told the City and County of San Francisco that six percent of landlords in the
    San Francisco metropolitan area use its algorithmic pricing software.  Kanig Decl., Ex. 6.

*or occupancy levels* that may be achieved for residential dwelling units in the city of Berkeley." Ordinance § 13.63.030(A) (emphasis added).  The second provision provides that: "It shall be unlawful for *a landlord* to *use* a *coordinated pricing algorithm* described in subsection A *when setting rents or occupancy levels* for residential dwelling units in the city of Berkeley."  *Id.* § 13.63 (emphasis added).  A "coordinated pricing algorithm" is "any analytical or computation processes that use data to recommend or predict the price of consumer goods or services *in direct or indirect coordination with one or more competitors*[.]"  *Id.* § 13.63.020 (emphasis added).[4] In short, the Ordinance exclusively proscribes direct or indirect coordination among competitors. To facilitate effective enforcement, the Ordinance creates two civil rights of action: (1) a public right of action for the Berkeley City Attorney to enforce both provisions; and (2) a private right of action for tenants to enforce the "use" provision against landlords.  *Id.* § 13.63.040.

In finding the Ordinance necessary to promote the health, safety, and welfare of Berkeley residents, the City Council determined: (A) coordinated pricing algorithms have threatened to destabilize residential rental housing in Berkeley; (B) this software enables landlords to indirectly coordinate with one another to artificially inflate rents and vacancy rates for residential rentals; (C) this price coordination has contributed to double-digit increases in rent, higher vacancy rates, and higher eviction rates in Berkeley; (D) that harm further fuels the consolidation of corporate and private equity ownership of residential rentals at the expense of both Berkeley tenants and other Berkeley landlords who do not engage in unlawful price coordination.  *Id.* § 13.63.010.

> **D.    RealPage filed this action, alleging that the Ordinance will infringe on its First Amendment free speech and Fourteenth Amendment due process rights.**

RealPage filed this lawsuit against Berkeley and its City Manager on April 2, 2025.  Dkt. No. 1 ("Compl.").  RealPage alleges that the Ordinance—which proscribes the sale and use of algorithmic software for price coordination among landlords in the residential rental market— threatens an imminent and irreparable violation of its First Amendment *free speech* rights and

---

[4] This definition in the Ordinance includes the following as an example: "[A] software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants."  *Id.*

Fourteenth Amendment **due process** rights. *Id.* ¶¶ 60–73. Specifically, RealPage alleges that the

Ordinance "prohibits the dissemination of information," "burdens the creation and dissemination

of information, and "prohibits the use of information" used to "generate rental information, to

gather, sort, and analyze that rental information, and to share that rental information[.]" *Id.* ¶ 61.

It claims that this is a First Amendment violation subject to strict scrutiny, because this is "core

speech activity," the restriction of which is "presumptively unconstitutional." *Id.* ¶ 62.

RealPage further contends that the Ordinance is unconstitutionally vague under the Due

Process Clause of the Fourteenth Amendment because it "fails to define key terms." *Id.* ¶ 69.

Those terms are "coordinated pricing algorithms," "competitor data," and "information." *Id.*

RealPage also complains that the Ordinance "singles out RealPage as the target of enforcement,"

and alludes to the claim that this targeting will cause "arbitrary enforcement" against it. *Id.* ¶ 70.

For these allegedly threatened constitutional violations, RealPage seeks declaratory and

injunctive relief under 42 U.S.C. § 1983 and its attorney's fees and costs under 42 U.S.C. § 1988.

On April 3, 2025, RealPage filed this motion for preliminary relief. Dkt. No. 12.

## III.    LEGAL STANDARD

The standard for issuing a temporary restraining order is identical to the standard for

issuing a preliminary injunction. *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co.*, 240 F.3d

832, 839 n.7 (9th Cir. 2001). Preliminary injunctive relief is a matter of equitable discretion and

is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is

entitled to such relief." *Winter*, 555 U.S. at 22. A plaintiff seeking such relief must prove "[1]

that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the

absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an

injunction is in the public interest." *Id.* at 20. In cases involving the government, as here, the

third and fourth factors of this test "merge" into one. *Drakes Bay Oyster*, 747 F.3d at 1092.

## IV.    ARGUMENT

**A.    RealPage has failed to meet its substantial burden of proving that it will likely prevail on the merits of either of its claims challenging the Ordinance.**

RealPage has failed to show that it can prevail on the merits of its constitutional claims,

and the Court should deny the extraordinary relief that it requests on this basis alone. *Pimentel v. Dreyfus*, 670 F.3d 1096, 1111 (9th Cir. 2012) (holding that this is an "irreducible minimum" of preliminary injunctive relief, and the other *Winter* factors need not be considered where it fails). Before diving into the specific reasons why RealPage has failed to meet its burden, it is important to appreciate that Sections 13.63.030(A) and 13.63.030(B) are separate and distinct provisions of the Ordinance that concern different conduct and different actors. The first covers the sale of coordinated pricing software by providers like RealPage, while the second covers the use of such software by landlords. RealPage has attempted to blur them into one regulation to hide certain defects in its claims, but each provision requires its own separate consideration on the merits.

>    **1.     The Ordinance will not violate RealPage's First Amendment rights.**

RealPage's First Amendment challenge fundamentally misconstrues the Ordinance and the law. The Ordinance is not subject to First Amendment scrutiny because it does not target ***any*** protected speech or expressive conduct whatsoever. It restricts the ***sale*** and ***use*** of coordinated pricing algorithms—software—to set rental and occupancy rates in Berkeley's residential rental market. That is pure economic regulation. *See HomeAway.com*, 918 F.3d at 685 (affirming denial of preliminary injunction regarding rental regulation on this precise basis); *Airbnb*, 217 F. Supp. 3d at 1076–79 (denying similar motion for preliminary injunction on this same basis). In fact, to the extent that the Ordinance did incidentally burden any protected speech—and RealPage fails to explain what speech it would burden beyond what it calls algorithmic "speech"—that still would not trigger any First Amendment scrutiny. *IFA*, 803 F.3d at 408. All regulations can theoretically burden some downstream speech, but that does not implicate free speech concerns. *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986) (O'Connor, J., concurring). And this Court should resolutely refuse to entertain RealPage's dangerous and unprecedented attempt to expand the First Amendment's protections to algorithmic "speech"—especially on this record.

Further, even if the Ordinance did burden actual speech, it would be unlawful commercial speech that is also unentitled to any First Amendment protection. It is well-established that the First Amendment does not protect speech or conduct that violates the antitrust laws. *Cal. Motor Transp.*, 404 U.S. at 515. Here, RealPage has failed to put forward any argument, let alone actual

evidence, proving their product is lawful.  To the contrary, the U.S. Department of Justice and the State of California have already determined—in an exhaustive complaint that should be accorded its due weight at this early stage—that coordinated pricing algorithms like RealPage's software fix prices and facilitate price-fixing in violation of the antitrust laws.  *See* Section II.A, *supra*.  On this limited record, it is impossible to conclude that RealPage is a lawful market actor.

Finally, to the extent that the Ordinance prohibits speech not already prohibited by federal and state antitrust and unfair competition law, it would be purely commercial speech not entitled to strict scrutiny, but intermediate scrutiny.  The Ordinance advances an undisputedly compelling governmental interest that is narrowly drawn and part of a multipronged effort to combat the ongoing housing affordability crisis in Berkeley.  The declarations submitted herewith make clear that its vulnerable renters are undergoing an unprecedented assault from corporate interests that requires a multipronged approach, including this Ordinance.  Ernst Decl. ¶¶ 3–11; Declaration of Jordan Klein ("Klein Decl.") ¶¶ 3–7 & Ex. A; *see also* Kanig Decl., Ex. 5 at 11–18.

This Court should reject RealPage's pretextual invocation of the First Amendment.  This lawsuit and this motion for preliminary relief are a smokescreen for illegal antitrust conduct.

       **a.**     **The Ordinance's prohibition on the sale of algorithms is an economic regulation subject to no First Amendment protection.**

As a threshold matter, RealPage has failed to show that the Ordinance's prohibition on selling coordinated pricing algorithms restricts any speech, let alone any core speech or specific speakers.  For that reason alone, RealPage cannot succeed on its First Amendment challenge.

Economic regulations are not subject to First Amendment scrutiny.  *HomeAway.com*, 918 F.3d at 685.  The key case upon which RealPage relies—*Sorrell v. IMS Health Inc.*—makes that clear: "[R]estrictions on protected expression are distinct from restrictions on economic activity or, more generally, on nonexpressive conduct."  564 U.S. 552, 567 (2011).  Indeed, the regulation of economic activity may incidentally burden protected speech without issue.  Applying First Amendment scrutiny to every such incidental impact on speech "would lead to the absurd result that any government action that had some conceivable speech-inhibiting consequences, such as the arrest of a newscaster for a traffic violation," would require review.  *Arcara*, 478 U.S. at 708.

Accordingly, the Ninth Circuit holds that First Amendment scrutiny of economic or other conduct-based regulations is proper only if "conduct with a 'significant expressive element' drew the legal remedy" or if "the [statute] has the inevitable effect of 'singling out those engaged in expressive activity.'" *IFA*, 803 F.3d at 408 (quoting *Arcara*, 478 U.S. at 706–07). To determine whether an economic regulation targets expressive speech or specific speakers, courts look to the "inevitable effect of a [law] on its face" and its "stated purpose." *Sorrell*, 564 U.S. at 565.

Here, RealPage has failed to show that the Ordinance's prohibition on the sale of certain algorithms targets or affects any speech or expressive conduct to satisfy this threshold test. To the contrary, on its face, Section 13.63.030(A) prohibits only economic conduct: the sale, licensure, or provision of coordinated pricing algorithms—a software product that fixes rental prices—to landlords. The stated purpose of this provision is not to target any speech, but it is to prohibit price coordination in the Berkeley residential real estate market. Ordinance § 13.63.010. "[T]he Ordinance is plainly a housing and rental regulation." *See HomeAway.com*, 918 F.3d at 685. Further, Section 13.63.030(A) does not "singl[e] out" any specific category or class of actor engaged in expressive (or any) activity. Its general prohibition applies to ***any*** person or entity—without limitation—that sells, licenses, or provides covered algorithms for a covered purpose.[5]

The Ninth Circuit and courts in this District have consistently and recently rejected arguments that restricting economic activity imposes a burden on protected speech. Those courts have made clear that when an economic regulation does not target any expressive conduct or any speakers for unfavorable treatment, as here, no First Amendment scrutiny should be applied.

In *Airbnb, Inc. v. City & County of San Francisco*, Judge Donato denied a preliminary-injunction motion challenging a San Francisco ordinance banning the collection of fees for booking unregistered short-term residential rentals. 217 F. Supp. 3d at 1076–79. The court held that the collection of "booking service" fees targeted by the ordinance was plainly "a business

---

[5] That the Ordinance's definition of "coordinated pricing algorithm" does not include "reports published by a trade association" containing "aggregated" historical renter data does not "singl[e] out" RealPage's "expressive activity" for suppression. *See* Ordinance § 13.63.020; *IFA*, 803 F.3d at 408. Not only does the Ordinance not prohibit any expressive conduct, those trade reports do not set, recommend, or advise on residential rental rates for the purpose of direct or indirect price coordination. *See* Ordinance § 13.63.020. They provide mere historical and public rental data. RealPage's claim that these trade reports are allowed to provide "ideal" pricing is imaginary.

transaction to secure a rental, not conduct with a significant expressive element." *Id.* at 1076.

Just like RealPage does here, defendant Airbnb relied on *Sorrell*, 564 U.S. at 567, and *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 110–17 (1991), to argue that the economic regulation at issue burdened its right to protected speech. The statute held unlawful in *Sorrell* had "restricted the sale, disclosure and use of pharmacy records revealing doctors' drug prescribing practices so that 'recipient speakers' such as pharmaceutical companies could not receive or 'use the information for marketing.'" *Airbnb*, 217 F. Supp. 3d at 1077 (quoting *Sorrell*, 564 U.S. at 564). But the statute permitted the disclosure and use of that same information for the purpose of marketing generic prescription drugs. *Sorrell*, 564 U.S. at 564. It was thus a content-based ban on "disfavor[ed] marketing" speech that "disfavor[ed] specific speakers": brand-name (but not generic) pharmaceutical manufacturers. *Airbnb*, 217 F. Supp. 3d at 1077 (quoting *Sorrell*, 564 U.S. at 564). The statute in *Simon & Schuster* prohibited convicted criminals from profiting on the sale of a book or other expressive work based on their crime. *Id.* (citing *Simon & Schuster, Inc.*, 502 U.S. at 110, 116). That law was thus a speaker-based ban on a form of expressive speech. *See id.* Judge Donato easily distinguished those cases because they involved "core First Amendment concerns" about speaker-based restrictions, which an economic restriction on charging for a particular business transaction does not implicate. *Id.* "No specific speaker is targeted for disparate or unfavorable treatment under the Ordinance." *Id.* Further, the court found that Airbnb failed to show that the ordinance was "motivated by a desire to suppress speech." *Id.* at 1076 (quoting *IFA*, 803 F.3d at 409). Rather, the legislative record showed that San Francisco enacted this law to "help enforce compliance with the registration requirement by ensuring that hosting platforms do business with law-abiding hosts." *Id.*

The Ninth Circuit confirmed this approach was correct in affirming the denial of a similar preliminary-injunction motion in *HomeAway.com v. City of Santa Monica*. 918 F.3d at 685–86. There, Santa Monica had enacted an ordinance similar to the one challenged in the *Airbnb* case. The Ninth Circuit held that "[b]ecause the conduct at issue—completing booking transactions for unlawful rentals—consists only of nonspeech, nonexpressive conduct . . . the Ordinance does not implicate the First Amendment." *Id.* at 685. For that same reason, "the incidental impacts on

speech cited by the Platforms raise[d] minimal concerns." *Id.* at 686. "[T]o the extent that the speech chilled advertises unlawful rentals, '[a]ny First Amendment interest . . . is altogether absent when the commercial activity itself is illegal and the restriction on advertising is incidental to a valid limitation on economic activity.'" *Id.* (quoting *Pittsburgh Press Co.*, 413 U.S. at 389).

Since the Ninth Circuit decided *HomeAway*, several other courts in this District have likewise found that First Amendment challenges to economic regulations are meritless under the Ninth Circuit's *IFA* test. *See, e.g.*, *Garcia v. Cnty. of Alameda*, 2024 WL 4476659, *3 (N.D. Cal. Oct. 11, 2024) (Chief District Judge Seeborg denying injunction against ordinance criminalizing attendance at sideshows, despite fact that plaintiff was a journalist who wanted to report on the events); *Diamond S.J. Enter., Inc. v. City of San Jose*, 395 F. Supp. 3d 1202, 1229–30 (N.D. Cal. 2019), *aff'd*, 100 F.4th 1059 (9th Cir. 2024) (then-District Judge Koh dismissing First Amendment claim that nightclub licensing requirement burdened expressive activity).

This line of authorities—which RealPage studiously avoids mentioning in its motion— precludes RealPage's First Amendment claim. RealPage's software sales do not involve speech with any expressive element, much less a significant one that would implicate "core First Amendment concerns" like a prohibition on certain marketing content or selling a certain type of book. *See Airbnb, Inc.*, 217 F. Supp. 3d at 1077. Further, like the ordinances examined in *IFA*, *Airbnb*, *HomeAway*, *Diamond S.J. Enterprise*, and *Garcia*, Section 13.63.030(A) is "directed at specific business transactions and practices, and 'not to any message the businesses express.'" *See Airbnb*, 217 F. Supp. 3d at 1076 (quoting *IFA*, 803 F.3d at 409). The decision "to form a business relationship"—here, between software providers and landlords—and their "resulting business activities" are "not expressive conduct." *Id.* at 1076 (quoting *IFA*, 803 F.3d at 408).

RealPage's radical and unsupported argument that the output of its software's algorithm is protected speech under *Moody v. NetChoice, LLC*, 603 U.S. 707, 732–33 (2024), should also be rejected. *See* Mot. at 15–16. Indeed, it would constitute an unprecedented and dangerous expansion of First Amendment law to protect this algorithmic "speech," let alone to require strict scrutiny as a "content-based" restriction on speech. *See* Mot. at 8–9. *Moody* held that a statute regulating social media companies' content moderation was subject to First Amendment scrutiny

2898822

1   because that content moderation involved the curation of varied voices and the exercise of

2   editorial discretion over which messages are uplifted or suppressed.  603 U.S. at 731 ("[T]he First

3   Amendment offers protection when an entity [engaged in] compiling and curating others'

4   speech[] is directed to accommodate messages it would prefer to exclude."); *id.* at 738 (describing

5   social media content moderation as "the product of a wealth of choices about whether—and, if so,

6   how—to convey posts having a certain content or viewpoint").  In other words, *Moody* involved a

7   viewpoint- and speaker- based restriction that implicated "core" protected speech.  It would be an

8   unprecedented and dangerous expansion to interpret *Moody* as protecting algorithmic "speech" at

9   all, let alone to require strict scrutiny as a "content-based" restriction on speech.  *See* Mot. at 8–9.

10      Bafflingly, RealPage tells this Court that *Moody* stands for the broad proposition that the

11  "First Amendment protects speech 'technology.'"  Mot. at 16.  Whatever RealPage believes

12  "speech technology" is, *Moody* does not mention it.  Instead, *Moody* recognized that social media

13  content moderation is a form of expressive activity, grounding its decision in "the core teaching"

14  that "[t]he government may not, in supposed pursuit of better expressive balance, alter a private

15  speaker's own editorial choices about the mix of speech it wants to convey."  603 U.S. at 734.

16  The Supreme Court did not hold that the First Amendment protects any output from any

17  algorithm, and this Court should not either.  There is no expression, communication, or content

18  moderation to consider in the context of a coordinated pricing algorithm.  The Ordinance in no

19  way limits any entity's freedom to express a message.  RealPage can continue to speak about its

20  software in any way that it chooses; it simply cannot sell that software to landlords in Berkeley

21  for use in setting rental rates in direct or indirect coordination with competing landlords.

   **b.    RealPage has no First Amendment right to speech that relates
           to price-fixing or facilitating price-fixing in the rental market.**

24      Even if the Ordinance's prohibition on sales of algorithms did cognizably suppress some

25  kind of algorithmic "speech," it would be speech relating to unlawful price-fixing.  This is the

26  basis for the Government Action.  *See* Section II.B, *supra*.  But the First Amendment has never

27  protected speech that constitutes or relates to violations of the antitrust laws under any standard of

28  judicial scrutiny.  *Cal. Motor Transp*, 404 U.S. at 515.  This, too, is a "threshold matter" that

1    defeats RealPage's challenge to Section 13.63.030(A). *See Metro Lights, L.L.C. v. City of Los*

2    *Angeles*, 551 F.3d 898, 903 (9th Cir. 2009) (discussing *Cent. Hudson*, 447 U.S. at 564–66).

3         Generally, speech proposing or relating to an illegal transaction is excluded from First

4    Amendment protection. *HomeAway.com*, 918 F.3d at 685 (first citing *United States v. Williams*,

5    553 U.S. 285, 297 (2008); *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S.

6    376, 388–89 (1973)); *accord Airbnb*, 217 F. Supp. 3d at 1077. The Supreme Court has rejected

7    the "fallacy" of "seeking to use the First Amendment as a cloak for obviously unlawful" activity

8    by "attributing protected expressive attributes to that conduct." *Arcara*, 478 U.S. at 705 (citing

9    *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 67 (1973)). "Any First Amendment interest . . . is

10   altogether absent when the commercial activity itself is illegal[.]" *Pittsburgh Press*, 413 U.S. at

11   388–89. A law "barring anti-competitive collusion is not wholly unrelated to a communicative

12   component, but that in itself does not trigger First Amendment scrutiny." *IFA*, 803 F.3d at 408.

13        Here, on this preliminary challenge, RealPage has not submitted *any* evidence—beyond

14   one executive's self-serving declaration that cites no evidence (Dkt. No. 12–6)—nor cited *any*

15   authority to prove that selling coordinated pricing algorithms that set, recommend, or advise on

16   rental or occupancy rates in direct or indirect coordination with competing landlords does not

17   violate existing federal and state antitrust law (or California's unfair competition law). Instead,

18   RealPage makes bare assurances that it is a lawful actor, but that does not carry its burden on this

19   motion for extraordinary relief. Because conduct and speech relating to unlawful antitrust

20   conduct receives no First Amendment protection, RealPage has failed to satisfy its substantial

21   burden of showing it will likely succeed on the merits of its challenge to Section 13.63.030(A).

22        Thus, even if RealPage's contention that the Ordinance's prohibition bans "the sale of

23   information" were true—it is not—Section 13.63.030(A) would prohibit only the sale of

24   information relating to unlawful price-fixing and the facilitation of price-fixing. *See* Mot. at 9–

25   11. The First Amendment takes no issue with that prohibition on already-unlawful activity.

26        **c.    Even if the Ordinance is subject to First Amendment scrutiny,**
             **it regulates commercial speech and is precisely tailored to serve**
27           **Berkeley's interest in promoting a fair housing market.**

28        RealPage may contend that the Ordinance's prohibition on the sale of coordinated pricing

2898822

1    algorithms regulates speech that extends beyond the prohibitions of existing law and remains

2    subject to First Amendment protection.  As an initial matter, it may not raise such an argument for

3    the first time on reply.  *See In re Yahoo Mail Litig.*, 7 F. Supp. 3d 1016, 1035 (N.D. Cal. 2014).

4           In any event, even if the Ordinance did extend beyond existing antitrust or unfair

5    competition law, any burdened speech would be commercial speech between software providers

6    and landlords, or competing landlords, about setting, recommending, or advising on rental rates in

7    coordination with one another.  That is "expression related solely to the economic interests of the

8    speaker and its audience."  *Cent. Hudson*, 447 U.S. at 562 (citations omitted).  Accordingly, the

9    Ordinance's alleged suppression of that speech would be subject only to intermediate scrutiny.

10   *See Metro Lights*, 551 F.3d at 903 (discussing *Cent. Hudson*, 447 U.S. at 564–66); *see also*

11   *Zauderer v. Off. of Disciplinary Couns. of Supreme Ct. of Ohio*, 471 U.S. 626, 637 (1985) ("Our

12   commercial speech doctrine rests heavily on the 'common-sense' distinction between speech

13   proposing a commercial transaction . . . and other varieties of speech[.]" (marks omitted)).

14          To satisfy intermediate scrutiny, an ordinance must "directly advance[]" a "substantial

15   governmental interest" and be "not more extensive than is necessary to serve that interest."  *Cent.*

16   *Hudson*, 447 U.S. at 566.  RealPage does not dispute in its complaint or moving papers that the

17   Ordinance—in seeking to protect its residents from anticompetitive rental practices—serves not

18   only a "substantial" but a "compelling" governmental interest.  Mot. at 17.  Nor could it.  The

19   U.S. Supreme Court has long held that "[a]ntitrust laws . . . are as important to the preservation of

20   economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our

21   fundamental personal freedoms."  *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972).

22          RealPage argues only that the Ordinance is not sufficiently tailored to serve that interest.

23   *Id.* at 17–19.  To find sufficient tailoring, this Court need only find there is "a fit between the

24   legislature's ends and the means chosen to accomplish those ends, a fit that is not necessarily

25   perfect, but reasonable[.]"  *Retail Digital Network, LLC*, 861 F.3d at 846 (quoting *Bd. of Trs. of*

26   *State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477, 480 (1989) (brackets omitted)).

27          Section 13.63.030(A) is ***exactly*** tailored to address Berkeley's interests.  Berkeley found

28   that the sale of coordinated pricing algorithms to set rental rates in Berkeley allows landlord

competitors to coordinate on pricing, which has contributed to rising residential rental rates. Kanig Decl., Ex. 5 at 11–18; Ernst Decl. ¶¶ 6–11 & Ex. A.  The Ordinance prohibits those sales. To be a "coordinated pricing algorithm" under the Ordinance, the algorithm must "use data to recommend or predict the price of consumer goods or services *in direct or indirect coordination with one or more competitors*."  Ordinance § 13.63.020 (emphasis added).  This is the precise ill that Berkeley is combatting with the Ordinance.  *See id.* § 13.63.010.  Entities who do not sell coordinated pricing algorithms are not affected at all.  RealPage's hypotheticals—including that this prohibits landlords from using Excel or Zillow—are strawmen.  *See* Mot. at 6, 14.  No landlords using an Excel spreadsheet and publicly available data to calculate their own rental rates or occupancy rates would be covered.  Nor would a landlord using Zillow for the same purpose.  The only conduct covered by the Ordinance is the sale or use of coordinated pricing algorithms in direct or indirect coordination with competitors.  Landlords simply computing their own rental prices are not coordinating prices with competing landlords.[6]

Naturally, RealPage would prefer Berkeley to take a different approach.  *See* Mot. at 8 (suggesting that Berkeley should build more rental units); *see also id.* (asserting that Berkeley should ignore the issue because antitrust law bans unlawful coordination).  RealPage repeatedly cites to the Supreme Court's decision in *Citizen United v. FEC* for the proposition that the solution to Berkeley's problem is "more speech, not less," as if RealPage's software were *alleviating* the housing crisis.  *See id.* at 8, 10 (citing 558 U.S. 310 (2010)).  But these arguments are irrelevant.  RealPage cites no authority holding that a governmental entity is prohibited from simultaneously pursuing multiple avenues to address a multipronged problem causing its residents concrete harm.  *See* Klein Decl. ¶¶ 5–7 (explaining Berkeley's overall approach).  The Ordinance is a well-founded approach based on an extensive record concerning the issue of algorithm-facilitated price coordination.  *See, e.g.*, Kanig Decl., Ex. 5 at 2–18.

This Court may also safely ignore RealPage's citations to cases examining statutes that

---

[6] Even if RealPage had asserted a claim that the Ordinance is facially overbroad (as opposed to improperly tailored), which it has not done anywhere, "it is irrelevant whether the ordinance has an overbroad scope encompassing protected commercial speech of other persons, because the overbreadth doctrine does not apply to commercial speech."  *Hoffman Ests.*, 455 U.S. at 496–97.

2898822

1    *compelled* speech.  For example: a statute imposing a requirement that social-media companies

2    write reports opining on whether content on their platforms posed a risk to children.  *See, e.g.*,

3    *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1119 (9th Cir. 2024); *X Corp. v. Bonta*, 116 F.4th 888,

4    901 (9th Cir. 2024).  Compelled non-commercial speech is subject to strict scrutiny and is

5    irrelevant here.  Section 13.63.030(A) does not compel any speech.

6        At bottom, the Supreme Court has long held that where "the record disclose[s] a factual

7    basis for the [city's] conclusion that this kind of restriction will have the desired effect," it is not

8    the court's "function to appraise the wisdom of its decision" to address the problem in one

9    particular manner or another.  *Young v. Am. Mini Theatres, Inc.*, 427 U.S. 50, 71 (1976).  Rather,

10   "the city's interest in attempting to preserve the quality of urban life is one that must be accorded

11   high respect.  Moreover, the city must be allowed a reasonable opportunity to experiment with

12   solutions to admittedly serious problems."  *Id.*  This Court should allow Berkeley to address a

13   clear harm to its residents through economic regulation that addresses unlawful conduct.

14       For the foregoing reasons, Section 13.63.030(A)'s prohibition on the sale of coordinated

15   pricing algorithms does not violate—or even implicate—RealPage's First Amendment rights.

16       **2.    The Ordinance's separate prohibition on landlords' use of RealPage's
             software does not implicate RealPage's First Amendment rights.**

17

18       RealPage lacks standing to challenge Section 13.63.030(B) covering landlords' conduct

19   because it has not alleged, much less proved in it motion, that this provision could injure it in any

20   way.  *See Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010) ("[W]e have concluded that pre-

21   enforcement plaintiffs who failed to allege a concrete intent to violate the challenged law could

22   not establish a credible threat of enforcement."); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555,

23   560–61 (1992) ("injury-in-fact" is part of the "irreducible constitutional minimum" of standing).

24       Section 13.63.030(B) restricts only **landlords** from using price coordination software.

25   RealPage has not alleged that it is or intends to become a Berkeley landlord that uses such

26   software.  It thus lacks standing to challenge this provision.  *See Lopez*, 630 F.3d at 787.  Even if

27   RealPage had alleged that this provision is an unconstitutional restriction on its face, it would still

28   need to show imminent injury.  *See Diamond S.J. Enter., Inc. v. City of San Jose*, 100 F.4th 1059,

17

2898822

1065–66 (9th Cir. 2024) (holding that a plaintiff lacks standing to bring a facial challenge to an ordinance that did not apply to it because it failed to show that it intended to violate the statute) (citing *Get Outdoors II, LLC v. City of San Diego*, 506 F.3d 886, 895 (9th Cir. 2007)).

Even if RealPage had standing to challenge Section 13.63.030(B), no First Amendment scrutiny is triggered for the same reasons discussed above with respect to Section 13.63.030(A). Section 13.63.030(B) solely regulates unlawful conduct—landlords' use of an algorithm to horizontally coordinate rental and occupancy rates. It burdens no speech at all and certainly not any core speech. If any speech were incidentally burdened by prohibiting a landlord's use of price coordination software to set rent rates, it would necessarily be commercial speech related to unlawful activity, placing it outside the scope of the First Amendment. *See* Section IV.A.1.B. To the extent any lawful expressive commercial speech would somehow be burdened, the provision survives intermediate scrutiny. It is narrowly tailored to prohibit the use of only algorithms that coordinate prices with competitors, which serves the City's interest in ending price coordination by Berkeley landlords to ensure that its residents can access housing at fair, free-market prices.

### 3. The Ordinance is not unconstitutionally vague.

RealPage's vagueness argument fares no better. RealPage cannot show that the Ordinance is vague because it clearly applies to and proscribes RealPage's coordinated pricing algorithms.

#### a. RealPage cannot assert any vagueness challenge because the Ordinance expressly targets RealPage, as it repeatedly admits.

The Supreme Court has long said that plaintiffs whose conduct is "clearly proscribed" by a challenged statute cannot "raise a successful vagueness claim under the Due Process Clause." *Holder*, 561 U.S. at 20; *accord Hunt v. City of Los Angeles*, 638 F.3d 703, 714–15 (9th Cir. 2011). This makes good sense: a law is unconstitutionally vague only "if it does not provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *First Resort*, 860 F.3d at 1274 (marks omitted). So where the conduct is clearly proscribed, as here, the statute inherently provides the plaintiff notice and precludes arbitrary enforcement. Accordingly, RealPage cannot bring a vagueness challenge.

There is no question that the first provision of the Ordinance proscribes RealPage's sale of

2898822

price-coordination software in Berkeley.  The legislative findings underlying the Ordinance *expressly name RealPage* as an actor whose conduct spurred the urgent need for this regulation. Ordinance § 13.63.010(F),(G) (citing the Government Action and the MDL accusing RealPage of "reducing competition among landlords and taking over the market for [this] algorithm-based rental software"); *see also Arce v. Douglas*, 793 F.3d 968, 988 (9th Cir. 2015) (considering statutory purpose when assessing vagueness).  RealPage's complaint is littered with admissions that it knows its "rental management software" is prohibited by the Ordinance.  *See, e.g.*, Compl. ¶ 10 ("[T]he Ordinance expressly targets companies like RealPage."), *id.* ¶ 59 ("[T]he Ordinance . . . singl[es] out RealPage as the target of its prohibitions."), *id.* ¶ 70 ("The Ordinance . . . singles out RealPage as the target of enforcement.").  Even RealPage's motion concedes its conduct is clearly proscribed.  Mot. at 12:23 ("The Ordinance expressly targets RealPage by name.").

It is clear—to RealPage, the City of Berkeley, anyone who attended a city council meeting or read a transcript, and anyone who has read the Ordinance itself—that RealPage's rental-price coordination software is banned by the Ordinance.  RealPage's repeated assertions that its actions are specifically targeted by the Ordinance are irreconcilable with its argument that the Ordinance is too vague for it to know whether its conduct is affected.  *See Holder*, 561 U.S. at 20; *Hunt*; 638 F.3d at 714–15.  RealPage's vagueness challenge fails for this reason alone.

> **b.    The specific terms that RealPage claims are undefined are expressly defined by the Ordinance or have a plain meaning.**

RealPage's vagueness claim also fails on its merits.  RealPage's argument isolates words in the Ordinance, one by one, to try to find anything unclear, and ultimately challenges three terms.  One is from a definition of a phrase, one is from an example in that definition, and one is from the definition of a term in that example.  The Court need not engage in such nitpicky isolation of statutory provisions; the proper legal standard considers the terms in context and the Ordinance as a whole.  Indeed, two of the terms challenged by RealPage are in fact expressly defined in the Ordinance, and the third is "information," a word with a common understanding. This Court should reject RealPage's ill-disguised attempt to create confusion where none exists.

Under the Fourteenth Amendment's Due Process Clause, a law is unconstitutionally

vague where it "does not provide a reasonable opportunity to know what conduct is prohibited, or is so indefinite as to allow arbitrary and discriminatory enforcement." *First Resort*, 860 F.3d at 1274. "[P]erfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Matsumoto v. Labrador*, 122 F.4th 787, 805 (9th Cir. 2024) (quoting *Williams*, 553 U.S. at 304). Indeed, ordinances with "flexible terms" regularly survive vagueness challenges. *Gospel Missions of Am. v. City of Los Angeles*, 419 F.3d 1042, 1047–48 (9th Cir. 2005) (collecting cases). Even where a specific term is imprecise, other provisions can provide the requisite specificity. *See id.* at 1048 (collecting cases); *Hum. Life of Wash. Inc. v. Brumsickle*, 624 F.3d 990, 1021 (9th Cir. 2010). Courts will also look to "the statute's purpose," *Arce*, 793 F.3d at 988, and "overarching mandate," *Cal. Teachers Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1147 (9th Cir. 2001), to assess vagueness. And, words of common understanding are not vague simply because the statute leaves them undefined. *See Gospel Missions*, 419 F.3d at 1047; *United States v. Kilbride*, 584 F.3d 1240, 1257 (9th Cir. 2009).

The Ordinance bans the sale, licensure, or provision to Berkeley landlords of "any coordinated pricing algorithm that sets, recommends, or advises on rents or occupancy levels" for Berkeley rental units. Berkeley Mun. Code § 13.63.030(A). RealPage concedes that its "rental management software" recommends rental prices for Berkeley landlords, Compl. ¶ 3, and does not challenge this aspect of the Ordinance. Instead, it focuses on whether "coordinated pricing algorithm" is sufficiently clear to put RealPage and the public on notice of proscribed conduct.

"Coordinated pricing algorithm" is defined by the statute and is also clear from "the ordinance as a whole." *Hum. Life of Wash.*, 624 F.3d at 1021. **First,** despite alleging that the Ordinance "fails to define" this term, Compl. ¶ 69, RealPage admits there is a clear definition, *id.* ¶ 32—any (1) "analytical or computation processes"; (2) "that use data to recommend or predict the price of consumer goods or services"; (3) "in direct or indirect coordination with one or more competitors," Ordinance § 13.63.020(A). There is no vagueness issue where a challenged provision is more specifically defined in a subsequent provision. *See Edge v. City of Everett*, 929 F.3d 657, 667 (9th Cir. 2019). **Second,** RealPage's complaint demonstrates its rental management software falls within this definition because it (1) analyzes data; (2) uses that data to

2898822

"generate personalized price recommendations"; and (3) assesses "internal" (nonpublic) data with public (competitor) data. *See* Compl. ¶ 3. The definition is not vague. Particularly when contextualized by the legislative goal of prohibiting this kind of software and protecting renters, *see Arce*, 793 F.3d at 988, the Ordinance provides clear notice of the proscribed conduct.

Knowing this definition is clear, RealPage instead argues an ***example*** provided in the definition of "coordinated pricing algorithm" renders the whole Ordinance vague. Not so. While the Ninth Circuit has said that a term can be vague where the statute "fails to define [the term] or provide any examples," *Hunt*, 632 F.3d at 711, RealPage cites no case saying that an unclear example can render vague an otherwise clear provision. In any case, the example here is clear: a "software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels . . . for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants." Ordinance § 13.63.020(A). This is not vague—indeed, RealPage again acknowledges its conduct falls within this definition because its software calculates data about local rents to provide landlords with pricing recommendations. *See* Compl. ¶ 3; *Hum. Life of Wash.*, 624 F.3d at 1021 ("[V]agueness challenges will be rejected when it is clear what the ordinance as a whole prohibits.") (internal quotation marks and citations omitted)); *see also Reges v. Cauce*, 733 F. Supp. 3d 1025, 1047 (W.D. Wash. 2024) (rejecting vagueness argument because challenged words did "not stand on their own" and were clearly defined when "[r]ead in context").

RealPage drills further into the Ordinance to take issue with two words—in an example, from a definition—and isolates the phrase "competitor data" to argue it is vague. Again, despite alleging that the Ordinance "fails to define" competitor data, Compl. ¶ 69, RealPage admits the term is defined, *id.* ¶ 33. The definition is "information," including (1) "about actual rent prices, occupancy rates, lease start and end dates, and similar data"; (2) "regardless whether the information is attributable to a specific competitor or anonymized"; and (3) "regardless whether it is derived from or otherwise provided by another person that competes in the same market or a related market." Ordinance § 13.63.020(B). And again, RealPage implicitly acknowledges the definition is clear enough to proscribe its own software, which (1) analyzes data about rent; (2)

BERKELEY'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
Case No. 3:25-cv-03004-JSC

2898822

1    using data from sources without limit to specific competitors; and (3) the data concerns

2    competing properties, without limit to the market.  *See* Compl. ¶ 3.  There is no vagueness issue.

3    *Cf. Edge*, 929 F.3d at 667 (statute's examples clarified otherwise undefined term).

4            Faced with clarity at every level of the statute, RealPage digs even further to single out

5    one word in the definition of "competitor data" (a term itself part of an example): "information."

6    But "information" is not vague.  Like the words "implicit" or "member," information is a "word[]

7    of common understanding . . . [that] plainly require[s] no guessing at [its] meaning." *Kilbride*,

8    584 F.3d at 1258 (citation omitted); *Rosa v. Robertson*, 2025 WL 41937, at *15 (N.D. Cal. Jan. 7,

9    2025) (Donato, J.) (rejecting vagueness argument as to "member," despite its lack of statutory

10   definition, because it was "commonly used" so "no further definition" was required).  Thus, the

11   "ordinary, contemporary, common meaning" of information applies.  *Kilbride*, 584 F.3d at 1257.

12   It means "knowledge that you get about someone or something: facts or details about a subject."

13   *Information*, Brittanica Dictionary, https://www.britannica.com/dictionary/information (last

14   accessed Apr. 6, 2025); *see also Gospel Missions*, 419 F.3d at 1047 (rejecting vagueness

15   challenge in part based on dictionary definition).  At bottom, RealPage and the general public

16   know what "information" means, and know it includes residential rental data.  *See* Compl. ¶ 3.

17           RealPage's argument that the definition is thus unlimited and "includes no references . . .

18   to the data of competitors" is also wrong.  *See* Mot. at 13.  "Information" is merely a term in an

19   example of a definition for the proscribed software.  By definition, the proscribed software uses

20   data and recommendations—information—"in direct or indirect coordination with one or more

21   competitors."  Ordinance § 13.63.020(A).  RealPage ignores this absolutely crucial limitation.

22           In a final effort to avoid the inevitable conclusion that the Ordinance is sufficiently clear,

23   RealPage argues that the word "information" is vague because it is "sweeping."  *Id.* ¶ 6.  But

24   "sweeping" does not mean "vague."  *See Matsumoto*, 122 F.4th at 806 (overbreadth and

25   vagueness are separate inquiries); *Holder*, 561 U.S. at 19 (critiquing court's conflation of First

26   Amendment and vagueness inquiries).  Indeed, a "vagueness challenge does not turn on whether a

27   law applies to a substantial amount of protected expression."  *Holder*, 561 U.S. at 20.  This Court

28   should reject RealPage's attempt to conflate these two analytically distinct standards.

2898822

1    Fundamentally, "[i]n arguing that a person of ordinary intelligence cannot possibly know

2    what speech is regulated or who might be punished by the Ordinance's penalty provisions,

3    [RealPage] fails to view the specific language it challenges in the context of the Ordinance as a

4    whole." *First Resort*, 860 F.3d at 1274 (rejecting vagueness claim of company targeted by local

5    ordinance prohibiting crisis pregnancy centers from making misleading statements). RealPage's

6    vagueness argument fails, and it has no likelihood of success on the merits of this claim.

7    **B.    RealPage has failed to prove it faces an immediate risk of irreparable harm.**

8    **1.    RealPage has failed to assert a colorable constitutional violation and
     thus it has not shown that it is at risk of immediate irreparable harm.**

9

10    RealPage bases its irreparable harm argument solely on its First Amendment speech

11    claim. *See* Mot. at 22–23. A First Amendment claim must be colorable to support a finding of

12    irreparable harm in connection with a motion for preliminary injunctive relief. *Smith v. Helzer*,

13    95 F.4th 1207, 1214 (9th Cir.), *cert. denied sub nom. Smith v. Stillie*, 145 S. Ct. 567 (2024). But

14    for the reasons detailed above, RealPage has not established a colorable First Amendment claim.

15    Indeed, it has not shown that the First Amendment applies ***at all*** to the sale or use of coordinated

16    pricing algorithms. Even if the Ordinance theoretically imposes an incidental burden on some

17    lawful speech, RealPage has not identified what speech that would be, nor has it offered evidence

18    that it intends to engage in such speech. *See Wash. State Grange v. Wash. State Repub. Party*,

19    552 U.S. 442, 449–50 (2008) (cautioning courts "not to go beyond the [regulations'] facial

20    requirements and speculate about 'hypothetical' or 'imaginary' cases" (citation omitted)).

21    RealPage seeks shelter in the fact that courts considering entirely dissimilar First

22    Amendment claims have found that those plaintiffs showed irreparable harm. *See, e.g.*, *X Corp.* ,

23    116 F.4th 888 (First Amendment claim regarding compelled noncommercial speech about content

24    on social media site); *NetChoice*, 113 F.4th 1101 (same); *Cal. Chamber of Com. v. Council for*

25    *Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022) (First Amendment claim regarding

26    compelled commercial speech in the form of posting carcinogen warnings); *Ashcroft v. Am. C.L.*

27    *Union*, 542 U.S. 656, 666 (2004) (no consideration of irreparable injury; First Amendment claim

28    regarding restriction on material that could be posted online). Unlike the plaintiffs in those cases,

2898822

1    RealPage has failed to show that the First Amendment is implicated here at all, much less that it

2    has a colorable claim. *Cf., e.g.*, *Airbnb, Inc.*, 217 F. Supp. 3d at 1076–77 (denying injunction that

3    failed to state colorable First Amendment claim); *Homeaway.com, Inc. v. City of Santa Monica*,

4    2018 WL 1281772, at *6 (C.D. Cal. Mar. 9, 2018) (same); *Garcia v. County of Alameda*, 2024

5    WL 4476659, *3 (N.D. Cal. Oct. 11, 2024) (same).  Accordingly, for the same reasons that

6    RealPage has failed to prove it is likely to succeed on the merits of its First Amendment claim,

7    this Court should also find that it has failed to show irreparable harm.

8                    **2.    In any case, the Ordinance is not yet effective, and the City Council
                            may determine that a stay of enforcement pending review is needed.**
9

10         There are also fact-specific reasons why there is no risk of irreparable harm here.  Under

11   the Berkeley Charter and Berkeley Municipal Code, the Ordinance cannot go into effect before

12   April 24, 2025.  Berkeley Charter, art. XIV § 93; Berkeley Mun. Code § 1.04.040.  Until that

13   date, the Ordinance is subject to a "mandatory protest period," during which Berkeley citizens

14   may challenge it.  The City Council is also scheduled to convene twice before the effective date

15   of the Ordinance: in a closed session on April 14, 2025, and an open session on April 15, 2025,

16   providing two additional points at which the facts of this dispute could evolve.  Kanig Decl. ¶ 9.

17   As discussed during the status conference setting the briefing schedule on RealPage's motion,

18   Berkeley will alert this Court as to whether any stay of enforcement of the Ordinance results.

19         **C.    The balance of the equities and the public interest sharply favor Berkeley.**

20         Finally, even if RealPage had met its burden of showing a likelihood of success on the

21   merits and that the Ordinance is likely to cause it irreparable constitutional harm, which it has not,

22   this Court should still deny its motion for preliminary relief because the balance of the equities

23   and the public interest sharply favor Berkeley.  *See Drakes Bay Oyster*, 747 F.3d at 1092.

24         It is Berkeley that will "suffer[] an irreparable injury" if the Ordinance is enjoined.  *See*

25   *Wilson*, 122 F.3d at 719.  Berkeley enacted the Ordinance to protect vulnerable residential renters

26   from unlawful and anticompetitive algorithmic price coordination among landlords that is directly

27   contributing to the ongoing housing crisis.  Ordinance § 13.63.010; Ernst Decl. ¶¶ 5, 11; Klein

28   Decl. ¶ 7.  Berkeley has an undisputedly compelling governmental interest in combatting the

2898822

1    rising rental rents, rising vacancy rates, and rising eviction rates that have resulted.  Ordinance

2    § 13.63.010; Ernst Decl. ¶¶ 5-11; Klein Decl. ¶ 2, 6; *see also CTIA - The Wireless Ass'n v. City of*

3    *Berkeley, California*, 928 F.3d 832, 852 (9th Cir. 2019) (acknowledging Berkeley's "substantial

4    interest in protecting the health of its citizens"); *Golden Gate Rest. Ass'n v. City & Cnty. Of San*

5    *Francisco*, 512 F.3d 1112, 1127 (9th Cir. 2008) ("We are not sure on what basis a court could

6    conclude that the public interest is not served by an ordinance adopted in such a fashion.").  The

7    Ordinance also protects landlords who play by the rules and do not engage in price-fixing tactics

8    that raises rents.  *See Su v. L & Y Food, Inc.*, 728 F. Supp. 3d 1050, 1052 (C.D. Cal. 2024) (noting

9    the public interest of protecting "law-abiding competitors" from unfair competition).

10       Conversely, RealPage has no cognizable interest in price fixing or in selling products to

11   help landlords fix prices.  *Disney Enters., Inc. v. VidAngel, Inc.,* 869 F.3d 848, 867 (9th Cir.

12   2017) ("[H]arm caused by illegal conduct does not merit significant equitable protection"); *see*

13   *also* Section IV.B, *supra*.  This Court should accord no weight to RealPage's unevidenced claim

14   that it is a lawful actor.  Its own executives' public statements show that its only intent is to

15   artificially raise residential rental rates by unlawfully decreasing competition among landlords.

16   *See* Kanig Decl., Ex. 3.  Instead, this Court should give the exhaustive allegations of the

17   Government Action's complaint against RealPage and its coconspirators its necessary weight.

18       It is true that the Ordinance will require RealPage to stop its unlawful business practices in

19   Berkeley.  That may cost RealPage money.  But it is money that is earned through practices that

20   violate federal and state antitrust law.  Berkeley is acting to protect its population of vulnerable

21   renters in the face of coordinated and nationwide anticompetitive conduct.  For that reason, there

22   is no real question that the balance of the equities and public interest decisively favor Berkeley.

23   **V.    CONCLUSION**

24       For the foregoing reasons, Berkeley respectfully requests that this Court deny RealPage's

25   motion for a temporary restraining order and preliminary injunction.  Alternatively, this Court

26   should deny RealPage's motion for a temporary restraining order and order the parties to meet

27   and confer about a briefing and hearing schedule on RealPage's preliminary-injunction motion.

28

2898822

Dated:  April 9, 2025                          KEKER, VAN NEST & PETERS LLP


                                               By:    /s/ Ian Kanig
                                                      ELLIOT R. PETERS
                                                      IAN KANIG
                                                      CARA R. MEYER
                                                      KAYLA CROWELL


Dated:  April 9, 2025                          BERKELEY CITY ATTORNEY'S OFFICE


                                               By:    /s/ Farimah F. Brown
                                                      FARIMAH F. BROWN
                                                      City Attorney
                                                      KATRINA L. EILAND
                                                      Deputy City Attorney
                                                      STEPHEN A. HYLAS
                                                      Deputy City Attorney

                                                      Attorneys for Defendants THE CITY OF
                                                      BERKELEY, CALIFORNIA and PAUL
                                                      BUDDENHAGEN

BERKELEY'S OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER
Case No. 3:25-cv-03004-JSC

2898822