Kristin A. Linsley (#154148)
    klinsley@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center #2600
San Francisco, CA  94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

Jay P. Srinivasan (#181471)
    jsrinivasan@gibsondunn.com
Bradley J. Hamburger (#266916)
    bhamburger@gibsondunn.com
Samuel Eckman (#308923)
    seckman@gibsondunn.com
Alexander N. Harris (#278482)
    aharris@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA  90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

*Attorneys for Plaintiff RealPage, Inc.*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REALPAGE, INC.,<br><br>                Plaintiff,<br><br>     v.<br><br>THE CITY OF BERKELEY, CALIFORNIA, and PAUL BUDDENHAGEN, CITY MANAGER OF BERKELEY, CALIFORNIA, in his official capacity,<br><br>                Defendants. | CASE NO. 3:25-cv-03004-JSC<br><br>**REPLY IN SUPPORT OF PLAINTIFF REALPAGE, INC.'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>Date: April 16, 2025<br>Time: 11:00 a.m.<br>Judge: Hon. Jacqueline S. Corley<br>Trial Date: None Set<br>Date Action Filed: April 2, 2025 |

**TABLE OF CONTENTS**

Page

INTRODUCTION ...................................................................................................................... 1

I.    RealPage Is Likely to Prevail on the Merits ................................................................ 2

    A.    RealPage Has Standing to Challenge the Entire Ordinance ............................ 2

    B.    The Ordinance Violates the First Amendment ................................................ 4

        1.    The Ordinance Regulates Speech, Not Conduct ................................. 4

        2.    The Ordinance Does Not Regulate Only Illegal Speech ..................... 6

        3.    The Ordinance Does Not Regulate "Commercial Speech" and, Even It Did, It Would Fail Intermediate Scrutiny ............................... 8

    C.    The Ordinance Is Unconstitutionally Vague ................................................. 11

II.    The Remaining Factors Strongly Support Enjoining the Ordinance ......................... 13

CONCLUSION ....................................................................................................................... 14

Gibson, Dunn & Crutcher LLP

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Airbnb, Inc. v. City & Cty. of San Francisco*,
  217 F. Supp. 3d 1066 (N.D. Cal. 2016)...................................................................5

*Arcara v. Cloud Books, Inc.*,
  478 U.S. 697 (1986)...................................................................................................5

*Ariix, LLC v. NutriSearch Corp.*,
  985 F.3d 1107 (9th Cir. 2021)...................................................................................9

*Brown v. Entertainment Merchants Assn.*,
  564 U.S. 786 (2011)..............................................................................................1, 5

*California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*,
  29 F.4th 468 (9th Cir. 2022).....................................................................................2

*Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*,
  447 U.S. 557 (1980)..............................................................................................8, 9

*City of Cincinnati v. Discovery Network, Inc.*,
  507 U.S. 410 (1993)..................................................................................................11

*Cnty. of Tuolumne v. Sonora Cmty. Hosp.*,
  236 F.3d 1148 (9th Cir. 2001)...................................................................................6

*Coyote Publishing, Inc. v. Miller*,
  598 F.3d 592 (9th Cir. 2010).....................................................................................9

*Dex Media W., Inc. v. City of Seattle*,
  696 F.3d 952 (9th Cir. 2012)....................................................................................10

*Elrod v. Burns*,
  427 U.S. 347 (1976)..................................................................................................13

*Epic Games, Inc. v. Apple, Inc.*,
  67 F.4th 946 (9th Cir. 2023)......................................................................................6

*F.C.C. v. Fox Television Stations, Inc.*,
  567 U.S. 239, 253 (2012) ........................................................................................12

*Harris v. Quinn*,
  573 U.S. 616 (2014)...................................................................................................8

*Hoffman v. Capital Cities/ABC, Inc.*,
  255 F.3d 1180 (9th Cir. 2001)...................................................................................8

*Holder v. Humanitarian L. Project*,
  561 U.S. 1 (2010) ......................................................................................................5

Gibson, Dunn &
Crutcher LLP

*HomeAway.com, Inc. v. City of Santa Monica*,
    918 F.3d 676 (9th Cir. 2019) ........................................................................................... 5, 6

*International Franchise Ass'n, Inc. v. City of Seattle*,
    803 F.3d 389 (9th Cir. 2015) ............................................................................................... 5

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ............................................................................................................ 9

*Lowe v. S.E.C.*,
    472 U.S. 181 (1985) ............................................................................................................ 9

*Meinecke v. City of Seattle*,
    99 F.4th 514 (9th Cir. 2024) ........................................................................................... 2, 6

*Moody v. NetChoice, LLC*,
    603 U.S. 707 (2024) ......................................................................................................... 1, 5

*National Inst. of Fam. & Life Advocs. v. Becerra*,
    585 U.S. 755 (2018) ............................................................................................................ 4

*NetChoice, LLC v. Bonta*,
    692 F. Supp. 3d 924 (N.D. Cal. 2023) ............................................................................. 13

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ........................................................................................................... 10

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*,
    413 U.S. 376 (1973) ......................................................................................................... 6, 9

*In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*,
    709 F. Supp. 3d 478 (M.D. Tenn. 2023) ..................................................................... 2, 6, 7

*Steffel v. Thompson*,
    415 U.S. 452 (1974) ............................................................................................................ 4

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014) ............................................................................................................ 4

*United States v. United Foods, Inc.*,
    533 U.S. 405 (2001) ............................................................................................................ 8

*United States v. Wenger*,
    427 F.3d 840 (10th Cir. 2005) ............................................................................................ 9

*Virginia v. Am. Booksellers Ass'n, Inc.*,
    484 U.S. 383 (1988) ............................................................................................................ 3

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ........................................................................................... 14

**Statutes**

15 U.S.C. § 1 ............................................................................................................................ 8

Gibson, Dunn &
Crutcher LLP

Ordinance § 13.63.010.................................................................................................3

Ordinance § 13.63.020....................................................................................1, 7, 10, 11

Ordinance § 13.63.030...........................................................................................1, 3, 5

Ordinance § 13.63.040.................................................................................................4

**Other Authorities**

Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175 (1989).......................12

Gibson, Dunn &
Crutcher LLP

## INTRODUCTION

The City of Berkeley claims its Ordinance "does not target *any* speech" and just regulates "economic activity" by prohibiting "collusive" practices. Opp. at 1. Those assertions are at war with the actual text of the Ordinance, which expressly bans the sale, licensure, provision, or use of any software that "recommends or advises on rents or occupancy levels." Ordinance § 13.63.030(A). Providing recommendations and advice on a particular subject is obviously speech, whether conveyed through a computer program or through a printed newspaper, a book, or the spoken word. As the Supreme Court recently explained, "'whatever the challenges of applying the Constitution to ever-advancing technology, the basic principles'" of the First Amendment "'do not vary,'" including when a market participant's speech and content choices are "achieved through the use of algorithms." *Moody v. NetChoice, LLC*, 603 U.S. 707, 733 (2024) (quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 790 (2011) (alteration omitted)). The City also is incorrect that the Ordinance "exclusively proscribes direct or indirect coordination among competitors" Opp. at 6—as the text of the Ordinance, having introduced the word "coordination," then defines that term to "includ[e]" the use of algorithms "to perform calculations" using *any* "information"—from *any* source—"concerning local or statewide rents or occupancy levels, for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants." Ordinance § 13.63.020. Because the City has failed to justify its sweeping ban on speech that threatens immediate irreparable harm to RealPage and its customers, the Court should enjoin enforcement of the Ordinance before it goes into effect on April 24.

The City's attempts to distract from the constitutional problems with the Ordinance by pointing to other court proceedings involving RealPage are just that—a distraction. The City points to *allegations* in other cases—and not to any actual evidence—claiming that RealPage has facilitated price-fixing. As the records of those other proceedings show, RealPage has consistently disputed those allegations and is vigorously defending itself against these unproven and erroneous accusations of anti-competitive conduct. And one court has already held that these allegations do not amount to *per se* anticompetitive conduct and instead describe software that may have an overall pro-competitive effect such that the allegations against RealPage "do not receive a presumption of anticompetitive conduct"—

Gibson, Dunn & Crutcher LLP

and has dismissed a complaint under the applicable fact-bound rule-of-reason standard. *In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 520–21 (M.D. Tenn. 2023). Beyond that, these cases are irrelevant to RealPage's facial challenge to the Ordinance, and they also provide no defense to RealPage's as-applied challenge. Under the legal standard applicable to motions for preliminary relief under the First Amendment, *the City* bears the burden of justifying the Ordinance's restriction on speech—and mere allegations cannot carry that burden. *See Meinecke v. City of Seattle*, 99 F.4th 514, 521 (9th Cir. 2024).

Because the Ordinance—on its face and as-applied to RealPage—is unconstitutional, the Court should issue a temporary restraining order and then preliminary injunction barring Defendants from enforcing or causing to be enforced Berkeley Municipal Code Chapter 13.63, pending final resolution of this action. At a minimum, the Court should grant such relief specifically prohibiting enforcement as it relates to the sale, license, provision, or use of RealPage's revenue management software.

## I.    RealPage Is Likely to Prevail on the Merits

To obtain a preliminary injunction in a First Amendment case, the plaintiff need only show "a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement, at which point the burden shifts to the government to justify the restriction on speech." *Meinecke*, 99 F.4th at 521 (quoting *California Chamber of Com. v. Council for Educ. & Rsch. on Toxics*, 29 F.4th 468 (9th Cir. 2022)). Notably, the City nowhere mentions this specialized standard for equitable relief in the First Amendment context; under it, RealPage has plainly established a likelihood of prevailing on the merits because it has shown that its First Amendment rights are threatened with imminent infringement that will become real in a matter of days, and the City has failed to justify the Ordinance's sweeping restriction on speech. In fact, the City barely defends the Ordinance as enacted; it flees from the Ordinance's actual text, which is patently not limited to just barring anti-competitive conduct (something existing law already prohibits). And significantly, the City does not even try to show that the Ordinance satisfies strict scrutiny, which is the applicable standard here because the Ordinance does not meet the narrow test for regulations governing only commercial speech.

### A.    RealPage Has Standing to Challenge the Entire Ordinance

The City concedes that RealPage has standing to challenge Section 13.63.030(A) of the

Ordinance, which is the prohibition on "sell[ing], licens[ing], or otherwise provid[ing]" coordinated pricing algorithm programs in Berkeley. The City then argues that RealPage lacks standing to challenge the separate provision, Section 13.63.030(B), making it unlawful "for a landlord to *use* a coordinated pricing algorithm described in subsection A when setting rents or occupancy levels for residential dwelling units in the city of Berkeley." Ordinance § 13.63.030(B) (emphasis added). The City reasons that RealPage "has not alleged, much less proved in it[s] motion, that this [landlord "use"] provision could injure it in any way." Opp. at 17.

This argument makes no sense and is contrary to settled First Amendment law. Although RealPage does not "intend[] to become a Berkeley landlord that uses" software regulated by the Ordinance, Opp. at 17, it has a direct and concrete interest in challenging a ban on the "use" of its expressive products. As the Supreme Court has made clear, a party that is in the business of selling a communications medium—in that case, books—has standing under the First Amendment to challenge a prohibition of the *use* of that medium by others—this is because the "very existence" of such a prohibition "may cause others not before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 392 (1988). Just as booksellers have standing to challenge the "infringement of the First Amendment rights of bookbuyers," *id.*, RealPage, as the seller of software that provides advice and recommendations regarding rents and occupancy levels to landlords, has standing to challenge a law that would prohibit its customers from purchasing or using that advice and recommendations. Any other rule would make no sense: Under the City's flawed reasoning, a ban on buying books that would put a bookseller out of business could be challenged only by prospective bookbuyers, even though the bookseller would obviously be seriously harmed by such a law. Not surprisingly, the law has long been to the contrary.

The City next asserts that RealPage has not "show[n] imminent injury," Opp. at 17, but it is hard to imagine a more imminent injury—by its terms, the Ordinance will take effect in less than two weeks and is targeted at specific software products that RealPage currently provides to landlords in Berkeley. *See* Dreyfuss Decl. ¶¶ 6, 9; Ordinance § 13.63.010(F), (G). To the extent the City suggests that RealPage, in order to establish imminent injury, must identify a specific landlord who "intend[s] to violate the statute," Opp. at 17–18, that is simply not the law. The Supreme Court has squarely held

that "[n]othing in this Court's decisions requires a plaintiff who wishes to challenge the constitutionality of a law to confess that he will in fact violate that law." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 163 (2014). RealPage need only provide—as it has done here—some "evidence that the threat of enforcement is not 'chimerical.'" *Id.* at 164 (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)). As RealPage has shown, numerous statements by City Council members during the legislative process clearly evinced their intent to ban the use of RealPage, the text of the Ordinance also specifically refers to the use of RealPage's software by landlords in Berkeley and its alleged impact on the rents those landlords were charging, and the City's Opposition repeatedly asserts, without evidence, that landlords are using RealPage's software to collude. And the threat of enforcement is made even more evident by "the fact that authority to [seek enforcement] is not limited to a prosecutor or an agency," *id.* at 164, but rather is vested in any "tenant," Ordinance § 13.63.040(B). RealPage has therefore established a sufficiently concrete and imminent injury to invest it with standing to challenge both operative sections of the Ordinance.

### B.    The Ordinance Violates the First Amendment

The City does not dispute that, *if* the Ordinance is a content-based regulation of noncommercial speech, it cannot survive strict scrutiny, as it makes no argument whatsoever that the Ordinance could satisfy that demanding test. *See, e.g.*, *National Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 766 (2018) (strict scrutiny requires proof that a speech restriction is "narrowly tailored to serve compelling state interests"). Instead, the City tries mightily (and, as shown below, unsuccessfully) to recast the Ordinance as regulating conduct rather than speech, regulating illegal speech, and/or regulating mere commercial speech. Each of these efforts fails.

### 1.    The Ordinance Regulates Speech, Not Conduct

The City claims that the Ordinance does not implicate the First Amendment at all because it "does not target *any* protected speech or expressive conduct whatsoever" but rather "restricts the *sale* and *use* of coordinated pricing algorithms." Opp. at 8 (emphases in original). This is sophistry. The defining feature of the algorithms that the Ordinance bans is that they provide "advice" or "recommendations" on certain topics—things that are obviously speech: "It shall be unlawful to sell, license, or otherwise provide to city of Berkeley landlords any coordinated pricing algorithm *that sets,*

*recommends, or advises on* rents or occupancy levels that may be achieved for residential dwelling units in the city of Berkeley." Ordinance § 13.63.030(A) (emphasis added). Such advice or recommendations are quintessential speech activity covered by the First Amendment. The Supreme Court has made clear, for example, that a law prohibiting the provision of "expert advice or assistance" to designated foreign terrorist organizations outlawed speech and was thus subject to First Amendment scrutiny; the Court flatly rejected the government's argument "that the only thing actually at issue in this litigation is conduct." *Holder v. Humanitarian L. Project*, 561 U.S. 1, 8, 26–27 (2010). That the Ordinance accomplishes its ban on such communications by prohibiting the algorithm used to generate and convey them is neither here nor there, and certainly does not convert the ban into a regulation of "conduct," any more than an ordinance that banned the sale or use of books would be a mere regulation of "conduct" immune from First Amendment scrutiny. *See, e.g.*, *Moody*, 603 U.S. at 733 (First Amendment protects content-moderation algorithms); *Brown*, 564 U.S. at 790 (same for video games).

The City accuses RealPage of "studiously avoiding" any mention of a "line of authorities" purportedly establishing that laws like the Ordinance regulate conduct rather than speech. Opp. at 12. But RealPage did not cite those cases because they involved challenges to a completely different type of laws—namely, the regulation of various types of commercial conduct unconnected to any speech. *See, e.g.*, *Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 706–07 (1986) (enforcement of ordinance closing locations where prostitution was solicited did not violate First Amendment merely because it resulted in closure of adult bookstore); *International Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d 389, 409 (9th Cir. 2015) (minimum-wage ordinance affecting franchisees did not regulate speech just because "franchisees are identified in part as companies associated with a trademark or brand").

The housing regulations upheld in *Airbnb, Inc. v. City & Cty. of San Francisco*, 217 F. Supp. 3d 1066 (N.D. Cal. 2016), and *HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676 (9th Cir. 2019) prohibited "booking unlawful transactions," *HomeAway.com*, 918 F.3d at 680, meaning that the platforms were prohibited from executing booking transactions and "collecting or receiving a fee for[] Booking Services" in connection with rental units that had not been properly registered with the respective municipalities. *Airbnb, Inc.*, 217 F. Supp. 3d at 1071. In both cases, the courts make clear that these ordinances have no nexus to speech. Indeed, both laws were enacted in response to lawsuits

challenging earlier versions that would have prohibited platforms from "advertis[ing] any Home-Sharing activity" not authorized by the city, *e.g.*, *HomeAway.com*, 918 F.3d at 680—a regulation much more akin to the Ordinance here, which broadly bans speech to achieve its claimed goals.

In short, the Ordinance plainly bans the conveyance of speech—advice and recommendations from software providers to Berkeley landlords. This is no more a ban on conduct than would be a ban on selling the *Wall Street Journal* to Berkeley residents. The Court should reject the City's attempt to end-run the First Amendment in this way.

### 2.    The Ordinance Does Not Regulate Only Illegal Speech

The City next argues that the speech regulated by the Ordinance falls outside the First Amendment because "it would be speech relating to unlawful price-fixing," Opp. at 13, and "[a]ny First Amendment interest . . . is altogether absent when the commercial activity itself is illegal[,]" Opp. at 14 (quoting *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 389 (1973)). This misstates both the plain text of the Ordinance and the scope and concern of the antitrust laws.

At the outset, the City faults RealPage for "not submit[ting] *any* evidence . . . nor cit[ing] *any* authority" to show that its activities "do[] not violate existing federal and state antitrust law (or California's unfair competition law)." Opp. at 14 (emphases in original). But that is not RealPage's burden. As noted, once RealPage states "a colorable claim that its First Amendment rights have been infringed," the burden shifts to the government to "justify" the Ordinance. *Meinecke*, 99 F.4th at 521. RealPage has certainly made such a colorable claim here. The Ordinance expressly targets RealPage, and RealPage has already successfully defeated claims that its algorithm constitutes *per se* price fixing under the antitrust laws. *In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d at 520–21. Although the court did not foreclose the possibility that the algorithm might be found to violate the antitrust laws under the rule-of-reason standard, it already has dismissed one of the complaints under that standard. *Id.* at 528–34. And applying the rule-of-reason is a context-dependent inquiry in which RealPage will be able to show that the procompetitive benefits of its software "offset [any] anticompetitive effects." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 994 (9th Cir. 2023); *see also County of Tuolumne v. Sonora Cmty. Hosp.*, 236 F.3d 1148, 1160 (9th Cir. 2001) (under the rule-of-reason analysis, the court will need to determine whether "any anticompetitive harm is offset by the

procompetitive effects" of RealPage's software).  After all, the software's express mission is to advise landlords to better match supply with demand.  But the Ordinance nevertheless would ban RealPage's software even if it made this showing that its software had only pro-competitive effects and violated no antitrust law.   Further, leaving RealPage aside, it is all but certain that other contexts will arise in which similar algorithms would not violate the antitrust laws under this rule-of-reason standard—and yet they would still be barred by the Ordinance.

Further, the prohibitions of the Ordinance are patently *not* limited to advice or recommendations made in coordination with competitors.  Although it starts with the term "coordinated pricing algorithms" and then defines that term as algorithms that "use data to recommend or predict the price of consumer goods or services in direct or indirect coordination with one or more competitors," the Ordinance immediately follows that definition with a single example that, taking into account the definition of "competitor data," involves no coordination at all—"a software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels, for the purpose of advising landlords whether to leave their units vacant or on the amount of rent that landlords may obtain from tenants."   Ordinance § 13.63.020(A).   Because "competitor data" is separately defined as "information, including information about actual rent prices, occupancy rates, lease start and end dates, and similar data, regardless whether the information is attributable to a specific competitor or anonymized, and regardless whether it is derived from or otherwise provided by another person that competes in the same market or a related market," *id.*, § 13.63.020(B), this means that sole example of a prohibited "coordination pricing algorithm" is "a software program that uses one or more algorithms to perform calculations" of "information about actual rent prices, occupancy rates, . . . and similar data," regardless of whether it originates with a competitor.  *Id.* § 13.63.020(A).  Not only is this definition *not* limited to data from competitors, but it expressly disclaims any such limitation.

As the court overseeing the MDL involving RealPage has already made clear, there is no reason to believe that any software program that uses information—including non-public information—for the purposes of providing advice concerning occupancy or prices necessarily violates the antitrust laws.  *See In re RealPage, Inc. Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d at 520–21.  In fact,

despite the City's insistence that the Ordinance would not apply to "landlords using an Excel spreadsheet and publicly available data" or "a landlord using Zillow for the same purpose," Opp. at 16, the City offers no reason why this would be so—and none is apparent on the face of the Ordinance. Of course, not even the City suggests that these tools violate the antitrust laws, yet there is no reason why they would be not banned under the sweeping definitions of "coordination" and "competitor data" in the Ordinance.

But even if the Ordinance did prohibit advice and recommendations only when made in coordination with competitors, that would still not necessarily violate the antitrust laws or the rule of reason, which both focus not just on coordination among competitors, but on coordination among competitors *in restraint of trade*. *See, e.g.*, 15 U.S.C. § 1 ("Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce . . . is declared to be illegal."). The City suggests that the algorithms regulated by the Ordinance may place subtle pressure on landlords to increase their rents, but that is not necessarily the case. In fact, RealPage has submitted evidence in this case establishing that landlords make independent decisions about whether to adopt RealPage's recommendations, and the City has offered no evidence contesting that showing. *See* Dreyfuss Decl. ¶ 5 ("Customers retain complete discretion over their pricing decisions and are free to accept or reject any recommendation made by the software; in fact, customers set prices that are different than the software recommends over half the time.").

Because the Ordinance sweeps far beyond any illegal speech that may be regulated by the antitrust laws, the City cannot escape First Amendment scrutiny on this basis.

### 3. The Ordinance Does Not Regulate "Commercial Speech" and, Even It Did, It Would Fail Intermediate Scrutiny

The City claims that, "even if the Ordinance did extend beyond existing antitrust or unfair competition law, any burdened speech would be commercial speech" because it "is 'expression related solely to the economic interests of the speaker and its audience.'" Opp. at 15 (quoting *Central Hudson Gas & Electric Corp. v. Public Service Comm'n of New York*, 447 U.S. 557, 562 (1980)). But commercial speech is "usually defined as speech that does no more than propose a commercial transaction." *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001); *accord Harris v. Quinn*,

573 U.S. 616, 648 (2014); *Hoffman v. Capital Cities/ABC, Inc.*, 255 F.3d 1180, 1184 (9th Cir. 2001); *Coyote Publishing, Inc. v. Miller*, 598 F.3d 592, 604 (9th Cir. 2010).  The Supreme Court itself recognized in *Central Hudson* "the 'commonsense' distinction between speech proposing a commercial transaction, which occurs in an area traditionally subject to government regulation, and other varieties of speech."  447 U.S. at 563.

The speech that the Ordinance prohibits is not a proposal of a transaction between the speaker (RealPage) and another party (the owner or manager of a property).  It is not an advertisement, nor is it a "paid promotion" of a product or service.  *Ariix, LLC v. NutriSearch Corp.*, 985 F.3d 1107, 1119 (9th Cir. 2021).  Rather, it is market advice and recommendations about rents and occupancy levels that help customers manage their rental businesses.  Courts have routinely recognized that "'disinterested [market] advice will still qualify for full First Amendment protection.'"  *Id.* at 1119 (quoting *United States v. Wenger*, 427 F.3d 840, 848 (10th Cir. 2005)); *see also Lowe v. S.E.C.*, 472 U.S. 181, 210 (1985) ("[T]here can be no doubt about the protected character" of communications by a business that provides "actual information about past transactions and market trends" and "commentary on general market conditions.").  Likewise, recommendations or opinions about specific transactions receive full First Amendment protection as to which any prohibition is subject to strict scrutiny.  *See Wenger*, 427 F.3d at 848 ("[B]ecause the expression of an opinion about a commercial product, such as a loudspeaker, is protected by the First Amendment . . . it is difficult to see why the expression of an opinion about a marketable security should not also be protected.").

Although RealPage certainly has a commercial *motive* in developing and presenting its message, both the Supreme Court and the Ninth Circuit have been consistently clear that a profit motive does not transform otherwise protected communications into mere "commercial speech" or subject it to a lower standard of scrutiny.  As the Supreme Court has observed, "[i]f a newspaper's profit motive were determinative, all aspects of its operations—from the selection of news stories to the choice of editorial position—would be subject to regulation if it could be established that they were conducted with a view toward increased sales."  *Pittsburgh Press*, 413 U.S. at 385; *accord Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495 (1952) ("That books, newspapers, and magazines are published and sold for profit does not prevent them from being a form of expression whose liberty is safeguarded by the First

Amendment.").  As the Ninth Circuit has noted, the fact that there is a profit motive for publishing the yellow pages does not make them "commercial speech," because "economic motive in itself is insufficient to characterize a publication as commercial."  *Dex Media W., Inc. v. City of Seattle*, 696 F.3d 952, 960 (9th Cir. 2012).  In other words, there is no for-profit exception to the First Amendment; any other rule would be a license to ban most books and newspapers, and large swaths of online content.

Nor do communications and opinions become commercial speech, subject to less protection under the First Amendment, just because they are *about* commerce, the *object* of commerce, or made for the *purpose* of commercial gain.  Because the City offers no other basis for treating advice and recommendations about rents and occupancy levels as a form of second-class speech, the proper test here is strict scrutiny.  And because the City does not argue that the Ordinance satisfies strict scrutiny, RealPage is likely to succeed on the merits for that reason alone.

Even if the Ordinance were treated as a regulation of commercial speech, it also would not survive intermediate scrutiny, which requires that a challenged law "be 'narrowly tailored to serve a significant governmental interest,'" such that it does not "'burden substantially more speech than is necessary to further the government's legitimate interests.'"  *Packingham v. North Carolina*, 582 U.S. 98, 105–06 (2017) (citing prior cases).

The City does not argue that the Ordinance is "narrowly tailored," but rather that it is "*exactly tailored* to address Berkeley's interests."  Opp. at 15 (emphasis in original).  But this turns on the City's flawed assertion—divorced from the actual text of the Ordinance—that it reaches only coordination among landlords to set rents or occupancy rates: "The only conduct covered by the Ordinance is the sale or use of coordinated pricing algorithms in direct or indirect coordination with competitors."  *Id.* at 16.  But, as shown above, that is not what the Ordinance says.  Although "[t]o be a 'coordinated pricing algorithm' under the Ordinance, the algorithm must 'use data to recommend or predict the price of consumer goods or services *in direct or indirect coordination with one or more competitors*,'" *id.* (quoting Ordinance § 13.63.020), the sole example of such a "coordinated pricing algorithm" is a "software program that uses one or more algorithms to perform calculations of competitor data concerning local or statewide rents or occupancy levels"—without any mention of coordination with any landlords, especially in light of the boundless definition of "competitor data" that expressly

disclaims any limitation to data gleaned from or shared with competitors. Far from requiring coordination, the term "competitor data" expressly disclaims any such requirement, defining the term to mean "information, including information about actual rent prices, occupancy rates, lease start and end dates, and similar data, regardless whether the information is attributable to a specific competitor or anonymized, and *regardless whether it is derived from or otherwise provided by another person that competes in the same market or a related market*." Ordinance § 13.63.020(B) (emphasis added).

Because the City makes no attempt to show that the Ordinance as actually enacted is narrowly tailored to any government objective, much less a valid one, it cannot survive intermediate scrutiny. This is not a law that defines "competitor data" as information limited to materials received from competitors, that forbids only speech that would violate existing antitrust laws, or that narrowly defines what constitutes a "coordinated pricing algorithm" rather than banning any "process[] that use[s] data to recommend or predict the price of consumer goods or services in direct or indirect coordination with one or more competitors." Ordinance § 13.63.020(A). The City, in other words, seeks to defend a law that it did not enact.

If anything, the City's choice to focus on a hypothetical, narrower law confirms that the Ordinance as written cannot satisfy intermediate scrutiny. Although a regulation of commercial speech need not be "absolutely the least severe that will achieve the desired end," the existence of "numerous and obvious less-burdensome alternatives to the restriction" suggests that the "fit" between ends and means is not reasonable. *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417-18 n.13 (1993) (cleaned up).

For this reason, the Ordinance cannot survive intermediate scrutiny. And because strict scrutiny is even more demanding than intermediate scrutiny, the City necessarily fails to show that the Ordinance passes that heightened review even if it did not waive that argument by failing to argue that the Ordinance satisfies that standard.

### C.    The Ordinance Is Unconstitutionally Vague

RealPage is also likely to prevail on the merits of its vagueness challenge to the Ordinance under the Due Process Clause. The City offers two arguments in response, but neither is persuasive.

The City initially argues that RealPage cannot make a vagueness challenge to the Ordinance because "[t]he legislative findings underlying the Ordinance *expressly name RealPage* as an actor whose conduct spurred the urgent need for this regulation." Opp. at 19 (emphasis in original); *see also id.* at 2 ("No entity that is expressly and admittedly targeted by an ordinance like RealPage can raise a vagueness claim because it has fair notice that the law applies to it."). But whether a law is vague turns on whether it provides fair notice of the *conduct* that is regulated—otherwise, even entities that are clearly targeted by the law will not know what they must do to comply. That is certainly the case for RealPage: Although the City repeatedly insists that the Ordinance bans only anticompetitive conduct prohibited by the antitrust laws (a proposition that is patently incorrect, as shown above), RealPage denies that it has ever engaged in any such conduct and the City has submitted no evidence to support its allegations. Merely stating that a statute applies to a particular business, without specifying *why* that is so based on the text of the law, is hardly a defense to a vagueness claim.

Next, the City insists that the Ordinance is perfectly clear and that RealPage is just "attempt[ing] to create confusion where none exists." Opp. at 19. That is also incorrect. Although the Ordinance purports to target RealPage by name, multiple amorphous provisions—particularly those related to "competitor data" and "coordinated pricing algorithm"—are "impermissibly vague." *Fox*, 567 U.S. at 253; *cf.* Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1179 (1989) (recounting "emperor Nero's nasty practice[]" of "post[ing] his edicts high on the columns so that they would be harder to read and easier to transgress"). Three points warrant emphasis.

***First,*** the City's claim that the Ordinance always requires unlawful "coordination" between competitors, Opp. at 20–23, is not borne out by the text of the Ordinance, which (a) equates "direct or indirect coordination" to "includ[e]" conduct that does not require any coordination between competitors, and (b) defines "competitor data" as any "information." Imagine a law that prohibited "domestic terrorism," but defined that term to "include" non-violent protests against government policies. It would certainly be no defense to a constitutional challenge that such a law was "clear" in that it only restricted "terrorism." Put another way, the true scope of the Ordinance is in no way clarified by the "coordination" label that the City emphasizes.

**Second,** the City's significant concession that the Ordinance would not cover Zillow and Excel, Opp. at 16, only confirms that the Ordinance is not clear, and suggests that the City intends to apply it arbitrarily. If Zillow and Excel are not covered—even though a straightforward reading of the Ordinance's broad terms would seem to cover them—it is unclear why RealPage is any different.

**Third,** to the extent the City suggests that the Ordinance is clear—because it could be read to sweep in any "coordination" (not just antitrust violations) and encompasses all "information" (not just information that is unlawful to share)—that might mitigate the vagueness concerns, but it would only exacerbate the already significant overbreadth and First Amendment problems with the Ordinance.

## II.    The Remaining Factors Strongly Support Enjoining the Ordinance

Nothing in the City's Opposition weighs against the relief RealPage seeks here. RealPage is likely to suffer irreparable harm because the "loss of First Amendment freedom, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). The City never rebuts this point. Instead, it retreats to its merits arguments, reasserting that "RealPage has not established a colorable First Amendment claim." Opp. at 23. This is incorrect for the reasons outlined above. Similarly, the City's assertion that "[e]ven if the Ordinance theoretically imposes an incidental burden on some lawful speech, RealPage has not identified what speech that would be, nor has it offered evidence that it intends to engage in such speech," *id.*, is just a recapitulation of the City's (incorrect) argument that the Ordinance regulates only unlawful speech.

The City's argument that the risk of irreparable harm is not "immediate" is no more availing. Although the City notes that "the Ordinance is subject to a 'mandatory protest period'" for the next two weeks, and that "[t]he City Council is also scheduled to convene twice before the effective date," it offers no support for its speculation that "the facts of this dispute could evolve" and that a "stay of enforcement" may be imposed before the Ordinance takes effect on April 24. Opp. at 24. The legislative history of the Ordinance, its numerous express references to RealPage, and the City's assertion that Berkeley "will suffer an irreparable injury if the Ordinance is enjoined," *id.* at 24 (cleaned up), leave little doubt that the City is committed to enforcing the Ordinance. But even assuming the City might amend or delay the Ordinance, that is no basis for denying preliminary relief: If the City does not amend or delay the Ordinance, RealPage will be protected from the infringement of its

constitutional rights by this Court's order, whereas if the City does choose to amend or delay the Ordinance, the Court's preliminary relief will have no effect on the City. This is why courts routinely grant preliminary injunctive relief before laws take effect—and even when they will not take effect for months or even years. *See, e.g.*, *NetChoice, LLC v. Bonta*, 692 F. Supp. 3d 924, 964 (N.D. Cal. 2023) (having "no difficulty finding that NetChoice has established a likelihood of irreparable harm," as the effective date of the speech compulsion was "less than a year away"), *aff'd in relevant part*, 113 F.4th 1101 (9th Cir. 2024).

The public interest and balance of equities also favor enjoining the Ordinance pending a final judgment. It is "always in the public interest to prevent the violation of a party's constitutional rights." *X Corp. v. Bonta*, 116 F.4th 888, 904 (9th Cir. 2024). And "when a party raises serious First Amendment questions, that alone compels a finding that the balance of hardships tips sharply in its favor." *Id.* (cleaned up).

The City responds by again citing its "compelling governmental interest in combatting the rising rental rents, rising vacancy rates, and rising eviction rates," Opp. at 24–25, but these interests obviously cannot be pursued at the expense of RealPage's constitutional rights. That is why the City resorts to question-begging, asserting that "RealPage has no cognizable interest in price fixing or in selling products to help landlords fix prices." *Id.* at 25. But as established above, the Ordinance does not merely prohibit price fixing, and the City has done nothing to prove that RealPage has engaged in any anti-competitive conduct. And the City has numerous other tools to advance its stated interests during the pendency of this litigation, including enforcing existing antitrust laws.

\*       \*       \*

Because RealPage has raised a colorable constitutional claim, the equitable factors—irreparable harm, balance of the equities, and public interest—all favor enjoining the City's unconstitutional ordinance while this litigation proceeds.

## CONCLUSION

RealPage respectfully requests that this Court issue a temporary restraining order and then preliminary injunction barring Defendants from enforcing or causing to be enforced Berkeley Municipal Code Chapter 13.63, pending final resolution of this action. At a minimum, the Court should

grant such relief to the extent it would prohibit the sale, license, provision, or use of RealPage's revenue management software, pending final resolution of this action.

Respectfully submitted,

April 11, 2025

By: /s/ Kristin A. Linsley
       Kristin A. Linsley

Kristin A. Linsley (#154148)
  klinsley@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
One Embarcadero Center #2600
San Francisco, CA 94111-3715
Telephone:    415.393.8200
Facsimile:    415.393.8306

Jay P. Srinivasan (#181471)
  jsrinivasan@gibsondunn.com
Bradley J. Hamburger (#266916)
  bhamburger@gibsondunn.com
Samuel Eckman (#308923)
  seckman@gibsondunn.com
Alexander N. Harris (#278482)
  aharris@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Ave.
Los Angeles, CA 90071-3197
Telephone:    213.229.7000
Facsimile:    213.229.7520

*Attorneys for Plaintiff RealPage, Inc.*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28