Pages 1 - 61

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Jacqueline Scott Corley, Judge

REALPAGE, INC.,                    )
                                   )
            Plaintiff,             )
                                   )
    VS.                            )    NO. 25-CV-03004-JSC
                                   )
CITY OF BERKELEY, et al.,          )
                                   )
            Defendants.            )
_____   )

                        San Francisco, California
                        Wednesday, April 16, 2025

    TRANSCRIPT OF REMOTE ZOOM VIDEOCONFERENCE PROCEEDINGS

APPEARANCES:

For Plaintiff:
                    GIBSON, DUNN & CRUTCHER LLP
                    One Embarcadero Center, Suite 2600
                    San Francisco, CA 94111-3715
            BY:  KRISTIN A. LINSLEY, ATTORNEY AT LAW

                    GIBSON, DUNN & CRUTCHER LLP
                    333 S Grand Avenue, 15th Floor
                    Los Angeles, CA 90071
            BY:  JAGANNATHAN P. SRINIVASAN, ATTORNEY AT LAW

For Defendants:
                    CITY OF BERKELEY
                    Office of the City Attorney
                    2180 Milvia Street, 4th Floor
                    Berkeley, CA 94704
            BY:  KATRINA L. EILAND, ATTORNEY AT LAW

            (APPEARANCES CONTINUED ON THE NEXT PAGE.)

REPORTED REMOTELY BY:  Kendra A. Steppler, RPR, CRR
                        Official United States Reporter

**APPEARANCES:** (Continued)

                    KEKER, VAN NEST & PETERS LLP
                    633 Battery Street
                    San Francisco, CA 94111
          BY:   **ELLIOT R. PETERS, ATTORNEY AT LAW**
                **IAN A. KANIG, ATTORNEY AT LAW**

| | |
|---|---|
| 1 | <u>**Wednesday - April 16, 2025**</u>                          <u>**11:31 a.m.**</u> |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | **THE COURTROOM DEPUTY:**  Good morning, everyone.   Court |
| 5 | is now in session, the Honorable Jacqueline Scott Corley |
| 6 | presiding. |
| 7 | Calling Civil Action C 23-3004 [sic], RealPage, Inc. v. |
| 8 | City of Berkeley. |
| 9 | Counsel, starting with plaintiff, will you please state |
| 10 | your appearance for the record. |
| 11 | **MS. LINSLEY:**  Kristin Linsley for Gibson, Dunn & |
| 12 | Crutcher on behalf of plaintiff, RealPage. |
| 13 | **THE COURT:**  Good morning. |
| 14 | **MS. LINSLEY:**  Good morning, Your Honor. |
| 15 | **MR. SRINIVASAN:**  Good morning, Your Honor.  Jay |
| 16 | Srinivasan also here for RealPage. |
| 17 | **THE COURT:**  Good morning. |
| 18 | **MR. KANIG:**  Good morning, Your Honor.  Ian Kanig, |
| 19 | Keker, Van Nest & Peters, on behalf of defendant, City of |
| 20 | Berkeley and its city manager. |
| 21 | **THE COURT:**  Good morning. |
| 22 | **MR. PETERS:**  And Elliot Peters, also of Keker,     Van |
| 23 | Nest & Peters, on behalf of the City of Berkeley. |
| 24 | **THE COURT:**  Good morning. |
| 25 | **MS. EILAND:**  Good morning, Your Honor.  Katrina Eiland |

1    for the City of Berkeley City Attorney's Office for defendant,

2    City of Berkeley.

3        **THE COURT:**  All right.  Good morning.

4        Okay.  I take it, Mr. Kanig, we have -- the city council

5    did not do anything, given there was no update on the docket.

6        **MR. KANIG:**  No, Your Honor.  That's correct.

7        **THE COURT:**  Okay.  All right.

8        So, Ms. Linsley, my first question:  Is the plaintiff

9    seeking a TRO and an order to show cause re preliminary

10    injunction or a preliminary injunction?

11        **MS. LINSLEY:**  We framed our relief in the former way,

12    Your Honor, as a TRO and an OSC re preliminary injunction.  But

13    I think Your Honor has the option -- if the parties proceed

14    directly to the preliminary injunction -- that would also work.

15        **THE COURT:**  Well, I just want to know what you're

16    seeking.  Because, actually, that's not what it said.  There's

17    no OSC in your papers.  It said "and/or."  But it can't be

18    "and" because a preliminary injunction swallows up a TRO.  So I

19    need to know, is it a TRO and then we could then move on to

20    preliminary injunction, or are you skipping the TRO and we're

21    at preliminary injunction?

22        **MS. LINSLEY:**  We would prefer to have a TRO, Your

23    Honor --

24        **THE COURT:**  Okay.

25        **MS. LINSLEY:**  -- today --

1          **THE COURT:**  That's normally -- yeah --

2          **MS. LINSLEY:**  -- given the way --

3          **THE COURT:**  -- that's --

4          **MS. LINSLEY:**  -- given the timing, especially.  And

5     then if Your Honor needs additional briefing or additional --

6     an additional hearing on a preliminary injunction, we could do

7     it that way.

8          **THE COURT:**  Got it.  Okay.  All right.  So we'll treat

9     it as a motion for a TRO then.

10          **MS. LINSLEY:**  Yes, Your Honor.

11          **THE COURT:**  Okay.  All right.  So this case, in this

12     context, of course, I think has a lot of issues of sort of

13     first impression.  First, as I understand it, Ms. Linsley, the

14     irreparable harm showing is completely intertwined with the

15     likelihood of success, which, in the First Amendment context,

16     is a colorable First Amendment violation, because the plaintiff

17     is claiming the First Amendment violation is the irreparable

18     harm and no other irreparable harm; correct?

19          **MS. LINSLEY:**  Correct, Your Honor.  The legal standard

20     is just to show the likelihood of success on a constitutional

21     violation, because the loss of the constitutional right is, by

22     definition, irreparable harm.

23          That said, we did put in the declaration putting out that

24     there's, in effect, the -- obviously the ordinance is

25     imminently in effect and has penalties hanging over us.  And so

1   given -- by its -- on the face of the ordinance, it will impose

2   penalties as of the date of -- effect -- as of the effective

3   date, April 24, not only on RealPage, but also on its

4   customers.  So there's --

5         THE COURT:  Well, the penalties would have to be

6   enforced.  And penalties are money.  And normally money are

7   legal damages.  So --

8         MS. LINSLEY:  It's --

9         THE COURT:  So what I understand RealPage -- it's the

10  First Amendment violation.

11        MS. LINSLEY:  Yeah.  It is the First Amendment.  Yes.

12        THE COURT:  Okay.

13        MS. LINSLEY:  Although, there's an obvious chilling

14  effect on customers by virtue of the -- at least the threat of

15  the penalties.

16        THE COURT:  Well, the chilling effect, meaning in

17  terms of purchasing or using the plaintiff's product.

18        MS. LINSLEY:  Correct.

19        THE COURT:  Yeah, which is money.  So all that's to

20  say -- all that's to say is that -- well, I certainly am going

21  to apply the law that says a colorable claim of a First

22  Amendment violation is irreparable harm.

23        I do think this is a unique context.  Because, really,

24  what it's about is money for RealPage, as you just said.  That

25  they'll have to pay penalties or they won't be able to sell

1   their software or people won't buy it, which is money.  But --

2        **MS. LINSLEY:**  Well, technically, the same is true with

3   a book, for example.  You know, there's always you won't be

4   able to sell your book because --

5        **THE COURT:**  Yeah, maybe.  I mean, I think it's a

6   little different.  Anyway, but I'm going to apply the law

7   because I don't think --

8        **MS. LINSLEY:**  Mm-hm.

9        **THE COURT:**  I just -- going forward, I just think it's

10  an interesting question that's somewhat open in terms of

11  irreparable harm because of the unique circumstance we're in.

12  Okay.  So, really, what we're talking about -- speech.  And so

13  let me tell you my tentative view, and then everyone can argue.

14      My tentative view is that there is a colorable claim that

15  it is speech.  And I think the Supreme Court's case in *Sorrell*

16  is really the most apt case here, because we have it's

17  regulating actually the advice or recommendations that are

18  given.

19      I also think it's not commercial speech with the

20  heightened or lesser burden, because it's not advertising any

21  product; however, I also think the plaintiff hasn't shown that

22  it's protected speech because of the price-fixing allegation,

23  which was the basis for the ordinance.

24      And in *Pittsburgh Press*, the Supreme Court made it clear

25  that speech that violates the antitrust laws -- that there's no

```
 1    First Amendment interest in it.  And the plaintiff's opening

 2    brief didn't even acknowledge that, let alone the MDL or the

 3    DOJ action or that.  So a little bit for everybody or nothing

 4    for anybody.  That's sort of my tentative view.  And I'm open

 5    to whoever wants to go first.

 6              MR. KANIG:  Your Honor, if I may --

 7              MS. LINSLEY:  I'd probably --

 8              MR. KANIG:  -- I would love to address your first

 9    point about --

10              THE COURT:  Okay.

11              MR. KANIG:  Thank you.

12              THE COURT:  Wait, wait, wait.  Is that all right,

13    Ms. Linsley, if we start with sort of that --

14              MS. LINSLEY:  Well, it's okay, sure.  It is our

15    motion.  And I think that if the effect of what you're saying

16    is that a motion would be denied, then I think I'd like to be

17    able to address it.  But I don't mind if Mr. Kanig goes first.

18              THE COURT:  Well, I mean, maybe we should just sort of

19    skip because in the sort of -- and let's just talk about the

20    antitrust first and that.  And so let me start with Ms. Linsley

21    there.

22              MS. LINSLEY:  Yes.  I don't think we meant to avoid

23    the issue, Your Honor.  It's obviously all over the ordinance

24    that the City cited these antitrust cases as part of its case

25    for passing this ordinance.  The main reason the City gave for
```

```
 1   not being satisfied that the issue was being litigated in these
 2   other cases is that it wasn't going fast enough for the City's
 3   preference.  The City wanted relief more quickly.
 4        And all of that would be fine if the ordinance were
 5   limited to an antitrust violation or even speech that
 6   constitutes an antitrust violation.  But the way the ordinance
 7   is written goes well beyond --
 8        THE COURT:  No.  But I think we have to talk about
 9   your software.  Because that's what this case is about and that
10   is where the standing comes from, is your client's software.
11   And so where is the showing that your client's software -- even
12   a colorable showing -- that your client's software isn't
13   illegal price fixing?  Your --
14        MS. LINSLEY:  Well --
15        THE COURT:  Your -- you didn't argue -- anyone in
16   here -- that your client sells software that doesn't include
17   competitor data.
18        MS. LINSLEY:  Um --
19        THE COURT:  It includes competitor data; right?  So
20   even if the ordinance reached software, or something that
21   didn't include competitor data, that is no application to your
22   client whose software has competitor data.  So --
23        MS. LINSLEY:  Yeah.  Well, I can say this -- and I
24   think we did make this clear in our papers -- that the software
25   uses -- in the run time, it doesn't use any nonpublic
```

```
1   competitor data.  So it's only using public market data that --

2   that can -- can then be run through the software on an

3   anonymized basis to make recommendations about prices to

4   customers.

5       So that's not an antitrust violation if you're looking --

6   if you're just gathering public data about prices and looking

7   around the neighborhood to see what other people are --

8           THE COURT:  So you're telling me the record supports a

9   finding that the software does not get any data from the

10  landlord customers?

11          MS. LINSLEY:  The -- the record supports a finding

12  that the software does not use any nonpublic data and not --

13  and it -- and everything that it does use is anonymized in

14  terms of --

15          THE COURT:  Well, I don't -- I don't think the

16  anonymized matters.  But tell -- what do you mean by

17  "nonpublic" -- I mean, by "public"?

18          MS. LINSLEY:  It's -- it's -- for example, I think the

19  most obvious example is published prices for an apartment.  So

20  if you are a landlord, and you have an apartment building, and

21  you have a sign out in front of your building --

22          THE COURT:  Yeah.

23          MS. LINSLEY:  So you have a two-bedroom unit for

24  $1,000 a month.  If that's your sign outside, that's public

25  data showing a publicly advertised price for a unit.  So --
```

1          **THE COURT:**  So the software doesn't use any data from

2   the landlord specifically; it's all public?

3          **MS. LINSLEY:**  Well, the landlord can provide that

4   public data that then can be used in run time.  But, otherwise,

5   it's data drawn from customers and it's --

6          **THE COURT:**  Well, is it drawn from the landlord or is

7   it drawn --

8          **MS. LINSLEY:**  I think it's both.

9          **THE COURT:**  -- from the sign out front?

10         **MS. LINSLEY:**  But it's still not --

11         **THE COURT:**  Okay.  So they do get data --

12         **MS. LINSLEY:**  But it's still publicly available data.

13  It's not nonpublic data.

14         **THE COURT:**  Well, how would -- and where would I look

15  in the record that would show that it's publicly available

16  data -- all of it?

17         **MS. LINSLEY:**  I --

18         **THE COURT:**  Like, when a lease is up, how is that

19  publicly available data?  I understood the software includes,

20  like, when apartments are going to become vacant.  How is that

21  publicly available?

22         **MS. LINSLEY:**  That -- when an apartment is going to

23  become available would not be data that would be used by the

24  software to make recommendations on price as to any customer.

25         **THE COURT:**  And where is that in the record?

```
 1              MS. LINSLEY:  I -- I believe it's not -- I don't think
 2    we have that specific fact --
 3              THE COURT:  Okay.  All right.
 4              MR. SRINIVASAN:  Your Honor, if I --
 5              THE COURT:  Yeah.
 6              MR. SRINIVASAN:  If I can -- if I may, Your Honor?  I
 7    apologize for butting in, but --
 8              THE COURT:  No, no, no.  Anyone can argue from either
 9    side --
10              MS. LINSLEY:  It's totally fine.
11              THE COURT:  That's fine.
12              MS. LINSLEY:  Yeah.  Mr. Srinivasan knows this a
13    little better.
14              THE COURT:  Yeah.
15              MR. SRINIVASAN:  Again, I am counsel for RealPage in
16    all these antitrust cases.
17         But, specifically, to answer your question, in -- I
18    believe it's in paragraph 2 of the Dreyfuss declaration that
19    was submitted as part of our TRO -- where it says, "These
20    products evaluate internal supply and demand for the subject
21    property, along with publicly available rent data from other
22    properties, to generate recommendations."
23         In other words --
24              THE COURT:  Well, what's that "internal" mean?
25              MR. SRINIVASAN:  "Internal" means, like, if you're a
```

```
 1    landlord --
 2            THE COURT:  Yes.
 3            MR. SRINIVASAN:  -- the nonpublic data would be the
 4    data that I have about my own building --
 5            THE COURT:  Yes.
 6            MR. SRINIVASAN:  Of course, it's nonpublic to the
 7    world --
 8            THE COURT:  Yes.
 9            MR. SRINIVASAN:  -- but it's proprietary to me.
10            THE COURT:  And they share it with your client?
11            MR. SRINIVASAN:  They -- I -- no.  Well, yes.
12    Certainly, they would say, "Tell me what your data is so I can
13    provide you" --
14            THE COURT:  Yes.
15            MR. SRINIVASAN:  -- "recommendations."
16            THE COURT:  Yes.
17            MR. SRINIVASAN:  I'm not using any other competitor's
18    data for that.
19            THE COURT:  Well, they're all -- they're all providing
20    it to you.
21            MR. SRINIVASAN:  But no other competitor's data is
22    used for me.  So if I'm Customer X and I have --
23            THE COURT:  Okay.  But that's not what
24    Mr. Dreyfuss [sic] said.
25        Oh, I think you just froze.
```

1        **MS. LINSLEY:**  What she was saying, Your Honor --

2    Ms. Dreyfuss is saying that each person's internal data gets

3    used to give advice to that customer -- that person.  That

4    internal data is talking about how each competitor -- each

5    customer -- gives their information, and that information gets

6    used to make recommendations for them.

7        That is combined with publicly available information about

8    the market.  And some of that includes advertised prices by

9    other companies in the market.  But internal data is used only

10   to advise the company that gives that internal data to them.

11   In other words, that's isolated to that customer.  It is not

12   shared with other customers and it is not blended or shared

13   with anyone in the run time of the product.

14       In other words, in making recommendations, none of that

15   data is used across customers.  It's just used for the

16   individual customer that provided the data and is seeking the

17   advice.  In other words, the advice is customized to that

18   customer.  That's what she's saying in the declaration.  If

19   that's not clear enough, we can make that clear.  But that is

20   what --

21       **THE COURT:**  All right.  Let me hear from Mr. Kanig

22   about this, because I --

23       **MR. KANIG:**  Thank -- thank --

24       **THE COURT:**  Because the whole point of the ordinance

25   is that it uses internal, nonpublic information; right?

1          **MS. LINSLEY:**  Well, if I --

2          **MR. KANIG:**  Well, Your Honor --

3          **THE COURT:**  Wait, wait, wait.  I want to hear from

4   Mr. Kanig.

5          **MS. LINSLEY:**  Okay.  Sorry.

6          **MR. KANIG:**  Thank you, Your Honor.

7      I think that paragraph 2 of the Dreyfuss declaration is

8   extraordinarily ambiguous about what data is actually inputted

9   into this coordinated pricing algorithm and used with competing

10  landlords.

11     It says that it evaluates internal supply and demand data

12  from the subject property, which is precisely what the

13  Department of Justice's action and the State Attorneys General

14  accuse RealPage of doing.  It is using internal proprietary

15  information about a subject property to engage in these -- it

16  is a hub-and-spoke conspiracy in antitrust law, Your Honor,

17  without a rim, where you have vertical agreements between

18  RealPage and landlords that allow for the communication of

19  nonpublic data about these properties that is then inputted

20  into an algorithm that then recommends an output for other

21  competitors.

22     I don't think that there's anything in the Dreyfuss

23  declaration that remotely suggests that that data is limited to

24  a particular subject property.  And I think that given the

25  legal standard that applies in this situation, which is that

```
 1  it's their burden to show a colorable First Amendment

 2  violation, I don't think this declaration even comes close to

 3  establishing that the pro-competitive benefits of this

 4  software, if there are any, outweigh the anticompetitive harm.

 5  And --

 6          THE COURT:  Well, if it's -- it's not even a per se

 7  violation; right?  I understand --

 8          MR. KANIG:  Totally.

 9          THE COURT:  -- that's what the MDL court ruled, but

10  that's not --

11          MR. KANIG:  Of course.

12          MR. SRINIVASAN:  If --

13          THE COURT:  -- an open question here.

14      Yes, Mr. Srinivasan?

15          MR. KANIG:  That's -- that's --

16          THE COURT:  Okay.  You're back.

17      Oh, no, he just froze again.

18          MS. LINSLEY:  What I just wanted to point out, Your

19  Honor -- and sorry to interrupt Mr. Kanig --

20          MR. KANIG:  Well, Your Honor, if I may just continue

21  for a moment.

22          THE COURT:  No, I understand that.  I just -- this

23  one -- this one --

24          MR. KANIG:  Sure.

25          THE COURT:  -- point.
```

```
1          I guess, Ms. Linsley, the MDL survived the motion to

2    dismiss.  It's now -- I looked at the docket -- heavily into

3    discovery.

4              MS. LINSLEY:  There's a --

5              THE COURT:  So --

6              MS. LINSLEY:  There's a -- yeah -- it did survive.

7    The Court dismissed the per se --

8              THE COURT:  The student housing.  But that's a

9    different matter here.  Now we're talking about all Berkeley.

10             MR. SRINIVASAN:  I'm back, Your Honor.  I'm really --

11             THE COURT:  Yes.

12             MR. SRINIVASAN:  I apologize for the technical

13   difficulties.

14             THE COURT:  That's okay.

15             MR. SRINIVASAN:  But let me -- I think there's one

16   important piece of context here.  Mr. Kanig is incorrect in the

17   sense of that is -- the Department of Justice complaint is not

18   directed at individual customers using their own data along

19   with the public data.  It is directed at -- the software used

20   to work in a way wherein other customers' nonpublic data was

21   anonymized, aggregated, aged, et cetera and used as a pool,

22   along with an individual customer's data, along with public

23   data.

24         That is how the software worked when the DOJ complaint was

25   filed in most of the other -- all of the other -- complaints --
```

1  well, most of the other complaints were filed.  There's some

2  recent ones.

3      The company has changed the way in which the software

4  operates in response though, among other reasons, to the

5  San Francisco ordinance that was enacted back in October.  The

6  current operation of the software is different than what is

7  alleged in the DOJ complaint in the other complaints.

8          **THE COURT:**  Okay.  All right.  I hear you.  There's no

9  way for me to make that determination today.

10          **MR. SRINIVASAN:**  Well, I would submit that --

11          **THE COURT:**  So --

12          **MR. SRINIVASAN:**  -- Ms. Dreyfuss' comment is not

13  ambiguous.  She is saying without --

14          **THE COURT:**  Can you point to me, in the briefs, where

15  it says that?

16          **MR. SRINIVASAN:**  I think we argued -- I don't know if

17  it's --

18          **THE COURT:**  Can you just point me to the page in the

19  motion?  It's not in the motion, because the TRO doesn't even

20  acknowledge that.  Can you -- so it has to be in the reply.

21  Can you point to me where that argument is made in the briefs?

22          **MR. SRINIVASAN:**  I'll have to check, Your Honor.  I

23  mean, as Ms. Linsley explained, we didn't think it would be

24  relevant as to --

25          **THE COURT:**  Okay.  That's a different question.

1            **MR. SRINIVASAN:**  It is.  It is.

2            **THE COURT:**  That's a different question --

3            **MR. SRINIVASAN:**  Fair.

4            **THE COURT:**  -- of whether you made the argument or

5      not.  I'm not going to make a decision and make a finding when

6      it hasn't.  I'll give you the opportunity, of course.  We'll

7      get there.

8            **MR. SRINIVASAN:**  Fair enough, Your Honor.  I'll --

9            **THE COURT:**  You know, I don't see anywhere where they

10     say the software has changed.  I don't see that anywhere.

11         Mr. Kanig, you can tell me.  Is that anywhere, like, in

12     the --

13           **MR. KANIG:**  No, Your Honor.  That's exactly correct.

14     That's another glaring omission from the record in RealPage's

15     moving papers.  If this product has changed from constituting

16     anticompetitive conduct, that's an admission that they were

17     engaging in anticompetitive conduct --

18           **THE COURT:**  Well, so -- so -- no, no, no.  That is not

19     an admission of that.  You are -- don't -- that is not an

20     admission of that.  People change it all the time to perhaps

21     avoid something.  But --

22           **MR. KANIG:**  I meant --

23           **THE COURT:**  And, for your case, it doesn't matter.

24     Because if they're not engaging in anticompetitive conduct,

25     then I think there's an issue with the ordinance.  So it

1  doesn't help you that they -- it's an admission or not an

2  admission.  The question is the software.  There's no question

3  that this case is about their current software.  That that is

4  what is banned; right?

5           **MR. KANIG:**  Yes, Your Honor.

6           **THE COURT:**  And they're speaking to prohibit

7  enforcement against their current software.  And so --

8           **MR. KANIG:**  I --

9           **THE COURT:**  -- the question is, what does their

10  current software do?

11      Okay.  I think I understand that.  And I think -- so now I

12  understand that argument.  That argument is the software is

13  different and now our algorithm is not inputting any other

14  landlord's, you know, nonpublic information.  That, we'll have

15  to do some discovery on to back up.

16      Okay.  So, Mr. Kanig, then, you're saying, regardless,

17  it's not protected by the First Amendment.  So do you want to

18  address that then?

19           **MR. KANIG:**  Yes, Your Honor.  Thank you.

20      I appreciate that this is a new issue on the edge of

21  antitrust and First Amendment law; however, I think that

22  existing authority fully resolves this question and can be done

23  so on these papers.

24      Berkeley's ordinance bans the sale of expressive software

25  that automatically outputs price data through an algorithm.

1    That is a regulation of economic activity that does not target

2    speech or expressive activity under the Ninth Circuit's test --

3            **THE COURT:**  Why is it a recommendation or advice --

4    expressive activity?

5            **MR. KANIG:**  Your Honor, so in *Sorrell*, which is the

6    case that you mentioned earlier in the hearing, the U.S.

7    Supreme Court held that, quote, "restrictions on protected

8    expression are distinct from restrictions on economic

9    activity."  The Ninth Circuit extended that holding in IFA to

10   say that the decision to form a business relationship and

11   resulting business activities are economic activities.  And

12   unless that economic activity involves, quote, "significant

13   expressive speech," it doesn't get First Amendment scrutiny.

14   And there is absolutely no significant expressive speech here.

15       All of RealPage's authorities concern facial content bans

16   on human expression.  *Holder v. Humanitarian* --

17           **THE COURT:**  Okay.  Let me stop you for a second.

18           **MR. KANIG:**  Sure.  Sure.

19           **THE COURT:**  If instead of having an algorithm, we were

20   back 30 years ago.  And what RealPage did was -- and let's

21   assume they got information from all the landlords -- they

22   said, all landlords, tell me what your rents are.  Tell me your

23   vacancies.  And then RealPage said, individually, to each

24   landlord -- they handed them an envelope with their

25   recommendation or advice as to what the rent should be and when

```
1   they should make their unit vacant.  Speech or not speech?

2          MR. KANIG:  Your Honor, that is an entirely

3   different --

4          THE COURT:  Not --

5          MR. KANIG:  -- situation.

6          THE COURT:  Speech or not speech?

7          MR. KANIG:  I think that if a human communicates, to

8   another human, expressive speech, that is speech.

9          THE COURT:  Okay.  So --

10          MR. PETERS:  That would also be --

11          THE COURT:  So because --

12          MR. PETERS:  If I may, Your Honor --

13          THE COURT:  Yeah.

14          MR. PETERS:  -- that would be a straight-up antitrust

15   violation.

16          THE COURT:  No, I know -- I understand that.  That's

17   why I started there.  That's why I started there.  But now

18   Mr. Kanig wants to not start there.  He wants to go back to the

19   beginning.  So that's why we're talking about that.  So --

20          MR. KANIG:  Yes, Your Honor.

21          THE COURT:  So -- right?  So that would be speech.  So

22   your argument is because the speech is done by a computer as

23   opposed to a human, it's not protected?

24          MR. KANIG:  Yes, Your Honor.  But I think there's a

25   couple of important things to highlight there.  The first --
```

1          **THE COURT:**  Okay.  Wait a minute.  Wait a minute.

2    Nope, nope, nope.  I have questions, because I'm trying to

3    figure out this area --

4          **MR. KANIG:**  Yes, Your Honor.

5          **THE COURT:**  -- of first impression.

6          **MR. KANIG:**  Of course.

7          **THE COURT:**  In *Sorrell* --

8          **MR. KANIG:**  Yes.

9          **THE COURT:**  -- it wasn't a human that was

10   communicating this prescription data.  It was a computer that

11   was sending that data.  So why was there First Amendment

12   protection there?

13         **MR. KANIG:**  That was a medium for human speech.  That

14   was data that was sent by a human to another human.  And,

15   further, it wasn't the transmission of that data that was so

16   much at issue in *Sorrell* as that it was a speaker-based and

17   viewpoint-based discrimination on a pharmaceutical marketer

18   speech to doctors.  That's what *Sorrell* is concerned with.

19   Concerned -- it's concerned with the fact that Vermont is

20   precluding certain pharmaceutical companies for name-brand

21   drugs.

22         **THE COURT:**  Yes.

23         **MR. KANIG:**  It's concerned with blocking their

24   marketers from speaking to doctors in this detailing process.

25         **THE COURT:**  Yes.

```
 1            MR. KANIG:  Right?  And that --
 2            THE COURT:  And this ordinance is blocking RealPage
 3   from speaking to landlords about what their rent should be.
 4   Now, Mr. Peters will say that's a price-fixing violation.  I
 5   understand that.
 6            MR. KANIG:  Yeah.
 7            THE COURT:  But now we're just at whether it's
 8   speech --
 9            MR. KANIG:  Sure.
10            THE COURT:  -- apart from the antitrust violation.
11            MR. KANIG:  Well, and --
12            THE COURT:  That's why I actually do not see the
13   distinction at all.  Or the X case; right?  Where was compelled
14   speech --
15            MR. KANIG:  Compelled speech.
16            THE COURT:  No one at X was speaking.  No one at X.
17   That was a computer.  That was the Internet.  So I -- I -- I
18   just don't understand that distinction that you're making.
19   It's -- instead of a human saying this is what your rent should
20   be --
21            MR. KANIG:  Yes.
22            THE COURT:  -- it's being sent through the cloud.  I
23   mean, if the algorithm just did it in RealPage's office, or
24   whatever it is, a number comes up, and then some human had to
25   code something to get it sent to the landlord; right?  So a
```

1    human is involved.  We're not -- we're getting close, but we're

2    not yet where there are no humans involved in any part of it.

3         **MR. KANIG:**  That's true.  That raises a couple of

4    points, Your Honor.  And if I may briefly just address what I

5    perceive to be the two important issues you've highlighted

6    there.

7         An algorithm -- an output from an algorithm is very

8    different than the transmission of human speech through an

9    electronic medium.  Those are entirely different things.

10        One is speech conveyed through a medium of communication.

11   Another is a computer program running based on data inputs from

12   the landlord, like you said, but not from RealPage.  This is

13   not advice from RealPage.  This is an algorithmic product that

14   is on someone's computer.  And if what Mr. -- counsel for

15   RealPage is saying is correct, it is plugging out data back to

16   the landlord without the involvement of RealPage in any way

17   whatsoever.

18        And if you look at the *Moody* case, that's the only case

19   that they cite that has anything to do with algorithms.  Okay?

20   *Moody* held that a statute regulating social media company's

21   content moderation policies were subject to any First Amendment

22   scrutiny, because it interfered with the editorial curation of

23   human voices in an online forum.

24        It did not hold that any algorithmic output is subject to

25   First Amendment protection.  In fact, Justice Barrett's

1  concurrence expressly says that's not the holding of *Moody*.

2  What she says is, quote, "A function qualifies for First

3  Amendment protection only if it is expressive."

4      This is a -- analogously, this algorithm may be considered

5  a function.  It is not putting -- outputting -- significant

6  expressive speech of the kind that any Court has recognized as

7  expressive --

8          **THE COURT:**  No, no, I understand that we're, like, in

9  first impression territory.  That, I understand.  I'm just

10  trying to figure out --

11          **MR. KANIG:**  Sure.

12          **THE COURT:**  -- where we go.

13          **MR. KANIG:**  Well --

14          **THE COURT:**  So if the algorithm -- if the software was

15  instead just in RealPage's office, and they ran it, and then

16  they communicated the output of that algorithm to the landlord,

17  speech or not speech?

18          **MR. KANIG:**  If RealPage spoke to -- through an

19  electronic medium -- spoke to landlords, that is -- that's

20  closer to what I would consider speech.  But that's not what

21  we're dealing with here --

22          **THE COURT:**  Okay.  Okay.  Okay.  All right.  All

23  right.  So the distinction that you're making then -- you say

24  it turns on the fact that the software is on the landlord's

25  computer.  That once they buy the software from the --

1    RealPage -- they have nothing to do with RealPage and no

2    communication with them?

3         **MR. KANIG:**  I think that there is -- there might be

4    incidental speech that's separate and apart from that output of

5    that algorithm.

6         **THE COURT:**  And how do I know that?  How do I know

7    that as I sit here today -- or --

8         **MR. KANIG:**  Well, you don't, Your Honor.  I -- my

9    point is --

10        **THE COURT:**  Okay.  All right.  Okay.  That's just

11   another example of where I think the record just isn't

12   developed enough to draw the lines that you're sort of asking

13   me to draw.  But I don't know if Ms. Linsley or Mr. Srinivasan

14   want to address sort of how -- this particular argument on

15   whether it's speech.

16        **MS. LINSLEY:**  Yeah.  Let me address that quickly, Your

17   Honor, and then I'll let Mr. Srinivasan join, as well, on some

18   of the factual background.

19        But I do want to mention that I don't think the

20   representation of the commercial speech or conduct-only

21   arguments are correct.

22        First of all, starting with *Moody*, *Moody* did not hold

23   that -- and we are not arguing that this is speech just because

24   an algorithm is involved.  That is not what we're arguing at

25   all.  Just as in *Moody*, someone, specifically RealPage, has to

1    design the algorithm and decide what data will be used or not

2    used to make recommendations.

3        We just heard an example of that where there was -- some

4    nonpublic data passed actual prices versus advertised prices

5    that were anonymized and used.  And then a decision was made

6    not to do that in the current running of the software.  That's

7    a classic example of a choice that is a human choice.  This is

8    exactly what *Moody* was talking about.  There's no daylight

9    between the algorithms here and those in *Moody*, except what was

10   being organized.

11       The process of deciding the content and what the

12   algorithms will look at and not look at in curating that

13   content is exactly the same.  And we think *Moody* is directly on

14   point.

15       Justice Barrett made the obvious point that if it was only

16   algorithmic behavior -- in other words, it was just a computer

17   off on its own doing its own thing with no human guidance --

18   maybe that wouldn't be speech because -- because machines don't

19   have First Amendment rights.  But that's not what we're talking

20   about.  I thought it was a good point.  But she wasn't

21   suggesting that it applied to the facts of *Moody*, nor does that

22   paradigm apply to the facts here.

23       Obviously, what's getting communicated is curated by the

24   company in the form of a recommendation or advice on market --

25   on market conditions -- or market advice on what the customer

1    might or might not do in the marketplace.  So that is

2    quintessentially market advice that is First Amendment

3    protected.  It's not commercial speech and it's not content --

4    I mean, I'm sorry, it's not conduct -- conduct only -- it's not

5    mere commercial conduct.

6        I also think -- do not think that what either *Sorrell* or

7    the Ninth Circuit were saying was that any time you have a

8    business relationship, the -- any -- any speech that is

9    involved in that business relationship has to be high-level

10   First Amendment communicative conduct or speech.  That's not

11   what was being said at all.  The speech itself is subject to

12   full First Amendment protection and subject to strict scrutiny,

13   as long as it's not commercial speech and --

14           THE COURT:  Or an antitrust violation.  Okay.

15           MS. LINSLEY:  Yeah.  And so -- and likewise.

16   Obviously, if there is speech that says, "Hey, let's agree to

17   charge $100 for that product on next month's price list,"

18   great, that's what we're going to do.  That's been

19   non-protected speech under the Supreme Court precedent since at

20   least the '40s, if not earlier.  That's just a -- words that

21   are used to commit a crime.

22       But, first, this statute is not limited to that by its own

23   terms --

24           THE COURT:  Yes.  But for your client, it's -- it's --

25   your client --

1          MS. LINSLEY:  But --

2          THE COURT:  -- doesn't have standing --

3          MS. LINSLEY:  But --

4          THE COURT:  -- to go help other people.

5          MS. LINSLEY:  But --

6          THE COURT:  For your client, this is about the

7     software.  That's what we're talking about.  It's what does the

8     software that they offer --

9          MS. LINSLEY:  But --

10         THE COURT:  -- do and how does it do it?  That's what

11    it is.  I don't get to go in there and argue, well, you know,

12    on behalf of somebody else.

13         MS. LINSLEY:  But if you have a statute that says the

14    City of Berkeley hereby bans all illegal speech -- all

15    speech -- no -- all speech.

16         THE COURT:  Yes.

17         MS. LINSLEY:  The City of Berkeley hereby bans all

18    speech.

19         THE COURT:  Yes.

20         MS. LINSLEY:  Now RealPage challenges that.

21         THE COURT:  Yes.

22         MS. LINSLEY:  You say, well, unless you can show that

23    your speech is legal, you can't challenge the --

24         THE COURT:  Well, RealPage has a lot to speak on, so I

25    don't think that would be a problem.  I think your example was

1   probably too broad there --

2          **MS. LINSLEY:**  Well, it may be too exaggerated.  But

3   the way the ordinance is written literally --

4                        (Court reporter clarified.)

5          **MS. LINSLEY:**  Yeah.  I was just going to say the

6   ordinance is almost that broad.  It prohibits the use of any

7   information, whether it comes from a competitor or not.  That

8   is the express definition of covered information that can't be

9   used.  It says, "Regardless whether it is derived from or

10  otherwise provided by another person that competes in the same

11  market or a related market."

12     So the way the ordinance is written, it would prohibit

13  literally the use of a company's own data to set its own

14  prices.  That's what it says.

15         **MR. KANIG:**  Your Honor --

16         **THE COURT:**  Okay.  I'm not sure I read it that way.

17  But let's -- let's -- but --

18         **MS. LINSLEY:**  But, either way, let me get to Your

19  Honor's point, if I could.  I think we have shown that the --

20  that the operation of the software does not violate the

21  antitrust laws.

22         **THE COURT:**  I would say, at a minimum, it's a

23  colorable claim.  And so, in the Ninth Circuit, it is a lower

24  standard, Mr. Kanig.  It's a colorable claim.  And, frankly,

25  just given that we are in this land of first impression on that

1  issue as opposed to the antitrust, I think it's a colorable

2  claim.

3       And then when we turn to the commercial speech -- I mean,

4  I don't really know that it matters whether it's commercial or

5  strict scrutiny, given the question of the antitrust violation.

6  But, there, we have the *Bolger* test that this doesn't seem to

7  fall within either.  And I don't know if you wanted to address

8  that or you'll say, well, maybe not.

9           MR. KANIG:  Well, Your Honor, if you -- you know -- if

10 you agree with us, that there's not sufficient evidence in the

11 record to satisfy their burden of showing that their conduct is

12 lawful, I don't think that we need to reach the *Bolger* question

13 today.

14          THE COURT:  Okay.  Then let's just stop here.  Were

15 you aware, before today, that they had alleged they had changed

16 their software from what's at issue -- or was at issue -- in

17 the MDL or the DOJ action?

18          MR. KANIG:  I personally don't think that it really

19 matters, Your Honor, because public data can still be the basis

20 for a Section 1 per se violation of the antitrust laws.  If

21 I -- exchanging public information to set prices is price

22 fixing under Section 1.

23          THE COURT:  Okay.  I don't know.  I don't know.

24 Because none of that has really been addressed here.  I don't

25 know.  Okay?  I don't know.  Right?  I don't know.

1          **MS. LINSLEY:**  I will say that it's also in our

2     complaint.  It was made clear in at least paragraph 3 of the

3     complaint that it was publicly available rent data from other

4     properties to generate personalized price recommendations that

5     aligned with the customers' unique asset strategy for each

6     property.

7          **THE COURT:**  Okay.

8          **MS. LINSLEY:**  And that was essentially the same

9     information that Ms. Dreyfuss then validated in her

10    declaration.  It's --

11         **THE COURT:**  Well, I do think it's -- it wasn't clear.

12    And there was nothing argued in the brief -- briefs.  There's

13    nowhere you can point to where it says, "Hey, we've changed our

14    algorithm and what we do since those cases were filed."  It is

15    not there.  It is not disclosed.  So let -- yes.

16         **MR. SRINIVASAN:**  Sorry, Your Honor.  I just wanted to

17    address that point briefly as to why we didn't get into that

18    distinction.

19         It starts because we believe the use of nonpublic data in

20    an aggregated anonymized form, in the way RealPage does it,

21    bears no relationship to one person talking to five different

22    people and saying this is what we're going to set prices at.

23    It's nothing like that.

24         We believe the way the software has been designed is

25    antitrust compliant, even with the use of nonpublic data.  We

1  focused on the fact that no court has found otherwise.  And, in

2  fact, the Middle District of Tennessee has said it's definitely

3  not a per se violation.  And, in fact, I am not even sure it's

4  a rule of reason violation that might be pro-competitive.

5          THE COURT:  Exactly.  I understand all of that.  I

6  don't know, I'm not sure, whatever.  Those are totally

7  different matters than what I have in front of me.

8      By the way, I recently had a case involving a unique

9  situation.  And I said it's rule of reason.  And the Ninth

10 Circuit --

11         MR. SRINIVASAN:  It's --

12         THE COURT:  -- even though there was no case on

13 point -- reversed me and said it was per se.  So I don't know.

14         MR. SRINIVASAN:  Fair enough.

15         THE COURT:  That's the case I'm going to have to look

16 at.  I don't know what it is or it isn't.  What I do know is I

17 have to apply it to what the software actually does.  So --

18         MR. SRINIVASAN:  And I just -- if I can --

19         THE COURT:  Yeah.

20         MR. SRINIVASAN:  Just if I could just -- just to

21 explain why -- we certainly disagree with Mr. Kanig.  And I

22 know -- I appreciate that you made this comment -- that somehow

23 what we were doing previously was anticompetitive.  We do not

24 believe it was the way the software was designed; however --

25         THE COURT:  Well, I understand.  You haven't settled

```
 1   the MDL or the DOJ case.  Those cases are ongoing.
 2            MR. SRINIVASAN:  Right.
 3            THE COURT:  I understand.
 4            MR. SRINIVASAN:  But in an effort to address what some
 5   of these cases have focused on, which is the use of nonpublic
 6   data in the algorithm -- other than the subject properties
 7   data, of course, which would be nonpublic -- that is -- the
 8   point is, the software, as currently exists in operation in
 9   Berkeley, doesn't use that public data anymore in the run-time
10   operation.
11            THE COURT:  And is that just Berkeley or is that
12   nationwide?
13            MR. SRINIVASAN:  That is nationwide as far --
14            THE COURT:  Okay.  Let me ask you all a different
15   question then:  Does this case belong in the MDL?  I mean,
16   there is a judge that is actually looking at this very
17   question.  There's lots of discovery that's there and that's
18   ongoing.
19            MR. SRINIVASAN:  Well --
20            THE COURT:  But it's your case.  It's not the City's
21   case.
22            MR. SRINIVASAN:  Yeah.  Your Honor, I don't know if
23   that judge is prepared to take on a First Amendment violation.
24   Our belief here is that -- that --
25            THE COURT:  No, it's -- but, see, it comes back to the
```

```
1    end.  If it's price fixing, it's not a First Amendment
2    violation.  And the MDL is all about its price fixing.  We
3    could argue all day long, is it speech, commercial or not?  But
4    at the end of the day, if it's price fixing, it's not a First
5    Amendment violation.  And the MDL is all about, is it price
6    fixing?  As Ms. Linsley candidly said, if it violates the
7    antitrust laws, it's not protected by the First Amendment.  So
8    it runs smack into what the MDL is doing.
9         Anyway, I don't know.  I just raise that because --
10        MS. LINSLEY:  It --
11        THE COURT:  -- that is what's at issue.
12        MS. LINSLEY:  I do think the overbreadth thing is a
13   problem though.  And I think that we have standing to make an
14   overbreadth challenge and a facial challenge to this ordinance,
15   because it doesn't limit itself to anything --
16        THE COURT:  And what is it that your client does that
17   that overbreadth stops it from doing?  What is it?
18        MS. LINSLEY:  Well, I mean, obviously not all uses of
19   this software are an antitrust violation.
20        THE COURT:  How do I know?  I don't even know what
21   those other uses are.  I don't know.
22        MS. LINSLEY:  Well --
23        MR. SRINIVASAN:  Well --
24        THE COURT:  I don't know what use there is, other than
25   you sell it to landlords and you collect money from them for
```

1    it.  I don't know.

2        **MR. SRINIVASAN:**  The problem, I think, Your Honor, and

3    why this may not belong in the MDL, is the ordinance doesn't

4    say, if you have software that violates the antitrust laws,

5    it's banned.  That would be something that we could all live by

6    and proceed under.

7        Our view is it is decidedly not an antitrust violation the

8    way it was and the way it is now.  And it's an odd ordinance

9    because it hasn't been adjudicated as such.  In fact, we're

10   vigorously defending and we believe we're winning.

11       So does that mean we can say, okay, we don't think it's an

12   antitrust violation, so -- we're compliant with the way

13   Berkeley has written this.  That's the problem.  And,

14   ultimately, you know, if Your Honor should rule -- if this is

15   deemed an antitrust violation -- this software -- you can't use

16   it.  And until that has occurred, you're fine to proceed.  We

17   could live with that.

18       **THE COURT:**  Well, that is a chicken and egg problem;

19   isn't it?

20       **MR. SRINIVASAN:**  Well, it's not --

21       **THE COURT:**  I mean, again, we're -- we're now in

22   first-impression land, as well, because, normally, you don't

23   have ordinances about a -- prohibiting price fixing.  Because

24   price fixing --

25       **MR. SRINIVASAN:**  Well --

1    **THE COURT:**  There's a statute that's just out there.

2    And I hear what you're saying about the overbreadth.  I --

3    and maybe, Mr. Kanig, you can explain better.  I don't

4    understand how they have standing -- that case -- given that

5    we're talking about software -- particular software -- and

6    that's all we have.  But --

7    **MR. KANIG:**  I agree, Your Honor.  I don't see how they

8    can raise a facial overbreadth challenge.  And, in fact, I

9    don't think they even did so in any of their moving papers.

10   They don't perform a facial overbreadth analysis.  So I don't

11   think that issue is before the Court.

12   **THE COURT:**  But -- so let's sort of cut to the chase,

13   though, for a moment.  I think what this discussion has

14   demonstrated is the facts really matter here.  I mean, I'll

15   have to address -- and I'm just -- I'm not persuaded yet that

16   it's -- they haven't made a colorable claim that it's speech;

17   right?  It's a lower standard even than likelihood of success.

18   A colorable claim that it's speech.  I think that has been made

19   based on this limited record.  Based on this limited record.

20   So that's why the antitrust violation issue I think then

21   becomes big.  I think they have to make a showing, as well,

22   that it's not a color -- that a colorable showing -- that it's

23   not a violation of antitrust laws.  Query though whether the

24   Ninth Circuit would say that low or colorable standard would

25   apply to price fixing.  I don't know.  That's also another open

1  question.

2      But, at a minimum, they'd at least have to make a

3  colorable showing, not a violation of the antitrust laws.  I

4  have nothing in front of me that allows me to say anything one

5  way or another.  I have the MDL's order on a motion to dismiss.

6  Mr. Srinivasan tells me the software actually operates

7  differently now.

8      So -- and so I guess the question comes, what do we do in

9  the meantime?  Given that representation, I'm sure they could

10 file a -- they could file something tomorrow or even later

11 today -- a declaration -- about that.

12         **MR. KANIG:**  Your --

13         **THE COURT:**  And then I think we would open discovery;

14 right?  Berkeley would have to have the opportunity to really

15 go in.  And let's get the facts down as to how it actually

16 operates.  So I would then make a decision on that based on

17 actual facts.  And so --

18         **MR. KANIG:**  Your Honor --

19         **THE COURT:**  -- the question is in the meanwhile --

20         **MR. PETERS:**  Your Honor --

21         **THE COURT:**  -- whether Berkeley would then, in this

22 unusual situation, seriously then enforce and impose penalties.

23 Because that doesn't seem reasonable in light of the discussion

24 that we'd had today.

25         **MS. LINSLEY:**  The one problem, Your Honor --

1       **MR. PETERS:**  Your Honor --

2       **THE COURT:**  Wait, wait, wait.  I need to -- yes.

3       **MS. LINSLEY:**  Just -- it isn't just the City of

4 Berkeley.  It's also tenants that have standing to enforce the

5 ordinance, as well.

6       **THE COURT:**  Well, I don't have any tenants in front of

7 me.

8    So, Mr. Kanig, what do you want to say?

9       **MR. KANIG:**  Your Honor, I think that my colleague,

10 Mr. Peters, wanted to speak.  So I'll give him the chance --

11       **THE COURT:**  Oh, sure.

12       **MR. PETERS:**  Your Honor's question was sort of, so

13 what do we do?  And I think the answer is, you deny the TRO.

14 And if you're going to set a preliminary injunction hearing, we

15 discuss a schedule for doing the necessary discovery.  And we

16 allow the Court to then address this question when the facts

17 have been developed.

18       **THE COURT:**  Yes.  But is Berkeley going to then

19 threaten landlords -- because I do think that affects

20 RealPage -- or RealPage with penalties in the interim?  And I

21 understand, maybe you have to say, "I can't say they won't."

22 Then I'm going to have RealPage file a declaration as to

23 whether the software has changed.

24       **MR. PETERS:**  Your Honor --

25       **THE COURT:**  Because I was relying, in large extent, on

1  the order that you brought to my attention on the motion to

2  dismiss.  But if it's on a different version of software, then

3  that doesn't get me very far.

4        **MR. PETERS:**  Well, Your Honor, on that factual

5  question -- you know -- Ms. Linsley pointed to paragraph 3 of

6  the complaint.  It says exactly the same thing that it says in

7  the Dreyfuss declaration, literally.  It says, "Some of

8  RealPage's software products, known as revenue management

9  software, evaluate internal supply and demand data from the

10  subject property along with publicly available rent data from

11  other properties," and so on.

12      Now, to me, that's the factual showing that they've made.

13  That's what they've brought to the Court.  To me, internal

14  supply data is nonpublic data.  That's data that a particular

15  landlord knows and that that gets shared.

16        **THE COURT:**  I don't know.

17        **MS. LINSLEY:**  It doesn't --

18        **MR. PETERS:**  I --

19        **THE COURT:**  No.  I don't know.  My question was

20  different.

21        **MR. PETERS:**  So they haven't made --

22        **THE COURT:**  My question was different.  And that is,

23  this is complicated.  This is -- and what Berkeley is doing is

24  somewhat unprecedented in the extent that we don't have a

25  ruling yet -- right? -- from a Court that it is price fixing.

1    So they've gone ahead and banned it.  And maybe that's okay.

2    Maybe that's okay.  As they said, they don't want to wait.  But

3    I -- but I think they've made a colorable showing that it's

4    speech and that it's not commercial speech under *Bolger*.

5         And so the question is, then, is it price fixing?  And I

6    don't know.  That has not been fleshed out enough.  I don't

7    even actually know exactly what the software does.  And so --

8    but I don't think I have evidence in front of me that it's

9    changed, as was represented, but I'm sure they could do that.

10        In that case then -- I mean, I'm just saying, it would be

11   unreasonable, Mr. Peters, in this context, on April 25th, for

12   Berkeley then to start enforcing that statute until I've -- you

13   know --

14             **MR. PETERS:**  I hear --

15             **THE COURT:**  Until I've had the chance to do the

16   preliminary injunction, I guess, is what I'm saying.

17             **MR. PETERS:**  I hear that, Your Honor.  I just don't

18   have the authority to speak for the council.  And I can't call

19   one of them under the Brown Act --

20             **THE COURT:**  Oh, no, no, no.  I understand.

21             **MR. PETERS:**  So -- so I'm not -- I'm not ducking the

22   Court's question.  I'm just saying, with all sincerity, I just

23   can't answer that now.  I understand --

24             **THE COURT:**  Okay.  All right.  Well --

25             **MR. PETERS:**  -- where the Court is coming from.

1    But I do think that, you know, having RealPage now file a

2    one-page declaration to try and solve this factual problem --

3    **THE COURT:** It's not solved. It's not solved.

4    **MR. PETERS:** That doesn't sound like a good way to

5    solve the problem either.

6    **THE COURT:** Oh, it doesn't solve it. It's the first

7    step to getting us then to that preliminary injunction briefing

8    and discovery. No. No. Right? It's -- I agree with you, on

9    the record now, they haven't said anything. That it's

10   insufficient. But if I had -- and I'm sure Mr. Srinivasan

11   wouldn't tell me something that's not true -- but I can't just

12   accept attorney argument. I need something in the record.

13   And, in that case then, I think I'd be inclined to do the

14   TRO, just until the preliminary injunction and Berkeley has had

15   the opportunity to thoroughly explore the -- actually how the

16   software works and I get full-blown briefing on the antitrust

17   question.

18   **MR. KANIG:** Your Honor, on that point, if I may, it's

19   their burden to show that they are engaging in lawful speech.

20   They made a choice to bring an affirmative action challenging a

21   validly enacted ordinance. And they've made no showing on this

22   record that their speech is lawful.

23   They didn't contest any of the evidence that Berkeley put

24   into the record -- statements from their own executives

25   admitting that their software is anticompetitive, evidence from

```
 1   Berkeley itself showing that it's resulted in anticompetitive
 2   harm --
 3           THE COURT:  Yes.  And what software -- what version of
 4   the software was it?
 5           MR. KANIG:  There's absolutely no evidence in the
 6   record about that, Your Honor.
 7           THE COURT:  Exactly.  That's what I said.  But if
 8   it --
 9           MR. PETERS:  But it's their burden, Your Honor.
10           THE COURT:  I understand --
11           MR. PETERS:  It's their burden to show likelihood of
12   success --
13           MS. LINSLEY:  If I could just --
14                   (Indiscernible cross-talk.)
15           THE COURT REPORTER:  I'm sorry.  Excuse me.
16           THE COURT:  Yeah.
17      I'm just keeping the record open.  I understand you
18   disagree with that.  That's fine.  I actually just want to do
19   something that's fair and correct.  That's all.
20           MR. KANIG:  Well, and --
21           THE COURT:  That's all I want to do.  And I don't
22   see -- I don't see any immediate injury in -- if, in fact, the
23   software has changed in some way, that may be material -- I
24   don't know -- I don't know -- it hasn't been looked at yet --
25   then I don't know why --
```

1           **MR. KANIG:**  Well, Your Honor, I think it has been --

2    it has been looked at.

3           **THE COURT:**  By?

4           **MR. KANIG:**  By the MDL judge who ruled that if the

5    plaintiffs prove their allegations, it's a rule of reason

6    antitrust violation.

7           **THE COURT:**  Yes, but based on the software that was

8    alleged in that complaint.

9           **MR. SRINIVASAN:**  So, Your Honor, if I -- that's

10   correct, Your Honor.  You're 100 percent right.  But I would

11   just -- number one, this idea that this is not -- this is

12   somehow our burden -- under *Meinecke v. Seattle*, it is their

13   burden to show that the ordinance doesn't infringe free speech.

14      Now, there's an exception -- it sounds like Your Honor's

15   saying there's an exception if there's illegal speech.

16          **THE COURT:**  No, no, I'm not.  I'm saying something

17   different.

18          **MR. SRINIVASAN:**  Okay.

19          **THE COURT:**  And this is a question, too, that no one

20   really addressed, but which I think is important.  The question

21   is, whose burden -- it's your burden to show it's protected

22   free speech in the first place; correct?  And we know that an

23   antitrust violation is not protected free speech.

24      So the question is, is it your burden to show it's not an

25   antitrust violation or is it Berkeley's?  Frankly, if it was an

1  enforcement action, it would probably be Berkeley's.  But this

2  is your action to enjoin the statute, so I actually think it's

3  your burden in this context.  That's where I'm coming out --

4          **MS. LINSLEY:**  We could --

5          **THE COURT:**  -- without any help.

6          **MR. SRINIVASAN:**  Maybe we'll brief that, Your Honor.

7  But it is -- it does seem rather draconian that we are

8  litigating a case, in our view winning a case, to show

9  something is not anticompetitive --

10         **THE COURT:**  Please -- please -- you know,

11 Mr. Srinivasan, that is not helpful.  Why do you say that?  Do

12 you think I'm actually now going to go write an order that

13 says, "Because RealPage thinks it's winning its case in the

14 MDL, I'm going to rule in their favor."  It doesn't persuade me

15 one way or the other.  Every lawyer thinks their case is

16 winning.

17         **MR. SRINIVASAN:**  It's --

18         **THE COURT:**  At least that's what they're going to

19 publicly say.  Okay?

20         **MR. SRINIVASAN:**  Fair enough, Your Honor.  But even if

21 we're losing the case, we have -- we -- nobody has deemed what

22 our speech is to be anticompetitive.  They're contending

23 somebody somewhere else in the world is accusing us of that.

24 But nobody has said that we have.  And that's, again, the prior

25 iteration of --

1           THE COURT:  Well, that's not true.  No court has said
2      that you have.
3           MR. SRINIVASAN:  Fair enough.
4           THE COURT:  Many people -- many people have said you
5      have, including the Department of Justice and 11 or 18 attorney
6      generals of states.  So it's not just -- we're not even talking
7      about one private plaintiff here.  We're talking about the
8      United States Government has said that you have.  So --
9           MR. SRINIVASAN:  Fair enough, Your Honor.  Fair
10     enough.  But my point --
11          MS. LINSLEY:  If I could --
12          MR. SRINIVASAN:  Yeah.  It just seems like things
13     are -- anyway, I'll withdraw my comment and defer to --
14          THE COURT:  Okay.
15          MS. LINSLEY:  I was only going to say, Your Honor,
16     that we think we can put in additional confirmation of the
17     change in the software from that prior version that was at
18     issue -- or that has been at issue -- in the other cases.  We
19     can confirm that.
20          We -- I do think that the passage that Mr. Peters was
21     reading from in paragraph 3 of the complaint and in the
22     declaration says that.  You just have to read it for what it
23     says.  And it's -- I admit, it is a short version.  And we can
24     certainly provide a more detailed version.
25          But it says revenue management software, which is the only

1   software that's at issue here, evaluate internal supply and

2   demand from the subject property -- that's the customer -- from

3   the subject property along with publicly available rent data

4   from other properties to generate personal price

5   recommendations that align with the customer's unique asset

6   strategy.

7        In other words, it's using Company A's internal --

8            **THE COURT:**  No, I understand.  I understand.

9            **MS. LINSLEY:**  Okay.

10           **THE COURT:**  We'll have to --

11           **MS. LINSLEY:**  So we can elaborate on that.

12           **THE COURT:**  And nobody said anywhere that this is

13  different from --

14           **MS. LINSLEY:**  Right.

15           **THE COURT:**  -- from what was at issue in the MDL.

16           **MS. LINSLEY:**  And --

17           **THE COURT:**  That wasn't even hinted at in RealPage's

18  papers.  So --

19           **MS. LINSLEY:**  Exactly.  So we can clarify that, Your

20  Honor, in a submission that we can do very promptly.

21           **THE COURT:**  I mean, so let's see what they say, and

22  then I'll take the TRO under submission.  Regardless, we'll set

23  a briefing schedule on preliminary injunction.  I'll let you

24  guys work it out.  And there will have to be discovery.

25  Berkeley will have to be able to take discovery on the software

1   and how it works.

2       **MR. KANIG:**  Your Honor, I guess I just don't

3   understand the burden issue then.  Because it seems like you

4   are agreeing with us that it is their burden to show a

5   colorable First Amendment violation and that -- on a TRO -- and

6   that they haven't done so.  And that the only irreparable

7   injury that flows from their papers is a First Amendment

8   violation.

9       There's no basis to grant a TRO, especially in light of

10  the fact that there is ongoing and serious harm to Berkeley

11  residents that has gone -- that evidence has gone uncontested

12  in the papers.  The balance of the equities and the public

13  interest strongly and decisively --

14      **THE COURT:**  Mr. Kanig, your whole brief was based on

15  the MDL, that order which I read, and the software that was

16  alleged there.

17      **MR. KANIG:**  Well, it's also based on the evidence that

18  we put in, Your Honor.

19      **THE COURT:**  Well, I understand.  But I actually

20  think -- I disagree with you on the first two points.  And so

21  the antitrust violation, to me, becomes of primary importance.

22  And --

23      **MR. KANIG:**  I --

24      **THE COURT:**  -- if the argument and the MDL is based on

25  a version of software, which is, they say, materially

1  different, then I don't think -- then I think that makes a

2  difference.  And, again, it's --

3          MR. KANIG:  I guess --

4          THE COURT:  -- the colorable claim.  I understand --

5          MR. KANIG:  I guess I just don't understand --

6          THE COURT:  -- you don't agree.

7          MR. KANIG:  I guess I just don't understand why the

8  other actions are proceeding then; right?  Why is the DOJ

9  enforcement action proceeding?  Why is the MDL proceeding?  I

10  don't think -- I think it's because they're not giving you the

11  full picture here.  I mean, this is a -- this is --

12          THE COURT:  That's exactly what I want to get, is the

13  full picture.

14          MR. KANIG:  Can I suggest then, Your Honor, that the

15  appropriate course of action is to deny the TRO, allow us to

16  take discovery on this issue in the context of a preliminary

17  injunction motion --

18          THE COURT:  Mm-hm.

19          MR. KANIG:  -- and then proceed from there?  Because I

20  think, procedurally, that's the correct way to proceed, given

21  the fact that they failed to meet their burden here.

22          THE COURT:  Mm-hm.  And, in the meantime, Berkeley can

23  enforce and we can do -- have -- if it turns out to be a First

24  Amendment violation, because we don't know what this software

25  does -- they can go ahead and enforce, even though the DOJ, the

1    MDL plaintiffs -- all them -- none of them moved to enjoin that

2    software anywhere in the country.

3        That's it.  That's all we're talking about.  That's what

4    you're talking about.  That you want them to be able, you know,

5    30 days after it was passed, to go in and impose penalties.  I

6    hear you.  Okay.  That's fine.

7            **MS. EILAND:**  Your Honor --

8            **THE COURT:**  I'm going to -- yes.

9            **MS. EILAND:**  Your Honor, if I may jump in?  Just --

10   obviously we can't say anything, you know, on the record here.

11   But we could recommend to counsel, you know, possibly to allow

12   us to postpone enforcement.  That is potentially one option, as

13   well, if all the Court needs is more time to make the decision.

14   You now --

15           **THE COURT:**  Well, what I need is a more robust record;

16   right?

17           **MS. EILAND:**  Right.

18           **THE COURT:**  So I need --

19           **MS. EILAND:**  Right.

20           **THE COURT:**  I need full-blown preliminary injunction

21   briefing on a factual record that's been explored and so we

22   actually know what the software does.

23           **MR. KANIG:**  And --

24           **THE COURT:**  And maybe when I see all that, I would --

25   you know, this is all -- I'd say, oh, actually, that its speech

1    is not a colorable claim anymore; right?  I don't know.  I have

2    very little here as to how it actually works.  I'd have a

3    factual record on how it works, and then I would apply the

4    First Amendment law to it, which, in this unique case, also

5    includes the antitrust laws.

6         And so, yes, I think, actually, that would make tremendous

7    sense to just stay enforcement pending resolution of a

8    preliminary injunction.  I mean, it just makes enormous sense,

9    given the complexity, the unique issues here.  That's all.  I'm

10   not talking about -- that's what I'm talking about.

11            MS. LINSLEY:  If I could speak, Your Honor, just to

12   this remedies issue?  We would ask the Court to issue a TRO,

13   either today or upon this further showing that we've been

14   talking about, just -- because that's exactly our concern, is

15   that the City of Berkeley had the opportunity -- in fact, told

16   the Court and us last week -- that that's what they were going

17   to be considering Monday and Tuesday of this week.

18        And they did not take that action.  That was fully on the

19   table that they could have extended the effective date of the

20   ordinance.  They could have done any number of other things,

21   but they chose not to do that.  We would like to have the

22   threat of enforcement of this ordinance taken away while the

23   preliminary injunction is litigated --

24            THE COURT:  No, I understand.  I understand.

25            MS. LINSLEY:  -- on an expedited basis.

1        **THE COURT:**  I understand.

2        **MS. LINSLEY:**  I do think we've made the showing for

3    that, because I think a colorable claim includes showing that

4    the software, as currently constituted, doesn't use public --

5    nonpublic information.

6        **THE COURT:**  Okay.  Ms. Linsley, I disagree with you on

7    that last point, as I think we've said.  But I would allow you

8    to submit a declaration.  And it should be pretty detailed.

9    And then the City can respond any way they want.  And if --

10   yes, Ms. --

11       **MS. EILAND:**  Would it be okay --

12       **THE COURT:**  Is it Eiland or Eiland?

13       **MS. EILAND:**  It's Eiland.

14       **THE COURT:**  Eiland.

15       **MS. EILAND:**  -- just to make one final point?  I just

16   wanted to reorient.  You know, a question that I've been having

17   in hearing this is, you know, I don't think that whether the

18   sort of version of the software that's at issue here is as

19   critical as this conversation has led us to believe.

20       I think, you know, one important thing about the

21   software -- or about the ordinance -- is that it only bans

22   direct or indirect coordination among landlords.  So if it's

23   true that the software -- all the software does is it's

24   completely siloed, and the information just goes to the

25   individual landlord and back to the individual landlord with no

```
 1   coordination involved among any other landlords, then it

 2   wouldn't violate the ordinance.  And so --

 3           THE COURT:  Okay.  Then why did they talk about

 4   RealPage throughout the legislative history?  Berkeley actually

 5   thinks that RealPage's software violates it.  But if what

 6   you're saying is, if they can show us that, then we'll change

 7   it, all that's fine.  But as the ordinance stands, Berkeley has

 8   made it very clear that it believes its ordinance applies to

 9   RealPage's software; correct?

10           MS. EILAND:  Well, I -- I think that that -- those

11   findings were based on the fact that this kind of

12   anticompetitive conduct is unlawful.  And if they're saying we

13   don't have any direct or indirect coordination involved in this

14   software, then there would be no reason to enforce against

15   RealPage.

16       We might -- there might be other companies.  The ordinance

17   wasn't limited to RealPage.  And so there might be other

18   companies that engage in this kind of conduct.  And the

19   ordinance would target those -- those companies.

20       But, here, if RealPage is saying there's no -- it's just

21   completely siloed, then -- then here are the -- the problem

22   isn't, you know, the ordinance; right?  The ordinance wouldn't

23   apply to them.  There's no threat of enforcement if they're

24   saying that there's no direct or indirect coordination among

25   landlords.
```

1          THE COURT:  And what?

2          MS. EILAND:  And that's required to violate the

3    statute.  And I think that's something that was really unclear

4    in RealPage's papers.  And it's really important for the Court

5    to understand that if you read the ordinance, it's very clear

6    that it's -- it requires the direct or indirect coordination.

7          And so if the algorithm is not set up to provide that kind

8    of coordination, then it wouldn't violate the ordinance in the

9    first instance.

10         MS. LINSLEY:  But it's --

11         THE COURT:  And what does that mean -- the

12   "coordination"?

13         MR. KANIG:  "Coordination" refers to the classic

14   concepts in antitrust law and unfair competition law.  Direct

15   coordination is collusion between competitors.  Indirect

16   coordination would plainly encompass the type of hub-and-spoke

17   conspiracy that the Department of Justice has alleged in their

18   enforcement action.

19         MS. LINSLEY:  But the difficulty with that is if you

20   combine that concept with the definition of the competitor data

21   that is --

22         MR. KANIG:  Well --

23         MS. LINSLEY:  -- prohibited -- no, let me finish,

24   please -- the competitor data that is prohibited specifically

25   says information that is -- comes from a source other than

1  another person that competes in the same market.  So it

2  literally could be a market newsletter that gets circulated to

3  a bunch of competitors on a market.  So --

4       **THE COURT:**  I'm not -- I don't know about that.  But,

5  anyway, that's not what RealPage does or intends to do or is

6  asking.

7       **MS. LINSLEY:**  Yes.  But if what -- yeah.  But that's

8  why we're -- we're sort of going around in circles with what

9  Ms. Eiland said, is that it presupposes that the current

10 operation of the software is committing an antitrust violation.

11 So it presupposes that.  And that is what we're saying is not

12 true in the current version of the software or, frankly, in the

13 past version.  But we don't want -- we don't need to fight the

14 past version here.

15      **MR. KANIG:**  Your Honor --

16      **MS. LINSLEY:**  The current version of the software

17 doesn't use the nonpublic information of any kind.  It's

18 literally a --

19      **THE COURT:**  Okay.  But let's not go in circles.

20      **MS. LINSLEY:**  Okay.  I won't go in circles.

21      **THE COURT:**  Does anybody have anything new to say?

22      **MR. KANIG:**  Just one point, Your Honor.

23     I feel like I need to respond to this idea that the

24 example that they're providing -- you know, the example

25 provided and the definition of coordinated pricing algorithm

1    includes more than direct or indirect coordination.  Because

2    what Ms. Eiland said is exactly correct.

3        They're omitting the phrase "indirect" or "indirect

4    coordination" with one or more competitors from the definition.

5    They're pointing to the example that follows to say that, well,

6    that example doesn't include coordination, so nobody knows

7    what's going on here.  There's this big First Amendment

8    problem.

9        That's not true.  They are writing the word "through" out

10   of the example; right?  It says, "Indirect or indirect

11   coordination with one or more competitors, including through a

12   third-party vendor."

13       That imports -- that incorporates, directly, the concept

14   of coordination from the prior clause under basic canons of

15   interpretation of statutory text.  RealPage has been misreading

16   this definition the entire time.  And that's why they think

17   this is overbroad and includes all these things that would

18   constitute a colorable First Amendment violation.  That simply

19   is a misread of the definition --

20           THE COURT:  Okay.  That's not what -- and I didn't --

21   I told you, I didn't buy that overbreadth argument, because

22   what we're talking about is their software and whether they can

23   sell their software.  And --

24           MR. KANIG:  Fair enough.

25           THE COURT:  And Ms. Eiland is saying, hey, if their

```
1   software does what Mr. Srinivasan says it does, then it won't
2   violate, then maybe there's a way of you working it out; right?
3   And the question is -- then we'd have to say, is there a threat
4   of enforcement?  I don't know.
5        But -- so the next step will be that RealPage can file a
6   supplemental declaration.  What is today?  Wednesday?  Can you
7   do it by tomorrow?  Because I want it to be detailed.
8            MR. SRINIVASAN:  Your Honor, I don't --
9            THE COURT:  Do you want Friday?
10           MR. SRINIVASAN:  If we can get it by -- yeah -- I
11  think Friday would give us some buffer, you know, for --
12           THE COURT:  Okay, that's fine.
13           MR. SRINIVASAN:  Yeah.
14           THE COURT:  Just because you were the ones that filed
15  the TRO.  And then --
16           MS. LINSLEY:  The enforcement date is the 24th.
17           THE COURT:  Well, I understand, but -- I'm sorry.
18           MS. LINSLEY:  No, no, no.  I'm not saying --
19           MR. SRINIVASAN:  We'll try to get it --
20                  (Indiscernible cross-talk.)
21           MS. LINSLEY:  I'm not -- so Friday's the 18th.  And
22  then the next Thursday is the 24th.
23           THE COURT:  Yeah.  Well, I don't -- I would be
24  surprised if, on the 24th, they're going to be making any
25  noises about enforcement.  I would be surprised.  That's just
```

```
 1   not how cities work.  That's just not how they work.
 2        And then I'll give Berkeley the opportunity to say
 3   something, if you want, in response to their declaration.
 4             MR. KANIG:  We would love the opportunity to respond
 5   to that declaration, Your Honor.
 6             THE COURT:  So if it came Friday, then by Tuesday at
 7   noon?  Is that good?  Or do you want -- Tuesday at noon?
 8             MR. PETERS:  End of the day Tuesday -- 5:00 o'clock
 9   Tuesday would be better.
10             THE COURT:  Okay.
11             MS. LINSLEY:  Well, that just gives two days --
12   honestly, I'm still concerned about the 24th.  That doesn't
13   give much time.
14             THE COURT:  Because what's going to happen?
15             MS. LINSLEY:  I don't know.
16             THE COURT:  What's going to happen?  What's going to
17   happen that gives you so -- concern?
18             MS. LINSLEY:  I've just done a lot of these.  And I
19   worry about penalties racking up.
20             THE COURT:  And what is it?  $1,000 a day?
21             MS. LINSLEY:  Per violation.  So it --
22             THE COURT:  Yeah.  And how much are -- I'm not going
23   to -- this is a rhetorical question, but how much are they
24   paying you an hour, Ms. Linsley?  Okay.  I'm actually not that
25   concerned about it.  All right?
```

1        **MS. LINSLEY:**  No.  But it affects business too.  It

2   affects --

3        **THE COURT:**  That's not irreparable harm.  That's not

4   irreparable harm.

5        **MS. LINSLEY:**  I mean --

6        **THE COURT:**  And you didn't argue it, because you

7   can't.  Because that's money.  And you can be -- and your

8   client can be compensated for money damages; right?  So that's

9   why it was the First Amendment violation.  But, of course, your

10  client's First Amendment rights won't be violated if they just

11  continue to sell it.  You believe very strongly -- your client

12  does -- that it's lawful.  Okay.  So, I mean, I'm just being

13  real as to what's going on here.

14       My preference -- so that everybody knows -- and they can

15  go back and tell their clients -- my preference would be for

16  Berkeley to say, we're not going to, like, start doing

17  penalties or enforcing this, at least until the Judge has the

18  opportunity to decide a preliminary injunction on a complete

19  record.  That would be my preference.

20       I think that's what makes sense in this context.  That's

21  what I would hope for.  But I understand I may not get my

22  preference, in which case then I will rule after the

23  supplemental submissions are in.

24       **MR. PETERS:**  We hear you loud and clear.  I can't make

25  a response to that, nor can Ms. Eiland, but we hear the Court.

1          **THE COURT:**  I completely understand.  Okay.

2          **MR. SRINIVASAN:**  We appreciate that, Your Honor.

3          **THE COURT:**  Yeah.  All right.  Super helpful, good

4    argument.  Really interesting, cutting-edge issues.  I will not

5    be the last word on that.  That's oh-so comforting to me.

6        Okay.  Have a good day.

7          **ALL:**  Thank you, Your Honor.

8              (Proceedings adjourned at 12:39 p.m.)

9                    ---oOo---

1

2

3                    __CERTIFICATE OF REPORTER__

4          I certify that the foregoing is a correct transcript

5    from the record of proceedings in the above-entitled matter.

6

7    DATE:   Thursday, April 17, 2025

8

9

10    _____

11              Kendra A. Steppler, RPR, CRR

12          Official Reporter, U.S. District Court

13

14

15

16

17

18

19

20

21

22

23

24

25