KEKER, VAN NEST & PETERS LLP
ELLIOT R. PETERS - # 158708
epeters@keker.com
SHARIF E. JACOB - #257546
sjacob@keker.com
IAN KANIG - # 295623
ikanig@keker.com
CARA R. MEYER - # 348877
cmeyer@keker.com
KAYLA CROWELL - # 349061
kcrowell@keker.com
633 Battery Street
San Francisco, CA 94111-1809
Telephone:     (415) 391-5400
Facsimile:     (415) 397-7188

Attorneys for Defendants THE CITY OF BERKELEY, CALIFORNIA, and PAUL BUDDENHAGEN

BERKELEY CITY ATTORNEY'S OFFICE
FARIMAH F. BROWN - # 201227
City Attorney
KATRINA L. EILAND - # 275701
Deputy City Attorney
keiland@berkeleyca.gov
STEPHEN A. HYLAS - # 319833
Deputy City Attorney
shylas@berkeleyca.gov
2180 Milvia Street, Fourth Floor
Berkeley, CA 94704
Telephone: (510) 981-6998
Facsimile: (510) 981-6960

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| REALPAGE, INC., <br><br> Plaintiff, <br><br> v. <br><br> THE CITY OF BERKELEY, CALIFORNIA, and PAUL BUDDENHAGEN, CITY MANAGER OF BERKELEY, CALIFORNIA, in his official capacity, <br><br> Defendants. | Case No. 3:25-cv-03004-JSC <br><br> **DEFENDANTS' RESPONSE TO PLAINTIFF'S SUPPLEMENTAL DECLARATION IN SUPPORT OF MOTION FOR TEMPORARY RESTRAINING ORDER** <br><br> Date:     April 16, 2025 <br> Time:     11:30 a.m. <br> Dept.:     8—19th Floor (via Zoom) <br> Judge:     Hon. Jacqueline Scott Corley <br><br> Date Filed: April 2, 2025 <br><br> Trial Date:  Not Set |

I.     INTRODUCTION

RealPage's supplemental submission, for the first time, seeks to convince the Court that it does not violate Berkeley's Ordinance as written. Berkeley's Ordinance proscribes the sale and use of software that allows for "direct or indirect coordination" among landlords in setting prices. RealPage now contends that its software does not facilitate such coordination, in effect seeking a preliminary ruling that its software likely does not constitute anticompetitive conduct. But even if that were true, it would not establish that the Ordinance is likely unconstitutional. It would also mean that the Ordinance does not cover RealPage, undermining its entitlement to an order restraining the law. In any event, the City has agreed to temporarily stay enforcement, leaving no doubt that RealPage will face no irreparable injury while the parties brief and the Court rules on a preliminary injunction motion.

First, the Ordinance's constitutionality turns on what the Ordinance prohibits, not on whether RealPage's allegedly new software formula violates it. Of course, if RealPage's software constitutes an antitrust violation, it would be sufficient to show both its liability under the Ordinance and that any speech lacks First Amendment protection. But finding liability is not *necessary* to reject RealPage's pre-enforcement challenge to the Ordinance as unconstitutional. Instead, in this posture, RealPage must initially show that *the Ordinance* targets speech protected by the First Amendment. It cannot do so. The Ordinance prohibits the sale and use of products that facilitate unlawful anticompetitive conduct. As such, any associated speech would not be entitled to constitutional scrutiny.

Second, if RealPage's software does not facilitate such direct or indirect pricing coordination, as it contends, *see* Dreyfuss Supp. Decl. ¶ 14, it would fall outside the Ordinance's scope and would face no risk of irreparable harm from an inapplicable law. RealPage's statements that it does not intend to engage in the proscribed conduct are fatal to a claim of pre-enforcement standing.

Third, even if the nature of RealPage's software were necessary to resolve, it has failed to meet its burden of showing its software no longer enables unlawful coordination. Its submission claims that the product offered in Berkeley is brand new, involves no non-public data, seeks to

lower rents, and therefore does not embody an antitrust violation. Because these late-breaking factual allegations, which appeared nowhere in RealPage's Complaint, TRO application, TRO Reply, or at oral argument, are contradicted by numerous other facts, discussed below, RealPage would still fail to carry its burden of likelihood of success.

Finally, as RealPage is aware, Berkeley has offered, and hereby formally declares, that it will voluntarily stay enforcement of the ordinance against RealPage to allow the parties to litigate and this Court to resolve, in an orderly fashion and on a suitable record, any application for a preliminary injunction. *See* Declaration of Farimah Brown ¶ 6 ("Brown Decl."). This voluntary stay will maintain the status quo and leave no doubt that RealPage faces no risk of irreparable harm in the interim. For each of the foregoing reasons, and for all of them, this Court should deny RealPage's TRO application.

## II.     BACKGROUND

### A.     Procedural History

On April 3, 2025, Plaintiff RealPage, Inc. ("RealPage") filed a motion for a temporary restraining order against the City of Berkeley's Ordinance prohibiting algorithms that allow landlords to directly or indirectly coordinate rental rates. Its motion asserted that its First Amendment rights would be burdened because, it claimed, the Ordinance prohibited the mere lawful sharing of pricing information and recommendations via algorithm and thereby targeted core expressive speech without narrow tailoring to Berkeley's interests. *See* ECF No. 12. The City argued that RealPage had attempted to rewrite the Ordinance and had omitted key language that properly limits its scope to preventing the sale and use of software that allows for "direct or indirect coordination" among landlords in setting prices—that is, to price coordination via algorithm. *See* ECF No. 30.

During the April 16, 2025 hearing on its motion, RealPage represented to the Court for the first time that it had recently changed its product to bring it into compliance with a similar ordinance passed by San Francisco. *See* TRO Hearing Tr. at 18:3–7 ("The company has changed the way in which the software operates in response though, among other reasons, to the San Francisco ordinance that was enacted back in October.").

Following the hearing, counsel for the City of Berkeley requested a demonstration of RealPage's software and an opportunity to ask questions about the alleged changes to RealPage's product. Brown Decl. ¶ 5. RealPage declined to provide a demonstration in advance of the submission deadline for this supplemental brief. *Id.* RealPage does not make its revenue management software programs available to the public. As a result, RealPage has effectively prevented the City of Berkeley from conducting any analysis to test the representations in the declaration. Nonetheless, the City committed to staying enforcement of the Ordinance against RealPage until the Court can resolve a motion for a preliminary injunction or for 60 days, if no motion for a preliminary injunction is filed within that time. *Id.* ¶ 6. This voluntary stay eliminates the possibility of any harm to RealPage and negates RealPage's claimed need for a TRO.

### B. RealPage's Supplemental Declaration

On April 18, 2025, RealPage filed a five-page Supplemental Declaration of Amy Dreyfuss ("Supp. Dreyfuss Decl.") purporting to show how RealPage's product has changed since the filing of numerous class actions and lawsuits by the Department of Justice and state attorneys general alleging that RealPage's software violates federal antitrust laws. The supplemental declaration states that after the end of 2024, RealPage did not use non-public lease transaction data to recommend rents through YieldStar, one of the two revenue management software products RealPage currently offers in Berkeley. Supp. Dreyfus Decl. ¶ 8. However, RealPage concedes that one of its core products, AI Revenue Management ("AIRM"), allows Berkeley residents to use artificial intelligence trained on "non-public lease transaction data" to obtain recommended rents.[1] *Id.* ¶ 11.

There are ample reasons for the Court to look skeptically on the representations in the

---

[1] According to RealPage, its AIRM program offers additional features: AI Supply I, AI Supply II, and AI Demand "to fine tune certain components of the supply-and-demand forecasting." *Id.* ¶ 11. This AI was "last trained between 2022 and 2024" on "non-public lease transaction data" before the date RealPage alleges it "fully transitioned away from using actual lease transaction rent data as an input in its revenue management products." *Id.* ¶¶ 8, 11. RealPage states that this data is not used "in the software's runtime operations," *id.* ¶ 11, but presents no evidence that its AIRM product is not still using the non-public competitor data it was trained on to recommend rents to other landlords.

declaration. RealPage's declaration is replete with examples of how its algorithm allegedly lowers rents. *Id.* ¶¶ 8–9. While RealPage seeks to leave the Court with the impression that its model frequently recommends lower rents to landlords, RealPage to this very day tells landlords precisely the opposite. RealPage's website advertises that using its software will allow landlords to "maximize their revenue potential" and outperform the market by "2–4%."[2] The supplemental declaration also omits mention of facts that are crucial to understanding whether RealPage's software facilitates anticompetitive coordination between landlords. For instance, the supplemental declaration states that customers "retain complete discretion . . . to accept or reject any rent recommendations," *see id.* ¶ 10, but includes no discussion of the role of RealPage's pricing advisors, who enforce adherence to RealPage's pricing recommendations. *See In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 496 (M.D. Tenn. 2023). RealPage's declaration failed to disclose that it has maintained a "multi-layered monitoring system," including "pricing advisors or revenue managers, employed by RealPage, who closely monitor clients' conformance with RealPage's pricing recommendations, including through reviewing client pricing recommendations daily and issuing weekly reports." *Id.* RealPage also failed to disclose that AIRM and YieldStar have employed "auto-accept" functions that push landlords to accept its recommended rents. *See* ECF No. 30-2 ¶¶ 61–68 ("DOJ Amended Complaint"). It does not assert that its product no longer contains these anticompetitive features.

Finally, RealPage seeks to leave the Court with the impression that YieldStar is its primary product, and the artificial intelligence features of AIRM are rarely used. But RealPage failed to disclose to the Court that it had (and may still have) plans to sunset YieldStar and replace it entirely with the AI-driven approach of AIRM. *See id.* ¶¶ 14, 173.

---

[2] https://www.realpage.com/asset-optimization/revenue-management.

**III.     DISCUSSION**

     **A.     Likelihood of Success on the Merits**

          **1.     The Ordinance's Prohibition on Coordination Between Landlords Merely Prohibits Unlawful Price-Fixing.**

As RealPage now seems to acknowledge, the Ordinance prohibits only those algorithms that facilitate pricing coordination between landlords. The Ordinance proscribes only (1) "analytical or computation processes"; (2) "that use data to recommend or predict the price of consumer goods or services"; (3) "in direct or indirect coordination with one or more competitors." Ordinance § 13.63.020(A). That is the very definition of price-fixing, which lies at the heart of the Sherman Act. *See Catalano, Inc. v. Target Sales, Inc.*, 446 U.S. 643, 647 (1980). It is irrelevant that the actor uses a computer to facilitate volume price fixing—as former Deputy U.S. Attorney General Lisa Monaco put it, "training a machine to break the law is still breaking the law."[3] For example, airlines in the 1990s used software to facilitate price fixing. *See, e.g.*, *United States v. Airline Tariff Pub. Co.*, 836 F. Supp. 9, 10 (D.D.C. 1993) (analyzing settlement agreement in antitrust action against airlines); *see also Duffy v. Yardi Sys., Inc.*, No. 2:23-CV-01391-RSL, 2024 WL 4980771, at *7 (W.D. Wash. Dec. 4, 2024); *Meyer v. Kalanick*, 174 F. Supp. 3d 817, 822–24 (S.D.N.Y. 2016). It is also irrelevant whether the actors use nonpublic or public data, so long as there is an agreement with intent to coordinate. *See In re Citric Acid Litig.*, 191 F.3d 1090, 1103 (9th Cir. 1999) (possession of competitor information, public or not, is consistent with conspiracy but does not *alone* establish it); *Flannery Assocs. LLC v. Barnes Fam. Ranch Assocs., LLC*, 727 F. Supp. 3d 895, 912–13 (E.D. Cal. 2024) ("[T]he exchange of information may be considered a plus factor that supports a finding of conspiracy." (citation omitted)). The core conduct prohibited by the ordinance is a *per se* price fixing antitrust violation.[4]

Judge Lasnik of the Western District of Washington has held that a revenue management

---

[3] ECF No. 30-4, Kanig Decl., Ex. 3—U.S. DOJ, "Justice Department Sues RealPage for Algorithmic Pricing Scheme that Harms Millions of American Renters," Aug. 23, 2024, tinyurl.com/5hapwd5p.

[4] Even so, the fact that the Ordinance may also reach more complex price-fixing conspiracies prohibited by the Rule of Reason does not lessen the illegality of that conduct, which would likewise fall outside First Amendment protection.

software that uses an algorithm to recommend rents to landlords is a *per se* violation of the Sherman Act. *See Duffy*, 2024 WL 4980771, at *7. Judge Lasnik found that the software provider and the landlords signed the software agreements with the "*intent* to participate in a concerted scheme to *raise*, fix, or peg multifamily housing *rental prices*." *Id.* (emphasis added). Judge Lasnik relied in part on the software provider's ads to discern the conspirators' intent, *id.* at *3, and found persuasive the evidence that prices would go up regardless of occupancy, *id.* at *4. The Ordinance targets the very conduct that the *Duffy* court held was a *per se* antitrust violation. Therefore, prohibiting speech, if any, that falls within the scope of the Ordinance cannot be a First Amendment violation. *See, e.g.*, *Pittsburgh Press Co. v. Pittsburgh Comm'n on Hum. Rels.*, 413 U.S. 376, 388–89 (1973); *Int'l Franchise Ass'n, Inc. v. City of Seattle*, 803 F.3d at 408; *see also Arcara v. Cloud Books, Inc.*, 478 U.S. 697, 705 (1986) (rejecting the "fallacy" of "seeking to use the First Amendment as a cloak for obviously unlawful" activity by "attributing protected expressive attributes to that conduct").

    **2.    RealPage Cannot Show a Likelihood of Success on its First Amendment Claim Because the Ordinance Applies Only to Algorithms that Facilitate Direct or Indirect Coordination Between Competitors.**

RealPage's supplemental declaration confirms that it has not shown that the Ordinance's prohibited conduct is entitled to First Amendment protection, which is a necessary condition to establish a colorable claim. Because RealPage mounts an affirmative challenge, it is RealPage's burden to show that it has a colorable claim that the Ordinance violates its First Amendment rights.[5] *E.g.*, *Smith v. Helzer*, 95 F.4th 1207, 1214 (9th Cir.), *cert. denied sub nom. Smith v. Stillie*, 145 S. Ct. 567 (2024); *B & L Prods., Inc. v. Newsom*, 104 F.4th 108, 112 (9th Cir. 2024)

---

[5] In disputing its burden, RealPage ignores that different burdens apply to an affirmative motion for a TRO and an enforcement action. RealPage relies on inapposite cases where the government was enforcing a law against a private party. *See Illinois, ex rel. Madigan v. Telemktg. Assocs., Inc.*, 538 U.S. 600, 620 n.9 (2003) (state attorney general sued professional fundraisers for allegedly fraudulent representations); *Freedman v. Maryland*, 380 U.S. 51, 58 (1965) (appeal from conviction for exhibiting film not approved by censorship board); *Speiser v. Randall*, 357 U.S. 513, 525–26 (1958) (appellants challenged denial of tax exemption). In the posture of an affirmative facial challenge, it is the moving party that "bears the initial burden of making a colorable claim that its First Amendment rights have been infringed, or are threatened with infringement." *Smith*, 95 F.4th at 1214. Here, that includes showing that the First Amendment applies at all—i.e., that the Ordinance does more than proscribe antitrust violations that are not protected by the First Amendment. !

("As the party asserting such a claim, B&L bears the burden 'to demonstrate that the First Amendment even applies.'" (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 n.5 (1984))). If the Ordinance applies to RealPage's software, and if the Ordinance regulates speech, which the City disputes, RealPage still must establish that the Ordinance burdens *lawful* speech. Otherwise, the First Amendment does not protect it, and RealPage has no colorable First Amendment claim. *See, e.g.*, *Pittsburgh Press Co.*, 413 U.S. at 388–89.

For this reason, whether RealPage's software does or does not violate the antitrust laws is immaterial to resolving this TRO. If it does violate the antitrust laws, its speech is clearly not protected by the First Amendment. But even if RealPage's software does not violate the antitrust laws, it would still need to show that *the Ordinance* targets lawful speech—i.e., that the Ordinance covers protected speech beyond that which facilitates anticompetitive conduct. *See, e.g.*, *B & L Prods., Inc.*, 104 F.4th at 113 (examining text of challenged statutes to determine whether they restricted constitutionally protected speech). It cannot do so. As RealPage all but concedes, the Ordinance prohibits only those algorithms that use data in "direct or indirect coordination" with competitors.

The thrust of RealPage's supplementary filing is that it has redesigned its software to no longer involve any indirect or direct coordination. *See* ECF No. 42; Supp. Dreyfuss Decl. ¶¶ 8, 12, 14. Ample evidence undermines this contention, but even if RealPage's assertions are credited, its argument is self-defeating. If RealPage's software does not facilitate competitor coordination, it would fall outside the scope of the Ordinance, and RealPage would have no colorable claim that the Ordinance violates its First Amendment rights. RealPage must have standing to assert a pre-enforcement challenge, which requires RealPage to show both that (1) it intends to engage in a course of conduct arguably affected with a constitutional interest; *and* (2) that such conduct is proscribed by the Ordinance. *Nat'l Shooting Sports Found., Inc. v. Ferguson*, 722 F. Supp. 3d 1150, 1156 (E.D. Wash. 2024) (citing *Tingley v. Ferguson*, 47 F.4th 1055, 1067 (9th Cir. 2022)). If RealPage does not intend to sell software that facilitates direct or indirect coordination between landlords, it cannot satisfy the second prong because it does not intend to engage in conduct proscribed by the Ordinance. And if, conversely, it is selling

software that facilitates illegal coordination, then it cannot satisfy the first prong because its conduct is not constitutionally protected.

This TRO motion thus turns on the question: whether RealPage's planned conduct is both lawful *and* prohibited by the Ordinance. *See Lopez v. Candaele*, 630 F.3d 775, 787 (9th Cir. 2010); *Christian Action League of Minn. v. Freeman*, 31 F.4th 1068, 1072 (8th Cir. 2022) ("If the Statute doesn't prohibit [the plaintiff's] conduct, then [the plaintiff] isn't affected by the Statute and has no injury in fact."). RealPage fails to meet this burden. The present record thus precludes a colorable First Amendment claim—and therefore a TRO—in either situation: either (1) the *Ordinance* does not apply because the software does not involve indirect or direct coordination among competitors; or (2) the *First Amendment* does not apply because any associated speech would be unprotected speech in furtherance of an antitrust violation.

In short, the Court need not delve into the details of RealPage's declaration to decide this TRO. RealPage's First Amendment claim necessarily fails at the outset because it cannot show that its software is both protected by the First Amendment and proscribed by the Ordinance.

**B.     RealPage's Declaration Has Many Holes and Suggests That It May Be Facilitating Anticompetitive Conduct.**

As explained above, the Ordinance only restricts products that violate antitrust law by using algorithms that recommend prices in direct or indirect coordination with one or more competitors. *See* Ordinance § 13.63.020(A). The Court need not find that RealPage is likely violating antitrust law to determine that the Ordinance, which targets conduct prohibited by the antitrust laws, does not burden lawful speech (i.e., speech that does not further an antitrust violation).

However, even if the Court were to conclude that the Ordinance covers conduct beyond antitrust violations, and that such coverage could implicate protected speech, RealPage would still bear the burden of showing that its software does *not* violate the antitrust laws. *See B & L Prods., Inc.*, 104 F.4th at 112 (plaintiff seeking injunction bears the burden of showing "that the First Amendment even applies" (citation omitted)); *United States v. Milk*, 66 F.4th 1121, 1134 (8th Cir. 2023) (burden on challenger to show that First Amendment protected speech that potentially violated the federal obstruction-of-justice statute).

RealPage cannot meet this burden either. Even at this early stage, there is ample reason to believe that RealPage may be committing such a violation. The record is replete with evidence that RealPage and landlords contract with the intent to raise prices by using RealPage's revenue management software. As detailed above, RealPage *currently* advertises on its website that its software allows landlords to maximize rents and outperform the competitive market. *See supra* at 5. The statements from RealPage executives and landlord customers cited in the City's opposition brief, ECF No. 30 at 10–11, are additional examples manifesting intent to raise prices to supracompetitive levels.

Furthermore, by its own admission, RealPage's current products, specifically AIRM's AI features use machine-learning to generate price recommendations based on the non-public competitor data with which the algorithm was trained. *See* Supp. Dreyfuss Decl. ¶ 11.[6] While the declaration claims that raising rents, as its own software recommends, is "optional," it does not acknowledge the evidence that RealPage uses both technological features within its software and pressure from sales representatives' efforts to ensure that landlords are indeed accepting the recommended rates. *See supra* at 5. RealPage's descriptions of its products, along with the information it conspicuously omits, only underscore potential antitrust concerns rather than allaying them.

### C. Risk of Irreparable Harm

The City Attorney has committed not to enforce the Ordinance against RealPage until a motion for preliminary injunction can be resolved, or for 60 days if no motion for a preliminary injunction is filed within that time. Brown Decl. ¶ 6. This commitment eliminates any risk whatsoever of harm to RealPage in the interim period until the Court can decide a motion for preliminary injunction. Accordingly, a TRO would serve no purpose in this case. *See Nat'l Urb. League v. Ross*, 484 F. Supp. 3d 802, 805 (N.D. Cal. 2020) ("Temporary restraining orders 'serv[e] the[ ] underlying purpose of preserving the status quo and preventing irreparable harm

---

[6] RealPage's executive opines that *Gibson v. Cendyn Grp., LLC*, No. 2:23-CV-00140-MMD-DJA, 2024 WL 2060260 (D. Nev. May 8, 2024), held that "such kinds of model training cannot constitute an antitrust violation," but the *Gibson* order does not discuss model training, and it repeatedly and specifically distinguishes the *RealPage* case, *see id.* at *4 & n.7, *6.

just so long as is necessary to hold a hearing, and no longer.'") (citation omitted); *Jones v. H.S.B.C. (USA)*, 844 F. Supp. 2d 1099, 1100 (S.D. Cal. 2012) ("The underlying purpose of a TRO is to preserve the status quo and prevent irreparable harm before a preliminary injunction hearing may be held.").

Even absent the City's nonenforcement agreement, RealPage's failure to make out a colorable First Amendment claim would defeat its claim of irreparable harm. For the reasons discussed above and in the City's opposition brief, RealPage has not shown any speech prohibited by the Ordinance falls within the scope of First Amendment protections. Alternatively, if RealPage's software involves no direct or indirect coordination with competitors, the Ordinance does not apply to it. And, in disclaiming any intent to engage in the proscribed conduct, it cannot challenge the Ordinance.

### D.    Balance of the Equities and Public Interest

Finally, the balance of the equities and the public interest, which merge in this case, weigh in favor of denying a TRO. *See Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014). On the record before the Court, RealPage has not shown that the Ordinance proscribes lawful, protected speech. *See Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 867 (9th Cir. 2017) ("[H]arm caused by illegal conduct does not merit significant equitable protection."). Moreover, if RealPage has redesigned its software to no longer facilitate unlawful coordination, then its software is outside the scope of the Ordinance, and the Ordinance will serve to protect it from competitors who do seek to violate antitrust laws. *See Su v. L & Y Food, Inc.*, 728 F. Supp. 3d 1050, 1052 (C.D. Cal. 2024) (noting the public interest of protecting "law-abiding competitors" from unfair competition).

### CONCLUSION

For the foregoing reasons, the City respectfully requests that the Court deny RealPage's motion for a TRO. The City also respectfully requests that the Court set a deadline by which RealPage must file any motion for preliminary injunction, after which the parties shall meet and confer regarding a proposed schedule for any necessary expedited discovery and a proposed schedule for briefing the motion.

Dated: April 22, 2025                                    KEKER, VAN NEST & PETERS LLP

                                                  By:  /s/ *Sharif E. Jacob*
                                                       ELLIOT R. PETERS
                                                       SHARIF E. JACOB
                                                       IAN KANIG
                                                       CARA R. MEYER
                                                       KAYLA CROWELL

                                                       Attorneys for Defendants THE CITY OF
                                                       BERKELEY, CALIFORNIA, and PAUL
                                                       BUDDENHAGEN

Dated: April 22, 2025                                    BERKELEY CITY ATTORNEY'S
                                                         OFFICE

                                                  By:  /s/ *Farimah F. Brown*
                                                       FARIMAH F. BROWN
                                                       City Attorney
                                                       KATRINA L. EILAND
                                                       Deputy City Attorney
                                                       STEPHEN A. HYLAS
                                                       Deputy City Attorney

                                                       Attorneys for Defendants THE CITY OF
                                                       BERKELEY, CALIFORNIA, and PAUL
                                                       BUDDENHAGEN